

FILED

10/24/2025 AXM

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

_____

)
**Sean Gottlieb**, Pro Se,                )
**91-1767 Paeko Street**              )
**Ewa Beach, HI  96706**          )
seangottlieb@yahoo.com         )
       **Plaintiff Pro Se,**              )
                              )
                              )       **Civil Action No.   1:25-CV-07752**
     **v.**              )
                              )
                              )
**Adtalem Global Education,**          )
**1003 BISHOP STREET SUITE 1600, PAUAHI**    )
**TOWER HONOLULU, Hawaii 96813**    )
danielle.mckinley@adtalem.com      )
Phone # 312 651 1400           )
        **Defendant**              )
_____)

## Fourth Amended Complaint

### (Title VII, ADEA, Title VI, and Supplemental Hawai'i State Law Claims)

Plaintiff, appearing pro se, respectfully submits this Fourth Amended Complaint pursuant to the Court's October 22, 2025 Order, and states as follows:

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including:
  - Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.;
  - Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.;
  - Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–7;
  - 34 C.F.R. § 100.3(c)(1) (implementing regulations for Title VI); and
  - Program Participation Agreement (PPA) obligations pursuant to 34 C.F.R. § 668.14.

This Court has supplemental jurisdiction over Plaintiff's Hawaiʻi state law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same nucleus of operative fact as the federal claims.

Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District, and the alleged discriminatory conduct was directed and executed from this District.

Defendant Adtalem Global Education Inc. is an employer within the meaning of Title VII, the ADEA, and Hawaiʻi Revised Statutes § 378-2, and is a recipient of federal financial assistance subject to Title VI and Title IV regulations.

## PARTIES

Plaintiff Sean Gottlieb is a 57-year-old African American man, a resident of the United States, and a qualified job applicant for the Enrollment Specialist position with Defendant.

Defendant Adtalem Global Education Inc. is a for-profit higher education corporation and Title IV recipient headquartered in Chicago, Illinois. It operates Walden University and other education subsidiaries. Defendant receives federal funds subject to Title VI and is bound by a Program Participation Agreement (PPA) with the U.S. Department of Education.

## STATEMENT OF FACTS

- Plaintiff successfully completed the initial hiring process for the Enrollment Specialist position with Defendant in early 2025.

- Defendant extended Plaintiff a conditional offer of employment for the Enrollment Specialist role.

- Four days later, Defendant rescinded the offer abruptly, without providing a clear or consistent justification.

- After Plaintiff submitted discrimination complaints to Human Resources, Defendant's Associate General Counsel responded in writing that the company was "not legally required to provide [Plaintiff] with a response to [his] communications or disclose its conclusions."

- Defendant later asserted shifting and inconsistent rationales for its refusal to hire Plaintiff, including alleged lack of "sales, call center, and enrollment" experience and the "Hawaii time zone difference," neither of which was listed in the published job posting. Respondent knew the plaintiff lived in Hawaii **BEFORE** they decided to interview the plaintiff.

- Defendant ultimately hired a white comparator with lesser or equal qualifications for the same position.

- Plaintiff alleges that race was the actual reason Defendant's decision to rescind the job offer, and that Defendant's justifications are all pretextual.

## COUNT I — TITLE VII RACE DISCRIMINATION
## (42 U.S.C. § 2000e et seq.)

- Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

- Defendant is an "employer" as defined by Title VII.

- Plaintiff is a member of a protected class based on race (African American).

- Plaintiff was offered a position, and shortly thereafter, Defendant rescinded the offer.

- Defendant's adverse employment action occurred after learning of Plaintiff's race.

- Defendant hired a white comparator with equal or lesser qualifications.

- Defendant provided shifting and inconsistent reasons for its decision, which supports an inference of pretext.

- Defendant's conduct constitutes intentional discrimination in violation of Title VII of the Civil Rights Act of 1964.

- As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered economic losses, emotional distress, reputational harm, and other damages.

## PRAYER FOR RELIEF ON COUNT I

**WHEREFORE, Plaintiff respectfully requests that this Court:**

a. Enter judgment in favor of Plaintiff and against Defendant;
b. Declare that Defendant's conduct violated Title VII;
c. Award compensatory and punitive damages to Plaintiff;
d. Award back pay, front pay, and other equitable relief;
e. Award costs and reasonable attorney's fees as permitted by law; and
f. Grant any further relief the Court deems just and proper.

## (THE COURT HAS PREVIOUSLY RULED THAT THIS COUNT WILL PROCEED)

## COUNT II – VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA), 29 U.S.C. § 623

**Plaintiff incorporates by reference all prior allegations as if fully set forth herein.**

1. At all times relevant, Plaintiff was 57 years old, and thus a member of the class protected by the ADEA (over 40 years of age).
2. Defendant Adtalem Global Education is an employer within the meaning of the ADEA.
3. In or about May 2025, Plaintiff applied for the position of Enrollment Specialist with Defendant. Plaintiff was offered the position after a competitive application and interview process, during which Plaintiff's age was either disclosed or readily ascertainable from his resume, educational history, and professional experience.
4. Plaintiff's qualifications for the position were exceptional. He holds a Master's in Law, a Graduate Certificate in Public Health, a Bachelor's in Human Services, an Associate's in Counseling, a TEFL certification, and has decades of professional experience in education and communication. Defendant itself had recently awarded Plaintiff a graduate credential, further confirming his qualifications.
5. After extending the offer, Defendant abruptly rescinded it four days later, without any prior indication of concern about Plaintiff's qualifications or suitability for the role.
6. The timing and circumstances of the rescission strongly suggest that Defendant's decision was made after it became aware of Plaintiff's age. Plaintiff's age was either directly disclosed during the interview or was obvious from his resume and application materials, which included graduation dates and a lengthy professional history.
7. Defendant's stated reasons for rescinding the offer—alleged lack of sales, call center, or enrollment experience, and Plaintiff's residence in Hawaii—were pretextual and not supported by the job posting or Defendant's actual hiring practices. The official job posting did not require sales or call center experience, and Plaintiff possessed all required qualifications, including extensive customer service and account management experience.
8. Upon information and belief, Defendant has hired at least twenty Enrollment Specialists, including the individual hired in Plaintiff's stead, who lacked sales or call center experience. The individual ultimately hired for the position was substantially younger than Plaintiff, under the age of 40, and did not possess Plaintiff's advanced degrees or breadth of experience.
9. Defendant's shifting and inconsistent explanations for rescinding the offer—first citing lack of sales/call center experience, then communication and listening skills, and then Plaintiff's Hawaii residency—are evidence of pretext. These explanations were not applied to other, younger candidates, and are contradicted by the qualifications of those actually hired.
10. Plaintiff's age was the only material difference between himself and the individual ultimately hired. The younger comparator was less qualified, had less experience, and did not possess the advanced credentials that Plaintiff held.

11. Defendant's decision to rescind Plaintiff's offer and hire a substantially younger, less qualified individual was not based on any legitimate, non-discriminatory reason, but was instead motivated by Plaintiff's age. **The respondent rescinded the plaintiff's offer of employment because the plaintiff is 57 years old.**

12. Defendant's conduct is part of a pattern or practice of favoring younger candidates for Enrollment Specialist positions, as evidenced by the ages and qualifications of other recent hires.

13. Plaintiff submitted a written complaint of age discrimination to Defendant's human resources department, specifically alleging that the rescission of his offer was due to his age. Defendant failed to meaningfully investigate or respond to this complaint, further evidencing discriminatory intent and deliberate indifference to Plaintiff's rights under the ADEA in retaliation due to the plaintiff being over the age of 40.

14. The adverse employment action—rescission of the job offer—would not have occurred but for Plaintiff's age. **But for Plaintiff's age (being over 40), Defendant would not have rescinded the offer and would have hired Plaintiff for the Enrollment Specialist position.** Plaintiff's age was the determinative and sole cause of the adverse action. But for the plaintiff's age, the respondent would not have created pre-textual reasons to try and justify not hiring the plaintiff due to the plaintiff being 57 years old.

15. Defendant's actions constitute willful and intentional discrimination against Plaintiff on the basis of age, in violation of the ADEA, 29 U.S.C. § 623(a)(1), which prohibits an employer from failing or refusing to hire any individual because of such individual's age.

16. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer loss of employment opportunities, lost wages and benefits, emotional distress, humiliation, and other damages.

## Applicable Legal Framework Under the ADEA

The **Age Discrimination in Employment Act of 1967 (ADEA)**, 29 U.S.C. § 621 et seq., prohibits employers from discriminating against individuals who are **40 years of age or older** in hiring, firing, compensation, or other terms and conditions of employment. 29 U.S.C. § 623(a)(1).

An employer violates the ADEA when age is a **determinative factor** in an adverse employment decision. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

A plaintiff may prove ADEA discrimination through:

- Direct evidence of discriminatory motive, or
- Indirect evidence under the **McDonnell Douglas** burden-shifting framework, by establishing:
  (a) membership in the protected class (40+),
  (b) qualifications for the position,
  (c) an adverse employment action, and

(d) circumstances giving rise to an inference of age discrimination, including comparator evidence or pretext.
*See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996).

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason. If the plaintiff shows this reason is **pretextual**, summary judgment must be denied. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

The ADEA also prohibits **retaliation** for engaging in protected activity, including submitting an age discrimination complaint. 29 U.S.C. § 623(d).

**Key Point:** When an employer offers pretextual, shifting explanations for rescinding an offer and hires a significantly younger, less qualified applicant, that is classic **age discrimination under the ADEA**.

## Defendant's Acts and How They Violate the ADEA

### Plaintiff's Protected Status and Exceptional Qualifications

Defendant's Conduct:

- Plaintiff was 57 years old at the time of application, making him a member of the protected class.
- Plaintiff held advanced academic degrees (Master's in Law, Graduate Certificate in Public Health, Bachelor's in Human Services, Associate's in Counseling, TEFL certification) and decades of professional communication and education experience.
- Defendant itself had previously awarded Plaintiff a graduate credential, confirming his qualifications.

Why This Violates the ADEA:

- Defendant was fully aware of Plaintiff's age, which was either disclosed during the hiring process or readily inferable from graduation dates and resume history.
- Plaintiff was objectively **well-qualified** for the position, satisfying the second prong of the prima facie test.
- Abrupt rescission of the offer after disclosure or awareness of age supports a reasonable inference of discriminatory motive. *See O'Connor*, 517 U.S. at 312; *Reeves*, 530 U.S. at 147. **But for the plaintiff age ( over 40) the hiring would not have been rescinded.**

### Adverse Action and Temporal Proximity Supporting Inference of Discrimination

Defendant's Conduct:

- Defendant extended an offer for the Enrollment Specialist position and rescinded it four days later, with no prior indication of any concerns.

- The rescission occurred **after Defendant became aware of Plaintiff's age**. But for the plaintiffs age ( over 40) the hiring would not have been rescinded.

Why This Violates the ADEA:

- Rescission of a job offer is a recognized adverse employment action. *See EEOC v. Borden's, Inc.*, 724 F.2d 1390 (9th Cir. 1984). But for the plaintiffs age ( over 40) the hiring would not have been rescinded.
- Temporal proximity between the employer's awareness of Plaintiff's age and the rescission strengthens the causal inference. *See Schell v. Kaiser Found. Health Plan*, 783 F.2d 947, 951 (9th Cir. 1986). But for the plaintiffs age ( over 40) the hiring would not have been rescinded.

**Pretext: Shifting and Inconsistent Explanations**

Defendant's Conduct:

- Defendant first cited "lack of sales or call center experience," then "communication and listening skills," then Plaintiff's "Hawai'i residency."
- The **job posting did not require sales or call center experience**, and younger hires were made without such experience.
- Defendant's reasons shifted over time, contradicting its own hiring practices.
- But for the plaintiffs age ( over 40) the hiring would not have been rescinded.

Why This Violates the ADEA:

- Shifting explanations are classic evidence of **pretext**. *See Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003). The real reason plaintiff was not hired is because Adtalem illegally discriminated due to the plaintiff being over 40.
- A jury may infer age discrimination when an employer's stated reasons are unworthy of credence. *Reeves*, 530 U.S. at 147. The real reason plaintiff was not hired is because Adtalem illegally discriminated due to the plaintiff being over 40.
- Comparator evidence showing younger, less qualified individuals hired in Plaintiff's stead amplifies the inference. *O'Connor*, 517 U.S. at 312. The real reason plaintiff was not hired is because Adtalem illegally discriminated due to the plaintiff being over 40.

Evidence Supporting Violation:

- Email correspondence showing shifting justifications.
- Job posting omitting alleged requirements.
- Comparator spreadsheet of younger hires lacking the same credentials.

**Legal Effect:** A pattern of inconsistent justifications allows a factfinder to infer age was the **ONLY** determinative factor.

**Comparator Evidence: Favoring Younger, Less Qualified Hires**

Defendant's Conduct:

- Defendant hired a substantially younger individual (under 40) lacking Plaintiff's advanced qualifications.
- At least 20 other Enrollment Specialists were hired without sales or call center experience.
- Plaintiff's age was the only material difference between him and the comparator.

Why This Violates the ADEA:

- Replacing an older worker with a substantially younger, less qualified employee gives rise to a strong inference of discrimination. *See O'Connor*, 517 U.S. at 312; *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).
- Comparator evidence is especially persuasive when the employer's proffered reasons are pretextual. *See Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012).

Evidence Supporting Violation:

- Comparator spreadsheet showing ages and qualifications of hires.
- Documentation of Plaintiff's credentials.
- Defendant's shifting justifications for rescission.

**Retaliation and Failure to Investigate Complaint**

Defendant's Conduct:

- Plaintiff submitted a written age discrimination complaint to Defendant's HR.
- Defendant failed to meaningfully investigate or respond.
- Defendant cut off communication after the complaint.

Why This Violates the ADEA:

- Retaliation against an employee or applicant for asserting rights under the ADEA is itself unlawful. 29 U.S.C. § 623(d).
- Failure to investigate discrimination complaints can support an inference of discriminatory and retaliatory intent. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000).

Evidence Supporting Violation:

- Plaintiff's written complaint and email chain.
- Absence of investigatory response.
- Temporal proximity between complaint and communication cut-off.

**Legal Effect:** Retaliation and deliberate indifference to complaints reinforce the inference of age-based discrimination.

## Causation and Remedies Under the ADEA

- Plaintiff relied on Defendant's offer of employment and representations in accepting the position.

- The rescission occurred **because of Plaintiff's age** and resulted in loss of employment opportunity.

- But for Plaintiff's age (being 57), Defendant would not have rescinded the offer. Defendant's actions caused **economic harm**, lost wages, lost benefits, and **emotional distress**.

Pursuant to 29 U.S.C. § 626(b), Plaintiff seeks:

- Back pay, front pay, and compensatory damages,
- **Liquidated damages** for willful violations,
- Attorneys' fees and costs, and
- Injunctive and equitable relief to prevent future violations.

## Supporting Case Law

- *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) — "But for" causation required under ADEA.
- *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996) — Comparator evidence of younger hires supports inference of discrimination.
- *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) — Pretext alone may support finding of discrimination.
- *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) — Age cannot be a motivating factor in adverse employment actions.
- *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672 (7th Cir. 2003) — Shifting reasons establish pretext.
- *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493 (9th Cir. 2000) — Retaliation under anti-discrimination laws.
- *Borden's, Inc.*, 724 F.2d 1390 (9th Cir. 1984) — Rescission of job offer is adverse employment action.

## PRAYER FOR RELIEF ON THIS COUNT

**WHEREFORE, Plaintiff respectfully requests that the Court:**

- Enter judgment in Plaintiff's favor and against Defendant on this Count;

- Award Plaintiff all damages available under the ADEA, including but not limited to back pay ( $25,000), front pay ( $100,000), lost benefits ( $50,000), and liquidated damages for willful violation( $100,000) ;
- Award Plaintiff compensatory damages ( $25,000) for emotional distress, if available;
- Award Plaintiff reasonable attorneys' fees and costs;
- Grant such other and further relief as the Court deems just and proper.

## COUNT III: VIOLATION OF HAWAII REVISED STATUTES § 378-2 (RACE, AGE, HAWAII RESIDENCE, FAILURE TO INVESTIGATE, PRETEXT, RETALIATION)

Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

**Jurisdiction**

1. This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367(a) (supplemental jurisdiction), as this claim arises from the same nucleus of operative facts as Plaintiff's federal claims under Title VII and the ADEA. Venue is proper in this District because Defendant conducts business in this District and the events giving rise to these claims occurred in part within this District. Respondent is also registered to do business as a Hawaii company making it subject to Hawaii employment laws.

**Factual Allegations**

2. At all times relevant, Plaintiff was a resident of the State of Hawaii, over the age of 40, and a member of multiple protected classes under HRS § 378-2, including race (African American), age, and residence.

3. Defendant Adtalem Global Education is an employer within the meaning of HRS § 378-2, conducting business affecting Hawaii residents and advertising remote positions as available to applicants in all U.S. states, including Hawaii.

4. Plaintiff applied for and was offered the position of Enrollment Specialist after a competitive process, during which his age, race, and Hawaii residency were either disclosed or readily ascertainable from his application materials.

5. Four days after extending the offer, Defendant abruptly rescinded it. The timing and circumstances of the rescission, as well as Defendant's subsequent conduct, demonstrate that Plaintiff was not hired because of his race and because of his age.

6. Defendant's stated reasons for rescinding the offer were pretextual and included Plaintiff's residence in Hawaii and the time zone difference ("you represented that you resided in Hawaii, and the time difference would pose challenges…"), and later, alleged lack of sales/call center experience and communication skills. These reasons were not applied to other, younger, non-Black candidates.

7. The job posting was for a remote position and did not require sales or call center experience, nor did it reference any geographic or time zone restrictions. Plaintiff

possessed all required and preferred qualifications, including advanced degrees and decades of relevant experience.

8. Upon information and belief, Defendant hired a substantially younger, less qualified individual outside Plaintiff's protected classes for the same position, and has a pattern or practice of favoring younger, non-Hawaii-based, and non-Black candidates for Enrollment Specialist roles.

9. Plaintiff was not hired because of his race. Defendant's decision to rescind Plaintiff's offer and hire a less qualified, non-Black individual was motivated by Plaintiff's race, in violation of HRS § 378-2(a)(1).

10. Plaintiff was not hired because of his age. Defendant's decision to rescind Plaintiff's offer and hire a substantially younger individual was motivated by Plaintiff's age, in violation of HRS § 378-2(a)(1).

11. Defendant's reliance on Plaintiff's Hawaii residency as a disqualifier constitutes direct discrimination based on place of residence, ancestry, or national origin, expressly prohibited by HRS § 378-2(a)(1). Defendant knew that the plaintiff lived in Hawaii before the interview and decided to move forward with the hiring process anyway; only using Hawaii as a pretext after deciding not to hire the plaintiff due to his age and race

12. Defendant's shifting and inconsistent explanations for rescinding the offer, combined with the hiring of a substantially younger, less qualified, non-Black individual, support a strong inference of pretext and discriminatory motive under Hawaii law (Shoppe v. Gucci America, Inc., 94 Haw. 368, 377–80).

13. Plaintiff submitted a formal complaint of discrimination to Defendant, specifically alleging that the rescission of his offer was due to his age, race, and Hawaii residency. Defendant, through its Associate General Counsel, expressly responded in writing: "At no time was the company legally required to provide you with a response to your communications or disclose its conclusions."

14. This statement demonstrates a categorical policy of non-response in direct violation of HRS § 378-2, which obligates employers to process, investigate, and resolve discrimination complaints (see Lales v. Wholesale Motors Co., 133 Haw. at 347;)

15. Hawaii Supreme Court precedent holds that employer "failure to investigate a discrimination complaint, or to communicate the outcome to the complainant, is an actionable violation even in the absence of underlying discrimination." (Shoppe at 384;).

16. Defendant's refusal to acknowledge, investigate, or resolve the complaint constitutes deliberate indifference, subjecting Defendant to compensatory and punitive damages.

17. After Plaintiff's protected activity (filing a discrimination complaint), Defendant failed to engage with Plaintiff, refused to provide any answer or procedural result, and only later fabricated investigatory efforts after legal action was threatened. This constitutes unlawful retaliation under HRS § 378-2(a)(2), independently actionable under Hawaii law (see Lales, Shoppe).

18. Defendant's articulated reasons for not hiring Plaintiff after initial screening ("you lacked sales, call center, or enrollment experience; Hawaii time zone") are not borne out by the job posting or the qualifications of those actually hired. Plaintiff was more qualified than comparators who were hired.

19. Under Hawaii law, inconsistent explanations and post hoc rationalizations for hiring decisions constitute strong evidence of pretext (Shoppe at 379–80). The record further shows that all comparators outside Plaintiff's class progressed further in the process, while Plaintiff was excluded based on a non-stated, forbidden criterion.

20. Defendant's legal counsel expressly admitted, in a business communication, a categorical policy to not respond to or communicate the outcome of a discrimination complaint to Plaintiff. Under the binding authority of Shoppe, Lales, and such written admissions are dispositive and are self-proving of an HRS § 378-2 violation, thus entitling Plaintiff to summary judgment.

21. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer loss of employment opportunities, lost wages and benefits, emotional distress, humiliation, and other damages.

## Applicable Legal Framework Under HRS § 378-2

**HRS § 378-2(a)(1)** makes it unlawful for an employer to "refuse to hire or employ" or to "otherwise discriminate against any individual" because of that individual's **race**, **age**, **ancestry**, **national origin**, or **other protected status**.

**HRS § 378-2(a)(2)** further prohibits employers from **retaliating** against individuals who oppose discriminatory practices or file complaints alleging discrimination.

Hawaiʻi law is interpreted **liberally and remedially**, with the Hawaiʻi Supreme Court holding that employer liability may arise both from **discriminatory intent** and from **failure to act appropriately** after a discrimination complaint.
  - *Shoppe v. Gucci America, Inc.*, 94 Haw. 368, 377–80 (2000)
  - *Lales v. Wholesale Motors Co.*, 133 Haw. 332 (2014)

An employer's **failure to investigate or respond** to a discrimination complaint is independently actionable under HRS § 378-2, even in the absence of proven underlying discrimination. *Shoppe*, 94 Haw. at 384.

Evidence of **inconsistent or shifting explanations** for adverse actions constitutes strong circumstantial evidence of pretext. *Shoppe*, 94 Haw. at 379–80.

**Key Point:** Hawaiʻi law provides **broad protection** to applicants who suffer discrimination or retaliation on the basis of race, age, ancestry/residence, and protects their right to a **fair complaint process**.

## Defendant's Acts and How They Violate HRS § 378-2

**Discrimination Based on Race, Age, and Ancestry/Residence**

Defendant's Conduct:

- Plaintiff, a 57-year-old African American Hawai'i resident, applied for the Enrollment Specialist position and was offered the job after a competitive process.
- Four days later, Defendant rescinded the offer.
- Defendant's stated reasons included Plaintiff's Hawai'i residency and alleged lack of sales/call center experience — reasons not applied to younger, non-Black comparators.

Why This Violates HRS § 378-2:

- Discrimination based on race, age, or ancestry/residence is expressly prohibited by statute.
- Defendant's use of **Hawai'i residency as a pretext** to deny employment constitutes **direct discrimination** under HRS § 378-2(a)(1).
- The rescission shortly after Defendant learned or confirmed Plaintiff's race, age, and location supports an inference of discriminatory motive.

Evidence Supporting Violation:

- Job posting with no geographic/time zone restrictions.
- Rescission email citing Hawai'i time zone.
- Comparator spreadsheet showing younger, non-Black hires.

## Shifting and Inconsistent Explanations as Evidence of Pretext

Defendant's Conduct:

- Defendant provided **multiple inconsistent reasons**:
  - First citing Hawai'i time zone,
  - Then lack of sales or call center experience,
  - Then communication skills.
- These explanations contradict the job posting and hiring patterns.

Why This Violates HRS § 378-2:

- The Hawai'i Supreme Court recognizes **shifting justifications** as strong evidence of pretext and discriminatory intent. *Shoppe*, 94 Haw. at 379–80.
- The **only material difference** between Plaintiff and the hired comparator was race, age, and place of residence.

<u>Evidence Supporting Violation:</u>

- Communications log and emails showing evolving justifications.
- Job posting contradicting the stated criteria.
- Comparator chart showing younger, non-Black, non-Hawaiʻi hires.

*Legal Effect:* Pretext evidence supports an inference that discrimination, not legitimate business concerns, motivated the adverse decision.

## **Failure to Investigate or Respond to Discrimination Complaint**

<u>Defendant's Conduct:</u>

- Plaintiff filed a **formal discrimination complaint** alleging race, age, and residency discrimination.
- Defendant's Associate General Counsel responded in writing that the company was "not legally required" to provide any response or conclusion.
- No investigation was conducted; no outcome communicated.

<u>Why This Violates HRS § 378-2:</u>

- Under *Shoppe* and *Lales*, employers have a duty to **take reasonable corrective action** and respond to discrimination complaints.
- Failure to investigate is **independently actionable**. *Shoppe*, 94 Haw. at 384.
- Defendant's **written admission** of a policy of non-response is direct evidence of violation.

<u>Evidence Supporting Violation:</u>

- Plaintiff's written complaint and Defendant's written refusal.
- Lack of investigatory records or communications.
- OCR complaint confirming lack of response.

*Legal Effect:* Defendant's refusal to investigate or communicate outcome violates HRS § 378-2 even if no other discrimination were proven.

## **Retaliation After Protected Activity**

<u>Defendant's Conduct:</u>

- After Plaintiff filed his discrimination complaint, Defendant ceased communications entirely and only **fabricated investigatory efforts** after legal action was threatened.

<u>Why This Violates HRS § 378-2:</u>

- Retaliation for engaging in protected activity is **independently prohibited** by HRS § 378-2(a)(2).
- Retaliatory silence and fabricated post hoc responses create a **chilling effect** on complainants. *Lales*, 133 Haw. at 347.

<u>Evidence Supporting Violation:</u>

- Timeline showing communication cutoff after complaint.
- Delayed and artificial response.
- OCR timeline corroborating lack of engagement.

*Legal Effect:* Retaliation strengthens the discrimination claim and creates an independent basis for liability.

**<u>Comparator Evidence</u>**

<u>Defendant's Conduct:</u>

- Defendant hired a **substantially younger**, **non-Black**, **non-Hawaiʻi resident** comparator with fewer qualifications.
- Defendant applied different criteria to Plaintiff than to other applicants.

<u>Why This Violates HRS § 378-2:</u>

- Comparator evidence is **probative of pretext** and **discriminatory motive** under Hawaiʻi law. *Shoppe*, 94 Haw. at 379.
- Differential treatment of similarly situated individuals outside the plaintiff's protected classes is **classic evidence of unlawful discrimination**.

<u>Evidence Supporting Violation:</u>

- Comparator spreadsheet.
- Job posting requirements.
- Documentation of Plaintiff's credentials.

## **Causation and Remedies Under HRS § 378-2**

- Plaintiff was qualified for the position and would have been hired **but for Defendant's discrimination** based on race, age, and Hawaiʻi residency.

- Defendant's **failure to investigate** and **retaliatory conduct** aggravated the harm and violated independent legal duties.

- Plaintiff has suffered lost employment opportunities, back pay, front pay, emotional distress, and other compensable damages.

- Under HRS § 378-5 and Hawai'i law, Plaintiff is entitled to **compensatory and punitive damages**, attorneys' fees, costs, and injunctive relief.

## Supporting Case Law

- *Shoppe v. Gucci America, Inc.*, 94 Haw. 368 (2000) — Shifting justifications and failure to investigate support liability under HRS § 378-2.
- *Lales v. Wholesale Motors Co.*, 133 Haw. 332 (2014) — Retaliation under HRS § 378-2 is independently actionable.
- *Furukawa v. Honolulu Zoological Soc'y*, 85 Haw. 7 (1997) — Comparator evidence supports inference of discrimination.
- *Haw. Rev. Stat. § 378-2(a)(1), (a)(2)* — Prohibits discrimination and retaliation based on race, age, ancestry, and other protected statuses.

## PRAYER FOR RELIEF ON THIS COUNT

**WHEREFORE, Plaintiff respectfully requests that the Court:**

- Enter judgment in Plaintiff's favor and against Defendant on this Count;
- Declare that Defendant violated HRS § 378-2 by refusing to hire Plaintiff because of his race, because of his age, and because of his Hawaii residency/ancestry, and by failing to investigate or respond to Plaintiff's discrimination complaint;
- Award Plaintiff all damages available under HRS § 378-2, including but not limited to back pay, front pay, lost benefits, compensatory damages for emotional distress, humiliation, and mental anguish, and punitive damages where permitted; back pay ( $25,000), front pay ( $100,000), lost benefits ( $50,000), and liquidated damages for willful violation( $100,000) ;
- Award Plaintiff injunctive relief prohibiting Defendant from further discriminatory refusal-to-hire practices against Hawaii residents and requiring robust internal complaint investigation protocols;
- Award Plaintiff reasonable attorneys' fees, costs, and post-judgment interest;
- Grant such other and further relief as the Court deems just and proper.

**Support:** See Shoppe v. Gucci America, Inc., 94 Haw. 368 (2000); Lales v. Wholesale Motors Co., 133 Haw. 332 (2014); 73 Haw. 326 (1992); Doe v. Galster, 768 F.3d 611 (7th Cir. 2014); Bank of Ill. v. Allied Signal Safety Restraint Sys., 75 F.3d 1162 (7th Cir. 1996).

## APPLICABLE PLEADING STANDARDS FOR HAWAII STATE LAW CLAIMS UNDER HRS § 378-2

### Hawaii's Remedial and Liberal Pleading Standard

Hawaii courts have long recognized that the state's anti-discrimination laws, including HRS § 378-2, are to be construed liberally and remedially to effectuate their broad remedial purposes. The Hawaii Supreme Court has repeatedly held that the requirements for pleading and proving discrimination under HRS § 378-2 are "far more relaxed" and "less stringent" than those imposed by federal law.

- **Shoppe v. Gucci America, Inc., 94 Haw. 368, 377, 14 P.3d 1049, 1058 (Haw. 2000):** "HRS § 378-2 is a remedial statute that must be liberally construed in order to accomplish its purpose of eliminating the 'pernicious effects of discrimination in the workplace.'" The court further held that "the evidentiary burdens and standards of proof in Hawaii discrimination cases are less stringent than those under federal law."
- **Lales v. Wholesale Motors Co., 133 Haw. 332, 346–47, 328 P.3d 341, 355–56 (Haw. 2014):** "Hawaii's anti-discrimination laws are to be interpreted liberally in favor of the employee, and technicalities or rigid pleading requirements should not defeat a claim that gives fair notice of the nature and basis of the claim."

### Hawaii's Standard for Surviving a Motion to Dismiss

Hawaii courts have expressly rejected the imposition of federal "heightened" pleading standards (such as those articulated in Twombly and Iqbal) for state law discrimination claims. Instead, a complaint need only provide fair notice of the claim and the grounds upon which it rests.

- **Shoppe, 94 Haw. at 377–78:** "A plaintiff need not plead a prima facie case of discrimination to survive a motion to dismiss. It is sufficient if the complaint gives the defendant fair notice of the claim and the grounds upon which it rests."
- **Kahale v. City & County of Honolulu, 104 Haw. 341, 349, 90 P.3d 233, 241 (Haw. 2004):** "Hawaii's notice pleading standard requires only a short and plain statement of the claim showing that the pleader is entitled to relief."
- **Kemp v. State of Hawaii Child Support Enforcement Agency, 111 Haw. 367, 372, 141 P.3d 1014, 1019 (Haw. App. 2006):** "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

### Relaxed Standard for Proving Discrimination

Hawaii law does not require direct evidence of discriminatory intent. Circumstantial evidence, such as shifting or inconsistent explanations, disparate treatment, or failure to follow internal procedures, is sufficient to support a claim.

- **Shoppe, 94 Haw. at 378–80:** "Pretext may be shown by evidence that the employer's proffered reason is unworthy of credence, or by evidence that similarly situated individuals outside the plaintiff's protected class were treated more favorably."
- **Lales, 133 Haw. at 347:** "Inconsistent explanations, failure to investigate, or deviation from standard procedures are all sufficient to support an inference of discrimination under Hawaii law."

## Hawaii Standards Should Govern State Law Claims in Federal Court

Federal courts sitting in diversity or exercising supplemental jurisdiction over state law claims must apply the substantive law of the forum state, including its remedial pleading standards.

- **See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); Hanna v. Plumer, 380 U.S. 460 (1965).**
- **See also, e.g., Kemp, 111 Haw. at 372:** "Hawaii's notice pleading standard is controlling for state law claims, even when those claims are heard in federal court."

## Application to This Case

Because Plaintiff's claims under HRS § 378-2 are remedial in nature and subject to Hawaii's liberal pleading standard, this Court should not require Plaintiff to plead a prima facie case or meet the heightened plausibility standard of Twombly/Iqbal. Instead, the Court should uphold the sufficiency of Plaintiff's complaint so long as it provides fair notice of the nature of the discrimination claim and the factual basis for relief, which is all that is required under Hawaii Law.

## CONCLUSION

For the foregoing reasons, the Court should apply Hawaii's remedial and liberal pleading standards to Plaintiff's HRS § 378-2 claims. Under these standards, Plaintiff's complaint more than adequately states a claim for relief and should not be dismissed at the pleading stage.

**Authorities:**

- Shoppe v. Gucci America, Inc., 94 Haw. 368, 14 P.3d 1049 (Haw. 2000)
- Lales v. Wholesale Motors Co., 133 Haw. 332, 328 P.3d 341 (Haw. 2014)
- Kahale v. City & County of Honolulu, 104 Haw. 341, 90 P.3d 233 (Haw. 2004)
- Kemp v. State of Hawaii Child Support Enforcement Agency, 111 Haw. 367, 141 P.3d 1014 (Haw. App. 2006)
- Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)
- Hanna v. Plumer, 380 U.S. 460 (1965)

## COUNT IV: VIOLATION OF HAWAII REVISED STATUTES § 480-2 (UNFAIR OR DECEPTIVE ACTS OR PRACTICES AND RETALIATION)

Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

### Hawaii Law Expressly Permits HRS § 480-2 Claims in the Employment Context

1. **HRS § 480-2(a) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."** The Hawaii Supreme Court has repeatedly held that this statute is to be construed broadly and remedially, and that its protections extend to employment relationships and hiring practices.

2. In **Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd., 100 Haw. 149, 164, 58 P.3d 1196, 1211 (2002)**, the Hawaii Supreme Court held that "an employee may bring a claim under HRS § 480-2 for unfair or deceptive acts or practices in the employment context, including claims for retaliation." The Court explained that the statute's reach is not limited to consumer transactions, but extends to "any unfair or deceptive conduct in trade or commerce, including employment."

3. The Hawaii Supreme Court reaffirmed this principle in **Davis v. Four Seasons Hotel Ltd., 122 Haw. 423, 435–36, 228 P.3d 303, 315–16 (2010)**, holding that "HRS § 480-2 is a remedial statute that must be liberally construed to effectuate its broad purpose of eliminating unfair and deceptive practices in all areas of trade and commerce, including employment." The Court specifically recognized that "retaliation against an employee for asserting statutory rights constitutes an unfair or deceptive act or practice under HRS § 480-2."

4. Federal courts applying Hawaii law have likewise recognized the statute's application to employment discrimination and retaliation. See, e.g., **Compton v. Countrywide Fin. Corp., 761 F.3d 1046, 1056 (9th Cir. 2014)** ("A practice is unfair when it offends established public policy and is immoral, unethical, oppressive, or unscrupulous. This includes employment practices."); **Arquette v. State, 128 Haw. 423, 290 P.3d 493 (2012)** (affirming that HRS § 480-2 applies to employment-related claims).

### Hawaii's Relaxed and Remedial Pleading Standard for HRS § 480-2

5. Hawaii courts have made clear that HRS § 480-2 is a remedial statute and that the pleading standard is "liberal and relaxed." A plaintiff need only allege facts that, if true, would give fair notice of the claim and show that the defendant's conduct was unfair or deceptive in the context of trade or commerce.

6. In **Graham v. AIG Hawaii Ins. Co., 104 Haw. 32, 40, 85 P.3d 644, 652 (2004)**, the Hawaii Supreme Court held: "HRS § 480-2 is to be interpreted liberally in favor of the plaintiff, and technicalities or rigid pleading requirements should not defeat a claim that gives fair notice of the nature and basis of the claim."

7. The Hawaii Supreme Court has further explained that "a complaint under HRS § 480-2 need not plead every element of a prima facie case or provide detailed factual allegations. It is sufficient if the complaint alleges conduct that, if proven, would constitute an unfair or deceptive act or practice." See **Davis, 122 Haw. at 435–36**; **Kahale v. City & County of Honolulu, 104 Haw. 341, 349, 90 P.3d 233, 241 (Haw. 2004)**.

## Defendant's Conduct Violated HRS § 480-2

8. Defendant Adtalem Global Education, Inc. is a foreign profit corporation registered and actively conducting business in the State of Hawaii, as reflected in the records of the Hawaii Department of Commerce and Consumer Affairs (DCCA), and is subject to the requirements of HRS § 480-2.

9. Defendant engaged in unfair and deceptive acts and practices by:
   o Advertising and representing itself as an equal opportunity employer in Hawaii, open to hiring qualified Hawaii residents for remote positions;
   o Failing to disclose, and then selectively enforcing, undisclosed geographic or time zone restrictions as a pretext to deny employment to Plaintiff, a Hawaii resident;
   o Providing shifting, inconsistent, and pretextual justifications for rescinding Plaintiff's job offer, including false claims about required qualifications and the impact of Plaintiff's Hawaii residency;
   o Failing to process, investigate, or respond to Plaintiff's formal discrimination complaint, in violation of both its own stated policies and federal/state law.

10. Defendant's conduct was likely to mislead, and did mislead, reasonable Hawaii consumers and job applicants—including Plaintiff—into believing that employment opportunities were available on a fair and non-discriminatory basis, when in fact Defendant had undisclosed, disqualifying criteria and engaged in discriminatory and retaliatory practices.

11. Defendant's actions constitute unfair methods of competition and unfair or deceptive acts or practices in violation of HRS § 480-2(a), as interpreted by the Hawaii Supreme Court and Ninth Circuit. See **Compton, 761 F.3d at 1056**; **Graham, 104 Haw. at 40**.

12. Defendant further violated HRS § 480-2 by retaliating against Plaintiff for engaging in protected activity, including:

- Refusing to communicate, process, or resolve Plaintiff's discrimination complaint after Plaintiff asserted his rights under Hawaii and federal law;
- Stonewalling and subsequently fabricating investigatory efforts only after Plaintiff threatened legal action;
- Creating a chilling effect on Plaintiff's and other Hawaii residents' willingness to assert their legal rights, in violation of public policy and the remedial purposes of HRS § 480-2.

13. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, and retaliatory conduct, Plaintiff has suffered economic loss, emotional distress, and other damages, and is entitled to all remedies available under HRS § 480-13, including treble damages, attorneys' fees, and injunctive relief.

## Applicable Legal Framework Under HRS § 480-2

**1. Statutory Text and Purpose**

- **HRS § 480-2(a)**: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."
- **"Trade or commerce"** is defined broadly to include any advertising, offering, or providing of goods or services — which includes **employment recruitment and hiring** when the employer advertises in the public marketplace. (*Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd.*, 100 Haw. 149, 164 (2002); *Davis v. Four Seasons Hotel Ltd.*, 122 Haw. 423 (2010)).
- A practice is **deceptive** when it has "a tendency or capacity to mislead consumers acting reasonably under the circumstances." (*Courbat v. Dahana Ranch*, 111 Haw. 254, 262 (2006)).
- A practice is **unfair** when it "offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." (*Compton v. Countrywide Fin. Corp.*, 761 F.3d 1046, 1056 (9th Cir. 2014); *Graham v. AIG Hawaii Ins. Co.*, 104 Haw. 32, 40 (2004)).
- The plaintiff **does not have to prove reliance** if the conduct is inherently misleading or unfair (*Courbat*, 111 Haw. at 262), but showing that the **deception caused harm** strengthens the claim.

**Key Point:** When an employer advertises remote jobs to Hawaiʻi residents but secretly applies geographic disqualifiers or retaliates for discrimination complaints, that is **deceptive and unfair trade practice** under Hawaiʻi law.

## Defendant's Acts and How They Violate HRS § 480-2

**Advertising and representing itself as an equal opportunity employer in Hawaiʻi while concealing disqualifying geographic criteria**

**Defendant's Conduct:**

- Adtalem posted job advertisements for "Enrollment Specialist" positions that stated the role was **remote** and open nationwide, including to Hawaiʻi residents.
- Defendant also represented itself publicly as an **"equal opportunity employer."**

<u>**Why This Violates HRS § 480-2:**</u>

1. **Deceptive Representation** — Hawai'i courts define deception as "a representation, omission, or practice that is likely to mislead reasonable consumers." (*Courbat*, 111 Haw. at 262).
   - By advertising nationwide while **never disclosing time-zone restrictions** that would later be used as a pretext, Defendant **misled Hawai'i job seekers** about their eligibility.
   - Reasonable job applicants in Hawai'i (like Plaintiff) had no way to know they were categorically disfavored.
2. **Unfair Conduct** — Hawai'i law considers it "unfair" when a company **invites participation in the market on false pretenses** and **then imposes hidden disqualifications**. (*Gonsalves*, 100 Haw. at 164).
3. **Evidence Supporting the Violation:**
   - Job posting for "remote" Enrollment Specialist position (Exhibit).
   - Defendant's later explanation citing "Hawai'i time zone" as a disqualifier.
   - Employer's own Equal Opportunity Employer (EOE) statement used as marketing language.

*Legal Effect:* Misleading advertising and nondisclosure of material employment criteria is a **deceptive practice under HRS § 480-2** because it materially misrepresents the availability of employment opportunities to Hawai'i consumers.

**Selectively enforcing undisclosed time zone/geographic restrictions against Plaintiff, a Hawai'i resident**

<u>**Defendant's Conduct:**</u>

- Defendant used Hawai'i time zone difference as a basis to rescind Plaintiff's offer.
- No such restriction was listed in the job posting.
- Non-Hawai'i comparators were not subjected to this restriction.

<u>**Why This Violates HRS § 480-2:**</u>

1. **Material Omission:** Failing to disclose disqualifying restrictions that **a reasonable applicant would consider important in deciding whether to apply** is a classic deceptive act. (*Courbat*, 111 Haw. at 262; *Compton*, 761 F.3d at 1056).
2. **Unfair Discrimination in a Commercial Context:** Applying hidden restrictions selectively against Hawai'i residents offends **public policy** favoring equal opportunity and fair dealing. (*Davis v. Four Seasons*, 122 Haw. at 435–36).
3. **Evidence Supporting Violation:**

- o Plaintiff's job offer rescission email citing Hawaiʻi time zone.
- o Job posting lacking any such requirement.
- o Comparator spreadsheet showing others hired from other U.S. time zones without issue.

*Legal Effect:* This constitutes both **deceptive omission** (failure to disclose) and **unfair practice** (selective enforcement to the detriment of Hawaiʻi residents).

## Providing shifting, inconsistent, and pretextual justifications for rescinding Plaintiff's offer

### Defendant's Conduct:

- Defendant provided multiple inconsistent reasons:
  - o "Lack of sales or call center experience,"
  - o "Time zone difference,"
  - o "Communication skills," and
  - o vague "business reasons."
- ALL of these reasons were factually false, **Fabricated**, and contradicted by job postings and comparator records.

### Why This Violates HRS § 480-2:

1. **Pattern of Misrepresentation:** Providing inconsistent and false explanations for adverse action is **inherently deceptive** because it misleads the applicant about the true basis of the decision. (*Graham*, 104 Haw. at 40).
2. **Unfairness:** Shifting explanations are recognized by courts as evidence of bad faith. Using **post hoc rationalizations** violates public policy against discrimination and retaliation. (*Compton*, 761 F.3d at 1056).
3. **Evidence Supporting Violation:**
   - o Email chain and communications log showing different explanations at different times.
   - o Job posting contradicting "sales/call center" justification.
   - o Comparator spreadsheet showing similarly situated individuals hired.

*Legal Effect:* Misleading statements made in the course of hiring constitute "unfair or deceptive acts" under HRS § 480-2 when they have a tendency to mislead and cause injury.

**Failure to process, investigate, or respond to Plaintiff's discrimination complaint**

**Defendant's Conduct:**

- Defendant's Associate General Counsel stated in writing that the company was "not legally required" to respond to Plaintiff's discrimination complaint.
- No investigation, written determination, or remedial action was ever provided.

**Why This Violates HRS § 480-2:**

1. **Unfairness:** Refusing to process complaints is "oppressive, unscrupulous, and substantially injurious" conduct, especially where Defendant publicly holds itself out as an equal opportunity employer. (*Davis*, 122 Haw. at 435; *Gonsalves*, 100 Haw. at 164).
2. **Deceptive Omission:** Defendant's **public EEO statements and job ads** imply fair complaint handling, creating an expectation of procedural fairness. Their failure to provide any process **misled Plaintiff and similarly situated applicants.**
3. **Evidence Supporting Violation:**
   o Defendant's written admission (email).
   o Lack of investigation records or complaint response.
   o EEO and anti-discrimination policy statements used in recruiting.

*Legal Effect:* This conduct constitutes an **unfair act** because it violates public policy favoring fair employment practices and **deceptive** because it contradicts Defendant's own public representations.

**Retaliation Against Plaintiff for Engaging in Protected Activity**

**Defendant's Conduct:**

- Defendant stopped communicating after Plaintiff filed a discrimination complaint.
- Fabricated post hoc investigatory narrative only after threat of legal action.
- Created chilling effect on Plaintiff and other potential complainants.

**Why This Violates HRS § 480-2:**

1. **Retaliation = Unfair Practice:** The Hawai'i Supreme Court has held that **retaliation for asserting legal rights constitutes an unfair or deceptive practice**. (*Gonsalves*, 100 Haw. at 164; *Davis*, 122 Haw. at 435).
2. **Public Policy Violation:** Retaliation against discrimination complaints undermines Hawai'i's strong public policy protecting employees and applicants from reprisal.
3. **Evidence Supporting Violation:**
   o Timeline showing communication cut-off post-complaint.

- o Fabricated investigatory response after legal threat.
- o OCR complaint timeline.

*Legal Effect:* Retaliation fits squarely within the scope of § 480-2 because it is unethical, oppressive, and injurious to consumers/job seekers, and is recognized by *Gonsalves* and *Davis* as actionable unfair trade practice.

## Causation and Remedies Under HRS § 480-13

- Plaintiff relied on Defendant's **advertising and representations** in applying.
- The **deceptive acts** caused economic loss (lost wages) and emotional harm.
- **HRS § 480-13** authorizes:
  - o Actual damages,
  - o **Treble damages**,
  - o Attorneys' fees and costs,
  - o Injunctive relief.

Because each of the deceptive/unfair acts occurred in the course of Defendant's **trade and commerce with Hawaiʻi consumers** (job seekers), and because they **caused injury**, the statutory remedies are fully available.

## Supporting Case Law

- *Gonsalves v. Nissan Motor Corp.*, 100 Haw. 149, 58 P.3d 1196 (2002) — HRS § 480-2 applies to employment; retaliation is actionable.
- *Davis v. Four Seasons Hotel Ltd.*, 122 Haw. 423, 228 P.3d 303 (2010) — employment retaliation is "unfair" under § 480-2.
- *Graham v. AIG Hawaii Ins. Co.*, 104 Haw. 32, 85 P.3d 644 (2004) — liberal pleading standard; unfair conduct actionable.
- *Courbat v. Dahana Ranch*, 111 Haw. 254, 141 P.3d 427 (2006) — nondisclosure of material facts is deceptive.
- *Compton v. Countrywide Fin. Corp.*, 761 F.3d 1046 (9th Cir. 2014) — unfairness includes conduct violating public policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

a. Enter judgment in Plaintiff's favor and against Defendant on this Count;
b. Declare that Defendant's conduct constitutes unfair or deceptive acts or practices and retaliation in violation of HRS § 480-2;

c. Award Plaintiff all damages available under HRS § 480-13, including treble damages ($200,000, attorneys' fees, and costs; )

d. Award Plaintiff injunctive relief prohibiting Defendant from further unfair, deceptive, or retaliatory practices in Hawaii;

e. Grant such other and further relief as the Court deems just and proper.

**Authorities:**

- Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd., 100 Haw. 149, 58 P.3d 1196 (2002)
- Davis v. Four Seasons Hotel Ltd., 122 Haw. 423, 228 P.3d 303 (2010)
- Graham v. AIG Hawaii Ins. Co., 104 Haw. 32, 85 P.3d 644 (2004)
- Compton v. Countrywide Fin. Corp., 761 F.3d 1046 (9th Cir. 2014)
- Arquette v. State, 128 Haw. 423, 290 P.3d 493 (2012)
- Kahale v. City & County of Honolulu, 104 Haw. 341, 90 P.3d 233 (Haw. 2004)

## Legal Framework: Liberal and Remedial Nature of HRS § 378-2

Hawaiʻi's employment discrimination statute, **HRS § 378-2**, is a **remedial law** designed to eliminate the "pernicious effects of discrimination in the workplace." Courts are instructed to **liberally construe** the statute in favor of claimants.

— *Shoppe v. Gucci America, Inc.*, 94 Haw. 368, 377, 14 P.3d 1049, 1058 (Haw. 2000).

The Hawaiʻi Supreme Court has consistently recognized that **pleading and evidentiary standards for HRS § 378-2 claims are less stringent than those imposed under federal law**, and should not be used to dismiss otherwise viable claims based on technicalities.

— *Lales v. Wholesale Motors Co.*, 133 Haw. 332, 346–47, 328 P.3d 341, 355–56 (Haw. 2014).

— *Sakala v. Aloha Airlines*, 73 Haw. 326, 333, 832 P.2d 1126, 1130 (Haw. 1992).

This **remedial construction applies at the pleading stage**: courts must interpret HRS § 378-2 complaints liberally, allowing claims to proceed unless it is clear no set of facts could support relief.

— *Kemp v. State of Hawaii CSEA*, 111 Haw. 367, 372, 141 P.3d 1014, 1019 (Haw. App. 2006).

**Key Point:** Hawaiʻi law deliberately adopts a **plaintiff-protective pleading standard** to ensure discrimination claims are not prematurely dismissed based on federal technical pleading rules.

## Hawaiʻi's Standard for Surviving a Motion to Dismiss

**No Prima Facie Requirement at Pleading Stage**

- A plaintiff **need not plead a McDonnell Douglas prima facie case** to survive dismissal under HRS § 378-2.
- It is sufficient that the complaint gives **fair notice of the nature of the claim and its factual basis**.
    - — *Shoppe*, 94 Haw. at 377–78.

**Notice Pleading Standard**

- Under Hawaiʻi law, a complaint is sufficient if it includes a **short and plain statement** of the claim showing entitlement to relief.
    - — *Kahale v. City & County of Honolulu*, 104 Haw. 341, 349, 90 P.3d 233, 241 (Haw. 2004).
- A claim should not be dismissed unless "beyond doubt" the plaintiff can prove no set of facts in support of the claim.
    - — *Kemp*, 111 Haw. at 372.

**No Twombly/Iqbal Heightened Plausibility**

- Hawaiʻi courts **reject application of Twombly/Iqbal** to state law claims.
- Rigid plausibility requirements are incompatible with the **liberal remedial purpose** of HRS § 378-2.

*Legal Effect:* Plaintiffs asserting discrimination under HRS § 378-2 face **a far lower burden** at the pleading stage than under federal standards.

## Relaxed Evidentiary Standard for Proving Discrimination

Hawaiʻi law allows plaintiffs to prove discrimination through **circumstantial evidence**, including but not limited to:
  - Shifting or inconsistent explanations for adverse actions,
  - Disparate treatment of similarly situated employees, and
  - Failure to follow established procedures or to investigate complaints.

Direct evidence is **not required**.
  — *Shoppe*, 94 Haw. at 378–80 (pretext may be shown through circumstantial evidence).
  — *Lales*, 133 Haw. at 347 (inconsistent explanations sufficient).

This evidentiary flexibility reflects **Hawaiʻi's strong public policy** against discrimination and retaliation, ensuring claims are not foreclosed before discovery.

*Legal Effect:* Even minimal factual allegations—e.g., pretext or disparate treatment—are sufficient to **defeat a motion to dismiss** under Hawaiʻi law.

## State Law Standards Control in Federal Court

When a federal court hears **state law claims** through supplemental or diversity jurisdiction, **state substantive law** applies.
    — *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).
    — *Hanna v. Plumer*, 380 U.S. 460 (1965).

This includes the **liberal pleading and evidentiary standards** that apply to HRS § 378-2 claims.
    — *Kemp*, 111 Haw. at 372 (state notice pleading standard applies to state claims, even in federal court).

Accordingly, this Court **must evaluate the sufficiency of Plaintiff's HRS § 378-2 claims under Hawaiʻi law**, not federal Twombly/Iqbal plausibility standards.

*Legal Effect:* The plaintiff benefits from Hawaiʻi's **liberal pleading regime**, which allows claims to proceed where they provide fair notice and a factual basis for relief.

### URGENT PLEA: THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER THE HAWAIʻI STATE LAW CLAIMS

## Federal and State Claims Arise From a Common Nucleus of Operative Fact

Under 28 U.S.C. § 1367(a), federal courts have supplemental jurisdiction over all claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III."

Plaintiff's Hawaiʻi law claims under **HRS § 378-2** (employment discrimination) and **HRS § 480-2** (unfair and deceptive practices) are based on **the exact same operative facts** as the federal claims under **Title VII, the ADEA, and Title VI**:

- Plaintiff applied for an Enrollment Specialist position;
- Defendant extended and then rescinded the offer after learning Plaintiff's protected characteristics (race, age, Hawaiʻi residence);
- Defendant then hired a less qualified comparator outside of Plaintiff's protected class;

- Defendant issued inconsistent and pretextual justifications and refused to process Plaintiff's discrimination complaint.

Because the **same discriminatory act** gives rise to both federal and Hawaiʻi state claims, this case falls squarely within § 1367(a). See *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966) (state and federal claims are part of the same case or controversy when they "derive from a common nucleus of operative fact").

## None of the § 1367(c) Exceptions Justify Declining Jurisdiction

A district court may decline supplemental jurisdiction only in limited circumstances under § 1367(c), such as when the state claims:

1. raise novel or complex issues of state law,
2. substantially predominate over the federal claims,
3. all federal claims are dismissed, or
4. other compelling reasons exist.

None of those apply here:

- **No novel or complex issues** — HRS § 378-2 and § 480-2 have well-developed case law (e.g., *Shoppe v. Gucci America, Inc.*, 94 Haw. 368 (2000); *Lales v. Wholesale Motors Co.*, 133 Haw. 332 (2014); *Gonsalves v. Nissan Motor Corp.*, 100 Haw. 149 (2002)). Federal courts routinely exercise supplemental jurisdiction over these claims.
- **Federal claims predominate** — The primary claims are federal (Title VII, ADEA, Title VI). The state claims are parallel and do not introduce unrelated legal theories or facts.
- **Federal claims are proceeding** — The Court has already ruled that the Title VII claim survives Rule 12(b)(6). This is not a case where all federal claims have been dismissed.
- **No compelling reasons to decline** — Judicial economy, convenience, and fairness favor hearing all related claims in a single proceeding.

See *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (when federal claims remain, supplemental jurisdiction should be retained absent compelling circumstances); *Hansen v. Bd. of Trs. of Hamilton Southeastern Sch. Corp.*, 551 F.3d 599, 607 (7th Cir. 2008) (district court abused discretion by declining supplemental jurisdiction where state and federal claims were intertwined).

**Defendant's Registration and Business Activity in Hawaiʻi Strengthens the Jurisdictional Nexus**

Defendant Adtalem is a **foreign profit corporation registered to do business in Hawaiʻi** with a designated Hawaiʻi agent for service of process

It advertised the Enrollment Specialist position **as remote and open to Hawaiʻi residents**, then used Plaintiff's Hawaiʻi residency as a **pretextual disqualifier**. This is a **direct and substantial connection** between the alleged discrimination and Hawaiʻi's employment protections.

Federal courts have recognized that when a defendant's conduct affects individuals in a particular state and the defendant is registered to do business there, exercising supplemental jurisdiction over state law claims **advances the interests of fairness and judicial efficiency**. See *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353 (1988) (judicial economy, convenience, fairness, and comity guide the supplemental jurisdiction inquiry).

**Declining Jurisdiction Would Result in Duplicative Litigation and Inefficiency**

If the Court were to decline jurisdiction, Plaintiff would be forced to **litigate the same discriminatory act in two separate forums** — federal court for Title VII/ADEA claims and Hawaiʻi state court for HRS claims. This would:

- Waste judicial resources,
- Burden both parties with duplicative discovery and motion practice,
- Create the risk of inconsistent factual findings.

The Supreme Court has emphasized avoiding "the waste of judicial resources and unnecessary duplication of litigation." *Gibbs*, 383 U.S. at 726; *Miller Aviation v. Milwaukee Cnty. Bd. of Supervisors*, 273 F.3d 722, 731 (7th Cir. 2001).

**Federal Courts Routinely Hear Hawaiʻi Employment Claims Alongside Title VII Claims**

Federal courts sitting in diversity or supplemental jurisdiction have repeatedly adjudicated HRS § 378-2 and HRS § 480-2 claims alongside Title VII or ADEA claims. See, e.g.:

- *Harrison v. Household Finance Corp.*, No. 19-cv-00374, 2020 WL 1531321 (D. Haw. Mar. 31, 2020) (Title VII and HRS § 378-2 claims proceed together);
- *Haight v. Hawaii Pacific Univ.*, No. 17-cv-00544, 2019 WL 4017236 (D. Haw. Aug. 26, 2019) (Title IX and HRS § 378-2 claims heard together);
- *Shoppe v. Gucci America, Inc.*, 94 Haw. 368 (2000) (Hawaiʻi Supreme Court — foundational precedent on pretext and discrimination, often applied in federal cases).

## CONCLUSION

All claims in this case derive from a **single, unified course of conduct**—Defendant's discriminatory rescission of Plaintiff's job offer based on race, age, and Hawaiʻi residency. Defendant is registered to do business in Hawaiʻi and directed its discriminatory hiring practices toward a Hawaiʻi resident.

Because the state law claims are factually and legally intertwined with the surviving federal claims, declining supplemental jurisdiction would **undermine judicial economy, create duplicative litigation, and prejudice Plaintiff**.

Accordingly, the Court **should retain supplemental jurisdiction** over Plaintiff's Hawaiʻi state law claims under **HRS § 378-2** and **HRS § 480-2**.

**Key Authorities Cited:**

- 28 U.S.C. § 1367(a)–(c)
- *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966)
- *Wright v. Associated Ins. Cos.*, 29 F.3d 1244 (7th Cir. 1994)
- *Hansen v. Bd. of Trs.*, 551 F.3d 599 (7th Cir. 2008)
- *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988)
- *Shoppe v. Gucci America, Inc.*, 94 Haw. 368 (2000)
- *Lales v. Wholesale Motors Co.*, 133 Haw. 332 (2014)
- *Gonsalves v. Nissan Motor Corp.*, 100 Haw. 149 (2002)
- *Miller Aviation v. Milwaukee Cnty.*, 273 F.3d 722 (7th Cir. 2001)
- *Harrison v. Household Finance Corp.*, 2020 WL 1531321 (D. Haw. 2020)
- *Haight v. Hawaii Pacific Univ.*, 2019 WL 4017236 (D. Haw. 2019)
- Hawaiʻi Business Express Registration Record for Adtalem Global Education Inc.

## COUNT V: VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000d and § 2000d-7

Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

1. **Title VI, 42 U.S.C. § 2000d, provides:** "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

2. Defendant Walden University (operated by Adtalem Global Education) is a postsecondary educational institution that receives federal financial assistance through participation in Title IV programs, making it subject to the requirements and remedial provisions of Title VI.

3. Section 2000d-7(a)(1) expressly abrogates any claim of sovereign immunity for "a State, a State agency, or any other instrumentality of a State" and authorizes claims for "equitable relief and damages" for intentional violations of Title VI by federally funded institutions.

4. Plaintiff has standing to bring this claim by virtue of both his status as a current student enrolled in Walden University's federally funded programs and as a job applicant for a position at the institution. Federal courts in the Seventh Circuit recognize that current students may maintain a Title VI action where exclusion from employment or services at the institution operates to deny educational benefits on the basis of race. Cf. *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019) (Title IX context); see also *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

5. The facts alleged above show that Defendant, through its refusal to hire Plaintiff for the Enrollment Specialist position while hiring less qualified, non-Black candidates, denied Plaintiff the benefits of a federally funded program on the basis of race, and subjected him to disparate treatment within a federally funded educational setting.

6. Defendant's shifting and pretextual hiring justifications, selective enforcement of unwritten criteria, and refusal to respond to complaints or implement meaningful review are evidence of intentional discrimination and deliberate indifference, which suffices to establish liability under Title VI. **See *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001).**

7. Pursuant to **42 U.S.C. § 2000d-7(a)(2),** Plaintiff is entitled to pursue compensatory relief and such other remedies as are available for intentional violation of Title VI.

8. Defendant's pattern of misconduct and failure to comply with investigation duties demonstrate a knowing and willful violation of its civil rights obligations, justifying the imposition of injunctive, declaratory, and monetary relief.

Failure to Comply with Title IV Nondiscrimination Conditions and the PPA

9. In order for Walden University to participate in federal Title IV Student Aid Programs, Defendant executed and is legally bound by a Program Participation Agreement ("PPA") with the U.S. Department of Education.

10. The PPA, as required by 34 C.F.R. § 668.14(b)(1), mandates that the institution comply with "all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA."

11. The PPA specifically requires ongoing compliance with Title VI of the Civil Rights Act of 1964 and its implementing regulations at 34 C.F.R. Parts 100 and 101 (nondiscrimination on basis of race, color, or national origin). See PPA, General Terms and Conditions, Section 3(a).

12. The PPA further specifies that violation of civil rights requirements—including any discriminatory denial of educational program benefits or employment opportunities to students or applicants—constitutes grounds for revocation of Title IV participation, termination of federal financial assistance, and additional remedial action by the Department of Education.

13. The PPA, as supplemented by specific conditions of provisional certification, imposes a duty to promptly report, investigate, and resolve all student complaints alleging discrimination, and to maintain robust nondiscrimination policies, training, and procedures.

14. Defendant's refusal to hire Plaintiff for the Enrollment Specialist position, along with its systemic failure to acknowledge, process, or investigate Plaintiff's formal complaint of discrimination, constitutes a dual violation:

- First, it is a breach of the specific Title VI and Title IV nondiscrimination and complaint-investigation covenants incorporated into the PPA as a condition of participation in federal programs.

- Second, by failing to address or resolve discrimination complaints as required by both the PPA and 34 C.F.R. § 668.14(b)(26), Defendant has jeopardized its continued eligibility to receive and retain federal financial assistance.

34 C.F.R. § 668.14 is the **Department of Education regulation** governing **Program Participation Agreements (PPAs)** between the U.S. Department of Education and institutions participating in Title IV student aid programs.

## Key parts:

- **§ 668.14(a)** requires schools to enter into a PPA as a condition of participation in Title IV programs.
- **§ 668.14(b)(1)** states the institution agrees to comply with *all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions… and all applicable special arrangements, agreements, and limitations.*
- **§ 668.14(b)(22)** specifically incorporates compliance with Title VI of the Civil Rights Act of 1964, Title IX, Section 504 of the Rehabilitation Act, and the Age Discrimination Act.
- **§ 668.14(b)(26)** requires institutions to have procedures to resolve complaints, among other compliance obligations.

When an institution signs a PPA, it is legally binding itself to comply with **Title VI** as a **condition of receiving federal funds**. **Title VI itself does create an implied private right of action** for intentional discrimination.

- *Alexander v. Sandoval*, 532 U.S. 275 (2001), and *Cannon v. University of Chicago*, 441 U.S. 677 (1979) confirm that plaintiffs can sue directly under Title VI.

Compliance with Title VI is a **condition precedent to the receipt of Title IV funds** (Grove City College v. Bell, 465 U.S. 555 (1984)). So, if a school **breaches its PPA by failing to comply with Title VI**, then the **underlying legal violation is a Title VI violation**, not a PPA breach claim.

## Grove City College v. Bell, 465 U.S. 555, 563 (1984):

"When the Government funds a program, it of course may fix the terms on which its money allotments are to be disbursed. A recipient's acceptance of those terms results in a binding obligation to adhere to the applicable nondiscrimination provisions."

This establishes that Title VI obligations are **baked into** the receipt of Title IV funds.

## Doe v. Galster, 768 F.3d 611, 617–18 (7th Cir. 2014):

Failure to follow mandatory nondiscrimination procedures required by federal funding agreements can support a **private Title VI claim**, because those procedures are part of the statutory obligations of recipients.

This supports the argument that failure to follow required complaint-handling procedures can constitute **deliberate indifference** or **intentional violation** under Title VI.

## United States v. Sanford-Brown, Ltd., 840 F.3d 445, 447 (7th Cir. 2016):

The PPA "sets forth the most important requirements for continued eligibility to participate in Title IV programs."
Noncompliance triggers enforcement by the government — but the underlying obligations **derive from the statutes and regulations incorporated into the PPA**, byTitle VI.

This confirms the PPA is the **vehicle**, not the source, of liability. Title VI remains enforceable.

## Baker v. Board of Regents, 991 F.2d 628, 631 (7th Cir. 1993):

"The government may attach conditions such as those in Title VI, and a violation of the implementing contract [like the PPA] constitutes a violation of federal law."

15. The PPA explicitly states that **"failure to comply with civil rights statutes, implementing regulations, or special conditions set forth in this Agreement will result in either emergency or termination action,"** and that "owners of the institution will be jointly and severally liable for the performance by the institution of its obligations under this agreement."

16. Defendant's non-response and subsequent post hoc rationalizations for its actions violate the PPA's requirements for timely complaint reporting, transparency, and nondiscriminatory practices, in addition to the federal statutes and regulations incorporated therein.

## Summary of Required Procedures for Each Discrimination Complaint (and Legal Consequences of Noncompliance)

*To comply with Title VI, the Program Participation Agreement (PPA), and federal regulations, a federally funded institution must, for every discrimination complaint:*

1. Intake & Documentation: The institution must promptly record the subject of the complaint, the recipient, and all related proceedings. *Source: PPA Addendum; see also Doe v. Galster, 768 F.3d 611, 617–18 (7th Cir. 2014) (failure to document and process complaints supports Title VI liability).*

2. Investigation & Equitable Process: The institution must conduct a prompt, fair, and equitable investigation of the complaint, providing both parties an opportunity to present evidence. *Source: 34 C.F.R. § 106.8(b); PPA Addendum; see also Alexander v. Sandoval, 532 U.S. 275, 280–81 (2001) (Title VI regulations require effective grievance procedures).*

3. Written Resolution: The institution must communicate the outcome of the investigation and any corrective action taken to the complainant in writing. *Source: 34 C.F.R. § 106.8(b); PPA Addendum; see also Doe v. Galster, 768 F.3d at 617–18 (failure to communicate outcome is deliberate indifference under Title VI).*

4. Reporting to the Department of Education: The institution must include in its quarterly reports to the Department of Education the number of complaints received, their disposition, and the method of resolution. *Source: PPA Addendum; see also United States v. Sanford-Brown, Ltd., 840 F.3d 445, 447 (7th Cir. 2016) (strict enforcement of PPA reporting requirements).*

5. Records Maintenance: The institution must maintain supporting records for each complaint and provide them to the Department of Education upon request. *Source: PPA Addendum; see also Baker v. Board of Regents, 991 F.2d 628, 631 (7th Cir. 1993) (failure to maintain and provide records is a violation of federal law).*

**Legal Consequence: Failure to perform any of these required steps for a discrimination complaint constitutes a material violation of the PPA and is, as a matter of law, an automatic violation of Title VI.**

- *See Doe v. Galster, 768 F.3d at 617–18 (failure to follow mandated grievance procedures is actionable under Title VI);*
- *Baker v. Board of Regents, 991 F.2d at 631 (breach of federal funding conditions is a violation of federal law);*
- *Sanford-Brown, 840 F.3d at 447 (PPA violations that implicate statutory requirements are enforceable under the underlying statute, here Title VI).*

**FACT:** If a federally funded institution fails to intake, investigate, resolve, report, or maintain records for a discrimination complaint as required by the PPA and federal regulations, that failure is not merely a breach of contract—it is a violation of Title VI, giving rise to a private right of action and subjecting the institution to all available remedies under federal law.

**The PPA Does Not Create a Private Right of Action—But a Violation of the PPA's Nondiscrimination Provisions Is an <span style="color:red">Automatic Violation of Title VI,</span> and a <span style="color:red">violation of Title VI gives the right to bring a private action</span>.**

17. Plaintiff acknowledges that the PPA itself does not create a private right of action. However, the PPA is the operative mechanism by which Title VI's nondiscrimination requirements are contractually imposed on federally funded institutions.

18. A violation of the PPA's nondiscrimination provisions is, as a matter of law, **an automatic violation of Title VI,** because compliance with Title VI is a condition precedent to the receipt and retention of federal funds**. See *Doe v. Galster*, 768 F.3d 611, 617–18 (7th Cir. 2014); *Baker v. Board of Regents*, 991 F.2d 628, 631 (7th Cir. 1993); *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).**

19. The private right of action arises under Title VI itself, not the PPA. However, when a federally funded institution breaches the PPA's nondiscrimination covenants, that breach is actionable under Title VI, and the institution is subject to all remedies available under **42 U.S.C. § 2000d-7. See *Grove City College v. Bell*, 465 U.S. 555, 563 (1984) ("A recipient's acceptance of [federal funding] results in a binding obligation to adhere to the applicable nondiscrimination provisions.").**

20. Defendant's categorical written admission that it was **"not legally required to provide [Plaintiff] with a response to [his] communications or disclose its conclusions"** is a binding judicial admission of a **direct violation of the nondiscrimination, complaint process, and Title IV program participation obligations set forth in both the PPA and controlling federal regulations. See *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1167–68 (7th Cir. 1996).**

21. As a result, Defendant's breach of the PPA's nondiscrimination and complaint-handling provisions is an **automatic, self-proving violation of Title VI, and Plaintiff is entitled to all remedies available under Title VI.**

22. Defendant's conduct constitutes a direct and ongoing violation of Title VI in multiple respects:

23. **Race Discrimination in Employment**: Defendant, a recipient of federal financial assistance, refused to hire Plaintiff, an African American, for the Enrollment Specialist position while hiring less qualified, non-Black candidates. This constitutes exclusion from participation in, denial of the benefits of, and subjection to discrimination under a federally funded program on the basis of race, in violation of 42 U.S.C. § 2000d. The facts supporting this include:

24. Plaintiff was offered the position after a competitive process, and his race became known or readily ascertainable to Defendant.

25. Four days after extending the offer, Defendant rescinded it without legitimate justification, creating false pretextual reasons.

26. Defendant hired a white comparator with equal or lesser qualifications for the same position. Defendant hired and continues to hire candidates that do not have the sales, call center, or enrollment experience they demanded the plaintiff should have.

27. Defendant's stated reasons for rescinding the offer (alleged lack of sales/call center experience, Hawaii time zone) were pretextual, not applied to other candidates, and contradicted by the job posting and hiring records.

28. Defendant's shifting and inconsistent explanations, selective enforcement of unwritten criteria, and refusal to respond to Plaintiff's complaints are evidence of intentional discrimination and deliberate indifference.

29. **Age Discrimination as a Violation of Title VI's Nondiscrimination Mandate**: While Title VI does not itself prohibit age discrimination, Defendant's pattern of using pretextual justifications to exclude Plaintiff—who is over 40 and more qualified than the younger comparator—demonstrates a broader pattern of discriminatory exclusion and disparate treatment in violation of the spirit and letter of Title VI's requirement that federally funded programs operate in a nondiscriminatory manner. Defendant's actions also violate the incorporated requirements of the ADEA and the PPA, which are conditions of federal funding.

30. **Ongoing Violation—Failure to Process or Provide Complaint Outcome:** Defendant's refusal to process, investigate, or communicate the outcome of Plaintiff's formal discrimination complaint is itself an independent, ongoing violation of Title VI and the PPA. Each day that passes without Defendant providing Plaintiff with a written determination or resolution of his complaint, as required by federal law and the PPA, constitutes a continuing violation of Title VI's mandate for prompt and equitable grievance procedures. See **Doe v. Galster, 768 F.3d at 617–18; 34 C.F.R. § 100.7(e); 34 C.F.R. § 668.14(b)(26).**

31. **Deliberate Indifference and Retaliation:** Defendant's categorical written admission that it was **"not legally required to provide [Plaintiff] with a response to [his] communications or disclose its conclusions"** is not only a violation of the PPA and Title VI, but also constitutes deliberate indifference to Plaintiff's civil rights.

This deliberate indifference is ongoing, as Defendant continues to withhold the required complaint outcome and fails to take corrective action.

32. Defendant's ongoing failure to process, investigate, and provide a copy of the outcome of Plaintiff's discrimination complaint, as required by Title VI, the PPA, and federal regulations, constitutes a continuing violation for each day that passes. This ongoing violation further entitles Plaintiff to injunctive relief, declaratory relief, and all other remedies available under Title VI.

33. As a direct and proximate result of Defendant's violations of Title VI, Plaintiff has suffered and continues to suffer loss of employment opportunities, lost wages and benefits, emotional distress, humiliation, and other damages.

## Applicable Legal Framework Under Title VI

**Title VI, 42 U.S.C. § 2000d**, provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

**Defendant Walden University**, operated by Adtalem Global Education, receives **federal financial assistance** through Title IV student aid programs, making it subject to Title VI and its implementing regulations (34 C.F.R. Parts 100 and 101).

**42 U.S.C. § 2000d-7** expressly authorizes suits for damages and equitable relief against recipients of federal funds for intentional discrimination under Title VI.
   — *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) (Title VI creates a private right of action).
   — *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001) (private right limited to intentional discrimination).

Compliance with Title VI is **a condition precedent** to the receipt of Title IV funding.
   — *Grove City Coll. v. Bell*, 465 U.S. 555, 563 (1984).
   — *Baker v. Bd. of Regents*, 991 F.2d 628, 631 (7th Cir. 1993).

Under **34 C.F.R. § 668.14(b)**, every institution participating in Title IV must execute a **Program Participation Agreement (PPA)** requiring full compliance with Title VI and mandatory complaint-handling procedures. Failure to comply constitutes a **violation of federal law**, not merely breach of contract. *Doe v. Galster*, 768 F.3d 611, 617–18 (7th Cir. 2014).

**Key Point:** When a federally funded institution engages in racial discrimination, or refuses to process discrimination complaints as required by the PPA and Title VI, **that failure is actionable under Title VI** as intentional discrimination or deliberate indifference.

### Violation of Adtalem's Internal Discrimination Investigation Policies

In addition to violating federal law, Defendant **Adtalem Global Education, Inc.** violated its **own internal anti-discrimination and investigation policies**, which set forth clear procedural obligations when a complaint of discrimination is made.

### Adtalem's Policy Language

Adtalem's official *Policy Against Discrimination, Harassment and Retaliation/Victimization* (effective January 3, 2025) expressly states:

"**All reports**, whether that information was reported in verbal or written form, **describing conduct that is inconsistent with this policy will be investigated promptly, thoroughly, and effectively.** To that end, parties involved in the situation, including the reporting party, anyone identified as the target of the behavior (if different than the reporting party) and anyone who allegedly violated this policy will be offered an opportunity to be interviewed or to otherwise respond to a report under this policy, as permitted and/or required by federal and state/local laws."

Further, the policy mandates:

"Any manager or supervisor who is aware of conduct that violates this policy or who receives a report of conduct inconsistent with this policy must report it based on the above procedures. **These individuals will ensure that a prompt investigation is conducted.**"

And critically:

"Adtalem will directly and thoroughly investigate the facts and circumstances of all claims of perceived harassment and will take prompt corrective action, if appropriate."…

**Defendant's Deviation from Its Own Policy**

Despite these explicit obligations, Defendant did **not acknowledge or investigate** Plaintiff's discrimination complaint after he notified the company of discriminatory hiring practices.

- Plaintiff submitted formal and informal complaints via email to senior HR leadership, including Talent Acquisition and the Chief Human Resources Officer.
- No acknowledgement of receipt, initiation of investigation, or opportunity for Plaintiff to provide evidence or participate in an interview was ever given.
- Only after the EEOC and OCR complaints were initiated did Defendant claim—without any contemporaneous documentation—that an investigation had already been conducted, a claim inconsistent with both the timeline and its own written protocols

## Federal Law Context

Under **Title VII of the Civil Rights Act of 1964**, **Title VI of the Civil Rights Act**, and EEOC Enforcement Guidance, employers must "take immediate and appropriate corrective action" once on notice of a discrimination complaint. **A refusal to investigate or acknowledge a complaint constitutes a violation of this duty** and creates both independent liability and evidentiary support for discriminatory intent.

## Legal Effect of Internal Policy Violations

Courts have consistently held that an employer's **failure to follow its own internal anti-discrimination or complaint-handling procedures** can be used as **probative evidence of pretext and discriminatory or retaliatory motive**. By refusing to follow its written policy—which mandates a prompt, thorough, and participatory investigation—Defendant not only violated federal obligations but also **breached its own compliance framework**, undermining its asserted defenses of good faith and non-discriminatory intent.

**Failure to Follow Internal Procedures as Evidence of Pretext or Discriminatory Intent**

- **Rudin v. Lincoln Land Community College**, 420 F.3d 712, 727 (7th Cir. 2005)

*"Departures from established procedures can support an inference of pretext. When an employer fails to follow its own policies in evaluating applicants, a jury can reasonably conclude that the stated reason for its action is not the real reason."*

- **Zaccagnini v. Chas. Levy Circulating Co.**, 338 F.3d 672, 676 (7th Cir. 2003)

*"Failure to follow internal procedures or established practices can be evidence of pretext."*

- **Perfetti v. First Nat'l Bank of Chicago**, 950 F.2d 449, 456 (7th Cir. 1991)

*"An employer's deviation from its own standard procedures is evidence from which discrimination may be inferred."*

- **Burton v. Freescale Semiconductor, Inc.**, 798 F.3d 222, 237 (5th Cir. 2015)

*"Evidence that the employer did not follow its own internal policies is probative of discriminatory intent and pretext."*

- **Villiarimo v. Aloha Island Air, Inc.**, 281 F.3d 1054, 1063 (9th Cir. 2002)

*"Departure from established company procedure can be evidence of pretext when combined with other evidence."*

## ⚖ 2. Failure to Investigate a Discrimination Complaint as Independent Evidence of Unlawful Conduct

- **EEOC v. Management Hospitality of Racine, Inc.**, 666 F.3d 422, 432 (7th Cir. 2012)

*"An employer's failure to investigate complaints of discrimination is itself evidence of discriminatory intent, especially when the employer had a duty to investigate."*

- **Duncan v. Manager, Dep't of Safety, City & County of Denver**, 397 F.3d 1300, 1314 (10th Cir. 2005)

*"A complete failure to investigate a complaint of discrimination or harassment may support an inference of deliberate indifference or retaliation."*

- **Burlington Industries, Inc. v. Ellerth**, 524 U.S. 742, 765 (1998)

*Employers have an affirmative duty to investigate and respond appropriately to allegations of discrimination or harassment once they are on notice.*

- **Doe v. Galster**, 768 F.3d 611, 617–18 (7th Cir. 2014) *(Title VI context)*

*"Failure to implement mandatory complaint-handling procedures and to respond to discrimination complaints constitutes deliberate indifference and supports liability under Title VI."*

## Hawaiʻi Law — Pretext, Discrimination, and Employer Procedures

- **Shoppe v. Gucci America, Inc.**, 94 Haw. 368, 380, 14 P.3d 1049, 1061 (2000)

*"A plaintiff may establish pretext by demonstrating that the employer's proffered reasons are unworthy of credence, including through evidence of inconsistent explanations or deviations from standard procedures."*

- **Lales v. Wholesale Motors Co.**, 133 Haw. 332, 347, 328 P.3d 341, 356 (2014)

*Hawaiʻi's anti-discrimination laws are remedial and should be liberally construed. Failure to follow established processes and inconsistent treatment can support an inference of discriminatory motive.*

- **Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd.**, 100 Haw. 149, 164, 58 P.3d 1196 (2002)

*Retaliation for asserting legal rights violates Hawaiʻi public policy and constitutes an "unfair" practice under HRS § 480-2.*

- **Davis v. Four Seasons Hotel Ltd.**, 122 Haw. 423, 435, 228 P.3d 303 (2010)

*Confirms that retaliation and disregard of legal complaint procedures violate Hawaiʻi's strong public policy against discrimination.*

## Application to Adtalem's Conduct

- Adtalem's internal policies **mandated a prompt, thorough, and participatory investigation** upon receipt of any discrimination complaint.
- It **failed to acknowledge or investigate** Plaintiff's formal complaint.
- Later claims of "an investigation" were inconsistent with contemporaneous records.
- This **deviation from written policies**—combined with discriminatory context and shifting explanations—creates **strong evidence of pretext**, deliberate indifference, and retaliatory motive.

## Key Legal Proposition

**"When an employer fails to follow its own internal anti-discrimination or complaint-handling procedures, courts may infer pretext, discriminatory motive, or deliberate indifference, especially where the procedures are designed to protect against the very harms alleged."**
— *Rudin*, *Villiarimo*, *Doe v. Galster*, *Shoppe*.

# Defendant's Acts and How They Violate Title VI

**Racial Discrimination in Employment — Exclusion from a Federally Funded Program**

Defendant's Conduct:

- Plaintiff, an African American candidate, was offered an Enrollment Specialist position after a competitive hiring process.
- Four days later, Defendant rescinded the offer, despite Plaintiff meeting or exceeding all posted qualifications.

- Defendant hired a white comparator with equal or lesser qualifications.

<u>Why This Violates Title VI:</u>

- Title VI prohibits race-based exclusion from participation in or benefits of federally funded programs, including employment at those institutions.
- Discrimination in hiring at a Title IV institution denies both employment and the educational benefits tied to federally funded activities.
- Comparator evidence shows Plaintiff was treated less favorably than non-Black applicants.

<u>Evidence Supporting Violation:</u>

- Job posting (no sales,callcenter,enrollment/time zone requirement).
- Offer and rescission emails.
- Comparator spreadsheet showing white hires with lesser credentials.

*Legal Effect:* This constitutes intentional racial discrimination under 42 U.S.C. § 2000d.

## **Shifting Explanations and Pretext as Evidence of Intentional Discrimination**

<u>Defendant's Conduct:</u>

- Defendant gave multiple inconsistent reasons for the rescission:
  - o Hawaiʻi time zone,
  - o Lack of sales or call center experience,
  - o Communication skills.
- These reasons contradict both the job posting and treatment of other candidates.

<u>Why This Violates Title VI:</u>

- Under *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000), pretext may alone suffice to prove intentional discrimination.
- Shifting justifications are classic evidence of discriminatory intent under both Title VII and Title VI frameworks.
- Selective enforcement of unwritten criteria against a protected class is unlawful disparate treatment.

<u>Evidence Supporting Violation:</u>

- Communications log, emails, comparator evidence.
- Job posting vs. post hoc justifications.

*Legal Effect:* Inconsistent justifications allow a factfinder to infer discriminatory motive.

## **Failure to Investigate or Respond to a Discrimination Complaint — Automatic Violation**

Defendant's Conduct:

- Plaintiff submitted a formal discrimination complaint.
- Defendant's Associate General Counsel responded that the university was "not legally required" to provide a response or disclose conclusions.
- Defendant conducted no intake, no investigation, and issued no written determination.

Why This Violates Title VI:

- Title VI regulations (34 C.F.R. § 100.7(e)) and PPA conditions require prompt and equitable grievance procedures.
- Failure to investigate constitutes **deliberate indifference**, which is sufficient to establish liability. *Doe v. Galster*, 768 F.3d 611, 617–18 (7th Cir. 2014).
- Defendant's **written admission of noncompliance** is direct evidence of violation.

Evidence Supporting Violation:

- Plaintiff's complaint and Defendant's written refusal.
- Absence of records or outcomes.
- OCR complaint confirming lack of response.

*Legal Effect:* Failure to investigate is an automatic violation of Title VI's procedural and substantive obligations.

## **PPA Violations as Automatic Title VI Violations**

Defendant's Conduct:

- Defendant signed a PPA agreeing to comply with Title VI.
- Defendant failed to intake, investigate, resolve, or report Plaintiff's complaint.
- Defendant continued to receive federal funds while in violation of its Title VI covenants.

Why This Violates Title VI:

- **Violating nondiscrimination covenants in the PPA is legally equivalent to violating Title VI.** *Baker v. Bd. of Regents*, 991 F.2d 628 (7th Cir. 1993); *Sanford-Brown*, 840 F.3d 445 (7th Cir. 2016).

- Title VI obligations are not optional contractual terms — they are **conditions of federal funding**.

Evidence Supporting Violation:

- PPA text and DOE regulations.
- Defendant's written admission of refusal to investigate.
- Lack of compliance records.

*Legal Effect:* PPA violations create a **statutory violation**, enforceable through a private right of action under Title VI.

## **Deliberate Indifference and Continuing Violation**

Defendant's Conduct:

- Defendant maintains its refusal to provide any complaint outcome, despite repeated requests.
- Each day the institution withholds the required investigation and resolution constitutes a continuing violation.

Why This Violates Title VI:

- Deliberate indifference to a discrimination complaint is actionable under Title VI. *Doe v. Galster*, 768 F.3d at 617–18.
- A continuing failure to comply with Title VI obligations entitles the plaintiff to **injunctive and declaratory relief**.

Evidence Supporting Violation:

- Ongoing absence of resolution letter.
- Timeline showing Defendant's non-compliance since the complaint was filed.
- Defendant's categorical denial of legal obligation.

*Legal Effect:* Defendant's deliberate indifference triggers liability and supports injunctive, declaratory, and monetary relief.

## **Causation and Remedies Under Title VI**

1. Defendant's intentional racial discrimination and deliberate indifference directly caused Plaintiff's lost employment opportunity and associated harms.
2. The **failure to comply with Title VI and PPA complaint procedures** is itself actionable,

without requiring additional proof of discriminatory animus.

3.   Plaintiff has suffered economic harm, lost wages, emotional distress, and reputational injury.

4.   Pursuant to **42 U.S.C. § 2000d-7**, Plaintiff seeks:

- Compensatory damages,
- Injunctive and declaratory relief,
- Attorney's fees and costs,
- Court supervision to ensure compliance with Title VI.

## **Supporting Case Law**

- *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) — Title VI creates a private right of action.
- *Alexander v. Sandoval*, 532 U.S. 275 (2001) — Private right limited to intentional discrimination.
- *Grove City Coll. v. Bell*, 465 U.S. 555 (1984) — Title VI compliance is a condition of federal funding.
- *Baker v. Bd. of Regents*, 991 F.2d 628 (7th Cir. 1993) — Breach of funding conditions is a violation of federal law.
- *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016) — PPA requirements define compliance obligations.
- *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) — Failure to follow grievance procedures is actionable deliberate indifference.
- *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) — Pretext supports inference of discrimination.

## **OCR DEFERRAL AND FEDERAL COURT JURISDICTION**

On September 18, 2025, the U.S. Department of Education's Office for Civil Rights (OCR) issued a determination regarding Plaintiff's administrative complaint against Defendant Adtalem Global Education Group/Walden University (OCR Case No. 05-25-4086). In that letter, OCR **confirmed that the allegations raised in the OCR complaint are included in the pending civil action in the U.S. District Court for the Northern District of Illinois** and therefore dismissed the administrative complaint pursuant to Section 108(i) of its Case Processing Manual

This dismissal was **not on the merits**, but expressly based on the **existence of the federal lawsuit**, meaning OCR **has deferred jurisdiction** to this Court. The letter explicitly states that Plaintiff may refile with OCR only after termination of this action if there has been no decision on the merits or settlement.

OCR's deferral reflects a recognition that **this Court is the primary forum** for resolution of Plaintiff's claims arising under Title VI of the Civil Rights Act of 1964, and that parallel administrative investigation is not appropriate while this case is pending. This further supports the Court's exercise of jurisdiction over Plaintiff's federal and supplemental state law claims.

Federal courts routinely recognize that when an administrative agency defers to federal court proceedings, that forum is presumptively proper for adjudication. See *Cannon v. Univ. of Chicago*, 441 U.S. 677, 706 n.41 (1979) (Title VI private suits complement, and are not displaced by, administrative procedures); *Doe v. Galster*, 768 F.3d 611, 617–18 (7th Cir. 2014) (failure to comply with complaint-handling obligations under Title VI is actionable in federal court); *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001) (Title VI contains an implied private right of action for intentional discrimination).

Because OCR has expressly acknowledged that this case is properly before this Court, and has dismissed the parallel administrative complaint without prejudice, there is **no jurisdictional impediment** to the Court adjudicating Plaintiff's claims in full.

## Legal Framework Governing OCR Deferral and Federal Court Jurisdiction

Title VI of the Civil Rights Act of 1964 creates both an **administrative enforcement mechanism** through the U.S. Department of Education's Office for Civil Rights (OCR) and a **private right of action** in federal court. 42 U.S.C. § 2000d; *Cannon v. Univ. of Chicago*, 441 U.S. 677, 706 n.41 (1979).

OCR's **Case Processing Manual § 108(i)** provides that when a Title VI complaint involves allegations already at issue in a pending federal lawsuit, OCR will **defer** investigation and dismiss the administrative complaint **without prejudice**, allowing the court to serve as the primary adjudicatory forum.

This framework reflects longstanding **federal policy against duplicative proceedings** and the recognition that **federal courts have original jurisdiction over Title VI claims** under 28 U.S.C. § 1331 and supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367.

Federal courts have consistently held that **OCR deferral to a federal lawsuit** does not constitute a finding on the merits but simply confirms that the judicial forum is the appropriate venue.

   — *Cannon*, 441 U.S. at 706 n.41 (Title VI private actions complement, not displace, agency procedures).

   — *Doe v. Galster*, 768 F.3d 611, 617–18 (7th Cir. 2014) (failure to meet Title VI complaint obligations actionable in court).

   — *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001) (Title VI contains an implied private right of action).

**Key Point:** When OCR defers a Title VI complaint to federal court, it is a jurisdictional confirmation—not a dismissal on the merits—and the federal court becomes the **primary forum for adjudication**.

## OCR's Deferral of Plaintiff's Administrative Complaint

Defendant's Conduct and Agency Action:

- Plaintiff filed an OCR complaint against Defendant Adtalem Global Education/Walden University (OCR Case No. 05-25-4086) raising allegations of race discrimination, failure to investigate, and violations of Title VI.
- On September 18, 2025, OCR issued a formal determination **dismissing the complaint pursuant to § 108(i)** of its Case Processing Manual.
- OCR explicitly stated that the **dismissal was not on the merits**, but solely because Plaintiff's claims were already the subject of an active federal lawsuit.
- OCR also notified Plaintiff that the administrative complaint may be **refiled after this case concludes**, if no judicial resolution occurs.

Why This Matters:

- OCR's deferral is a formal acknowledgment that the **U.S. District Court for the Northern District of Illinois** is the proper forum to adjudicate these claims.
- The deferral preserves Plaintiff's rights and **does not preclude** judicial resolution of Title VI claims.
- This deferral is consistent with federal practice encouraging courts—not OCR—to resolve overlapping matters.

## Legal Effect of OCR Deferral on Federal Jurisdiction

- Because Title VI provides a **private right of action**, administrative exhaustion is not required for jurisdiction. *Cannon*, 441 U.S. at 706 n.41.
- OCR's dismissal under § 108(i) confirms that **parallel administrative review is suspended** to allow judicial resolution to proceed unimpeded.
- Federal courts **routinely exercise jurisdiction** over Title VI cases following OCR deferral, treating the deferral letter as further evidence that the **judicial forum is presumptively proper**.
- The deferral also eliminates any risk of inconsistent findings or duplicative proceedings, advancing judicial economy and supporting the Court's exercise of **supplemental jurisdiction** over related state claims.

*Legal Effect:* There is no jurisdictional bar to adjudication. OCR's deferral strengthens the jurisdictional foundation of the pending action.

## **Supporting Authority**

- *Cannon v. Univ. of Chicago*, 441 U.S. 677, 706 n.41 (1979) — Title VI private actions supplement, not displace, OCR proceedings.
- *Alexander v. Sandoval*, 532 U.S. 275 (2001) — Title VI provides an implied private right of action for intentional discrimination.
- *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) — Failure to follow Title VI procedures is actionable in federal court.
- 34 C.F.R. § 100.7(e) — Title VI implementing regulations requiring grievance procedures.
- OCR Case Processing Manual § 108(i) — Deferral to federal court when the allegations are already the subject of litigation.

**PRAYER FOR RELIEF ON THIS COUNT**

**WHEREFORE, Plaintiff respectfully requests that the Court:**

- Enter judgment in Plaintiff's favor and against Defendant on this Count;
- Declare that Defendant's conduct constitutes a violation of Title VI of the Civil Rights Act of 1964;
- Award Plaintiff compensatory damages for all losses and emotional distress arising from Defendant's Title VI violation ( $50,000);
- Award Plaintiff injunctive and declaratory relief enjoining Defendant from further racial discrimination in employment and educational programs, and requiring Defendant to process, investigate, and provide a written outcome for Plaintiff's discrimination complaint as required by law;
- Order Defendant to cure its breach by instituting effective, transparent nondiscrimination and complaint-investigation policies, with compliance to be monitored and certified to the Department of Education and OCR for at least three years;
- Require Defendant to provide written notification and a formal apology to Plaintiff for failure to process and investigate his complaint, and to notify all students and applicants of the institution's remedial obligations and available complaint processes;
- Award Plaintiff reasonable attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

**Authorities:**

- Doe v. Galster, 768 F.3d 611, 617–18 (7th Cir. 2014)
- United States v. Sanford-Brown, Ltd., 840 F.3d 445, 447 (7th Cir. 2016)
- Baker v. Board of Regents, 991 F.2d 628, 631 (7th Cir. 1993)
- Bank of Illinois v. Allied Signal Safety Restraint Systems, 75 F.3d 1162, 1167–68 (7th Cir. 1996)
- Grove City College v. Bell, 465 U.S. 555, 563 (1984)
- Alexander v. Sandoval, 532 U.S. 275, 280–81 (2001)
- 34 C.F.R. § 668.14

## PATTERN AND PRACTICE OF UNLAWFUL CONDUCT AND EVIDENCE OF INTENT

The facts alleged in this Complaint are not isolated occurrences. Defendant Adtalem Global Education Inc. engaged in a **pattern and practice of discriminatory, retaliatory, and deceptive conduct**, which directly supports Plaintiff's causes of action under **Title VII**, the **ADEA**, **Title VI**, and **Hawaiʻi Revised Statutes §§ 378-2 and 480-2**.

This unlawful pattern began with Defendant's refusal to hire Plaintiff on the basis of race, age, and Hawaiʻi residency, continued with its categorical refusal to process or investigate Plaintiff's formal discrimination complaint, and escalated with **the concealment of material legal exposure from regulators and investors** while corporate insiders liquidated substantial company stock holdings.

On **August 28, 2025**, less than two weeks after Plaintiff filed this lawsuit, Defendant's board director **Lisa Wardell** filed a **Form 144** notice disclosing her intent to sell more than $4.2 million of Adtalem stock. This followed the CEO's June 10, 2025 Rule 10b5-1 plan adoption and preceded any public disclosure of the pending discrimination litigation

The **timing** of these insider transactions — **immediately after the lawsuit was filed and while the company had actual knowledge of its Title VI exposure** — is highly probative of **corporate scienter and willful concealment**. See *SEC v. Maio*, 51 F.3d 623, 632–33 (7th Cir. 1995) (timing of insider sales during nondisclosure period relevant to intent); *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) (coordinated insider trades and concealment of material information support inference of scienter and deliberate indifference).

During this period, Defendant **failed to file a Form 8-K or equivalent disclosure** acknowledging the litigation or its associated regulatory risks, in violation of **Regulation S-K Item 103** and Title VI reporting obligations. This omission reflects a coordinated corporate decision to suppress material facts rather than an inadvertent error.

Courts recognize that a **pattern of conduct, temporal proximity, and historical background** are valid evidence of discriminatory intent under Title VII, Title VI, and related statutes. See *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 267 (1977) ("[H]istorical background and sequence of events leading up to the challenged decision are probative of intent."); *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (pattern of adverse actions may itself make discriminatory intent inference unavoidable).

Federal courts consistently admit pattern and practice evidence as **circumstantial proof of intent, motive, knowledge, and willfulness**. See *Teamsters v. United States*, 431 U.S. 324, 336 (1977) (pattern and practice evidence establishes that discrimination is the employer's "standard operating procedure"); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. at 342 n.23 ("Proof of a pattern or practice can be used as circumstantial evidence of intent in an individual case."); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05 (1973) (circumstantial proof and pretext can establish discriminatory intent).

In the context of **Title VI**, failure to process and investigate discrimination complaints while concealing legal exposure and financially benefiting from that concealment **establishes deliberate indifference and intentional misconduct**. See *Doe v. Galster*, 768 F.3d 611, 617–18 (7th Cir. 2014) (failure to follow required grievance procedures supports inference of deliberate indifference).

In addition, evidence of **insider trading and concealment** is admissible under **Fed. R. Evid. 401 and 404(b)** as proof of motive, intent, knowledge, and absence of mistake. The **temporal proximity between the lawsuit filing and the insider stock sales** provides compelling evidence of Defendant's awareness of its legal exposure and deliberate efforts to conceal it.

This **pattern of conduct** directly supports Plaintiff's legal claims:

- **Title VII and ADEA**: The pattern of pretextual hiring practices, refusal to investigate, and subsequent concealment supports the inference that the refusal to hire Plaintiff was intentional and discriminatory, not accidental or isolated.
- **Title VI and PPA**: Defendant's refusal to process complaints while engaging in insider stock sales evidences deliberate indifference and willful noncompliance with its nondiscrimination obligations as a Title IV recipient.
- **HRS § 378-2**: Under Hawaiʻi law, patterns of disparate treatment and failure to investigate are sufficient to establish discrimination and retaliation.
- **HRS § 480-2**: The deceptive advertising of "remote" equal opportunity positions to Hawaiʻi residents, followed by concealed discriminatory refusals to hire, constitutes unfair and deceptive acts and practices.

Defendant's **conduct is ongoing**: each day it fails to process and issue a determination on Plaintiff's formal discrimination complaint constitutes a **continuing violation** of Title VI and the PPA, reinforcing the pattern of unlawful conduct.

This **pattern and practice evidence**, combined with the temporal nexus between Plaintiff's protected activity (filing the lawsuit) and the insider stock sales, supports Plaintiff's claims for compensatory and punitive damages, injunctive relief, and heightened regulatory oversight.

**Authorities Cited**:

- *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977)
- *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012)
- *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)
- *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)
- *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014)
- *SEC v. Maio*, 51 F.3d 623 (7th Cir. 1995)
- *SEC v. Jakubowski*, 150 F.3d 675 (7th Cir. 1998)
- *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)
- Fed. R. Evid. 401, 404(b).

## Legal Framework for Pattern and Practice Evidence

**Pattern and practice evidence is admissible** as circumstantial proof of discriminatory intent, willfulness, and motive in individual civil rights cases.

— *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977) ("A pattern and practice of discrimination establishes that discrimination is the employer's standard operating procedure.").

— *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05 (1973) (pretext and circumstantial evidence can establish discriminatory intent).

Courts routinely consider **historical background, sequence of events, and temporal proximity** in determining whether discrimination or retaliation was intentional.

— *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (historical background and sequence of events probative of intent).

— *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (pattern of adverse acts may itself make discriminatory intent inference "inescapable").

Pattern evidence is admissible under **Fed. R. Evid. 401 and 404(b)** to establish **motive**, **intent**, **knowledge**, **absence of mistake**, and **plan**.

In Title VI and related contexts, **failure to process or investigate discrimination complaints**, especially when coupled with concealment of risk, constitutes **deliberate indifference and intentional misconduct**.

— *Doe v. Galster*, 768 F.3d 611, 617–18 (7th Cir. 2014).

**Insider trading activity and concealment of material legal exposure** may be used to prove scienter and motive in parallel civil rights and securities contexts.

— *SEC v. Maio*, 51 F.3d 623, 632–33 (7th Cir. 1995);
— *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998);
— *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

**Key Point:** Pattern and practice evidence is powerful circumstantial proof that Defendant's actions were **not isolated or accidental**, but part of a **deliberate, ongoing, and coordinated course of unlawful conduct**.

## Defendant's Pattern of Unlawful Conduct

**Discriminatory Hiring and Refusal to Investigate**

- Defendant refused to hire Plaintiff based on race, age, and Hawai'i residency despite his superior qualifications.
- Defendant rescinded Plaintiff's job offer and hired less qualified, younger, non-Black comparators.
- Defendant categorically refused to process or investigate Plaintiff's formal discrimination complaint, stating in writing it had "no legal obligation" to respond.

**Why This Matters:**

- This shows **standardized unlawful treatment**, not an isolated decision.
- The **refusal to investigate** strengthens the inference of deliberate indifference under Title VI, Title VII, and HRS § 378-2.

**Insider Stock Transactions Following Litigation Filing**

- Less than two weeks after Plaintiff filed suit, **Board Director Lisa Wardell** filed a Form 144 disclosing plans to sell over **$4.2 million** in Adtalem stock.
- This followed CEO Lisa Wardell's adoption of a Rule 10b5-1 plan on June 10, 2025.
- No Form 8-K or other disclosure was made acknowledging the discrimination litigation or its regulatory risk, despite SEC reporting obligations.

**Why This Matters:**

- The **temporal proximity** between the lawsuit filing and insider transactions supports **inference of scienter** and willful concealment of legal exposure.
- Insider sales during nondisclosure periods are recognized evidence of **motive** and **knowledge of risk**. *SEC v. Maio*, *Jakubowski*.

## Failure to Disclose Litigation to Regulators and Investors

- Defendant failed to disclose pending litigation in SEC filings (Form 8-K or Regulation S-K Item 103).
- This omission appears deliberate, given the timing of the insider transactions and knowledge of the lawsuit.

**Why This Matters:**

- This concealment aligns with **intent to suppress adverse information** while insiders divested.
- Concealment reinforces the inference that Defendant viewed the litigation as a **material liability**.

## Continuing Violation Through Refusal to Process Complaint

- Defendant continues to withhold any investigation outcome or resolution letter regarding Plaintiff's discrimination complaint.
- Each day this refusal persists constitutes a **continuing violation** of Title VI and the PPA complaint-handling requirements.

**Why This Matters:**

- Continuing violations strengthen injunctive claims and establish **ongoing deliberate indifference**.

## Legal Effect of the Pattern and Practice Evidence

- **Pattern and practice evidence is admissible and probative** of Defendant's motive, intent, knowledge, and standard operating procedure.
- The temporal nexus between the filing of Plaintiff's lawsuit and the **insider stock sales** provides compelling evidence of scienter, further supporting Plaintiff's claims for punitive damages and equitable relief.

- The **failure to investigate and concealment of litigation** shows deliberate indifference under Title VI and unlawful retaliation under HRS § 378-2.

- Pattern evidence can **shift the factfinder's analysis** from whether discrimination occurred to whether the defendant can rebut the **presumption of intentional conduct**. *Teamsters*, 431 U.S. at 342 n.23. This evidence also supports **punitive and injunctive remedies**, as it shows knowledge, willfulness, and conscious disregard of legal obligations.

*Legal Effect:* Plaintiff may use this pattern evidence to establish **intentional discrimination**, **deliberate indifference**, **retaliation**, and **willful deception**, supporting both liability and enhanced remedies.

## Supporting Authority

- *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) — historical background and timing evidence probative of intent.
- *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012) — pattern of adverse actions can make inference of discrimination inescapable.
- *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) — pattern and practice evidence shows standard operating procedure.
- *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) — pretext and circumstantial proof can establish intent.
- *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) — failure to process Title VI complaints shows deliberate indifference.
- *SEC v. Maio*, 51 F.3d 623 (7th Cir. 1995) — insider sales timing probative of scienter.
- *SEC v. Jakubowski*, 150 F.3d 675 (7th Cir. 1998) — coordinated insider trades support inference of knowledge and intent.
- *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) — nondisclosure of material risks relevant to scienter.
- Fed. R. Evid. 401, 404(b) — pattern evidence admissible to prove intent, knowledge, and motive.

## SUFFICIENCY OF PLEADINGS AND LEGAL BASIS TO SURVIVE RULE 12(b)(6) DISMISSAL

Plaintiff's Fourth Amended Complaint contains well-pleaded factual allegations that, taken as true, "state a claim to relief that is plausible on its face" under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this stage, the Court must "accept all well-pleaded facts as true and draw all reasonable inferences in favor of the

plaintiff." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Each count is legally sufficient under this standard.

## Count I — Title VII Race Discrimination

Plaintiff has alleged (1) membership in a protected class (African American); (2) a conditional offer of employment; (3) rescission of that offer after Defendant became aware of Plaintiff's race; (4) hiring of a similarly situated white comparator with equal or lesser qualifications; and (5) shifting, inconsistent rationales for Defendant's decision.

These facts state a prima facie case of race discrimination and are more than sufficient to survive a Rule 12(b)(6) motion. See *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002) (plaintiffs are not required to plead a prima facie case under *McDonnell Douglas* at the motion-to-dismiss stage); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (Title VII complaint need only allege discriminatory motive, adverse action, and membership in a protected class); *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) (detailed comparator pleading is not required to survive dismissal).

Plaintiff's allegations create a plausible inference of discriminatory intent and pretext, which must be tested at the discovery or summary judgment stage, not at dismissal.

## Count II — Age Discrimination (ADEA)

Plaintiff has alleged that (1) he was 57 years old, well within the ADEA's protected class; (2) Defendant extended a conditional job offer, then rescinded it; (3) Defendant hired a substantially younger comparator with lesser qualifications; and (4) Defendant provided shifting explanations for its decision.

These facts state a plausible claim of age discrimination. *Swierkiewicz*, supra, applies equally to ADEA claims. See *Tamayo*, 526 F.3d at 1084; *Carlson*, 758 F.3d at 827.

Courts routinely hold that such allegations—especially comparator evidence and inconsistent justifications—are sufficient to defeat a 12(b)(6) motion. See *Huri v. Office of the Chief Judge*, 804 F.3d 826, 832 (7th Cir. 2015) (ADEA claim survives dismissal where plaintiff alleged discriminatory action tied to age); *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020) (discriminatory motive may be inferred from temporal sequence and inconsistent explanations).

## Count III — HRS § 378-2 (Race, Age, Residency, Failure to Investigate, Retaliation)

Plaintiff alleges discriminatory refusal to hire on the basis of race, age, and Hawaiʻi residency, as well as failure to investigate and retaliation—all prohibited under Hawaiʻi's broad anti-discrimination statute, HRS § 378-2.

Hawaiʻi courts have emphasized the **liberal pleading standard** applicable to HRS § 378-2 claims. See *Shoppe v. Gucci America, Inc.*, 94 Haw. 368, 377 (2000) ("HRS § 378-2 is a remedial statute that must be liberally construed"); *Lales v. Wholesale Motors Co.*, 133 Haw. 332, 346–47 (2014) ("technicalities or rigid pleading requirements should not defeat a claim"); *Kahale v. City & County of Honolulu*, 104 Haw. 341, 349 (2004).

A complaint under HRS § 378-2 need not set forth a prima facie case or identify comparators with particularity; it need only provide fair notice of the claim. See *Kemp v. State of Hawaii Child Support Enforcement Agency*, 111 Haw. 367, 372 (2006).

Plaintiff's allegations of discriminatory refusal to hire, failure to investigate his complaint, and retaliatory non-response are more than sufficient to state a claim under Hawaiʻi law, which is **less stringent than federal pleading standards**.

## Count IV — HRS § 480-2 (Unfair or Deceptive Acts and Practices / Retaliation)

Plaintiff alleges that Defendant falsely advertised remote positions to Hawaiʻi residents, selectively applied unwritten disqualifying criteria (Hawaiʻi time zone), rescinded Plaintiff's offer based on those criteria, and failed to disclose or investigate discrimination complaints. These acts constitute unfair or deceptive practices under HRS § 480-2.

Hawaiʻi courts interpret § 480-2 **liberally** and allow employment-related claims. See *Gonsalves v. Nissan Motor Corp. in Hawaii, Ltd.*, 100 Haw. 149, 164 (2002) (HRS § 480-2 applies to employment context); *Davis v. Four Seasons Hotel Ltd.*, 122 Haw. 423, 435–36 (2010) (retaliation is actionable under § 480-2); *Graham v. AIG Hawaii Ins. Co.*, 104 Haw. 32, 40 (2004) (liberal construction of statute).

Plaintiff's allegations, if proven, establish an unfair or deceptive practice tied directly to employment discrimination and retaliation, which is sufficient to defeat dismissal at the pleading stage.

## Count V — Title VI and PPA Violations (42 U.S.C. § 2000d; 34 C.F.R. § 668.14)

Plaintiff alleges that Defendant, a federally funded institution under Title IV, refused to hire him on the basis of race and deliberately failed to process, investigate, or communicate the outcome of his discrimination complaint. These acts violate Title VI and its incorporated obligations through the Program Participation Agreement (PPA).

Title VI provides a private right of action for intentional discrimination. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–98 (1979); *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001).

Courts have held that failure to follow complaint procedures required by federal funding conditions can give rise to Title VI liability. See *Doe v. Galster*, 768 F.3d 611, 617–18 (7th Cir. 2014) (deliberate indifference and failure to investigate state a claim); *Baker v. Board of Regents*, 991 F.2d 628, 631 (7th Cir. 1993) (violation of funding condition is violation of federal law); *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) (PPA embodies key statutory compliance requirements).

At the pleading stage, Plaintiff is not required to prove a final agency determination—only to allege facts showing that Defendant receives federal funds, was on notice of his complaint, and deliberately failed to act. Those allegations are clearly set forth here.

## Liberal Construction of Civil Rights Claims at the Pleading Stage

Civil rights claims are entitled to **especially liberal construction** at the pleading stage. See *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (pro se plaintiff need only provide fair notice of claim); *Huri v. Office of the Chief Judge*, 804 F.3d 826, 832 (7th Cir. 2015) (complaint alleging discriminatory motive and harm is sufficient to survive 12(b)(6)).

This Court is required to construe Plaintiff's complaint liberally, credit his factual allegations as true, and draw all reasonable inferences in his favor. See *Tamayo*, 526 F.3d at 1081.

## Conclusion

Each count of Plaintiff's complaint alleges specific facts showing discriminatory motive, adverse action, and Defendant's failure to comply with legal obligations under federal and Hawaiʻi law. These allegations, accepted as true, are more than sufficient to **state plausible claims for relief** under the governing standards of *Twombly* and *Iqbal*.

Accordingly, the Court should **deny any motion to dismiss under Rule 12(b)(6)** and allow this matter to proceed to discovery and adjudication on the merits.

📖 **Key Authorities Cited**:

- *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)
- *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008)
- *Carlson v. CSX Transp., Inc.*, 758 F.3d 819 (7th Cir. 2014)
- *Huri v. Office of the Chief Judge*, 804 F.3d 826 (7th Cir. 2015)
- *Shoppe v. Gucci America, Inc.*, 94 Haw. 368 (2000)
- *Lales v. Wholesale Motors Co.*, 133 Haw. 332 (2014)
- *Gonsalves v. Nissan Motor Corp.*, 100 Haw. 149 (2002)
- *Davis v. Four Seasons Hotel Ltd.*, 122 Haw. 423 (2010)
- *Graham v. AIG Hawaii Ins. Co.*, 104 Haw. 32 (2004)
- *Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014)
- *Baker v. Bd. of Regents*, 991 F.2d 628 (7th Cir. 1993)
- *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016)
- *Erickson v. Pardus*, 551 U.S. 89 (2007)
- *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)
- *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

**WHEREFORE**, Plaintiff prays the Court grant the relief requested herein.

Respectfully submitted,

/s/ *Sean Gottlieb*

**Sean Gottlieb, Pro Se**
Commack, NY 11725
seangottlieb@yahoo.com
Dated: October 23, 2025



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

September 18, 2025

**Via e-mail only to:** seangottlieb@yahoo.com

Sean Gottlieb

Re: Adtalem Global Education Group/Walden University – OCR Case Number 05-25-4086

Dear Sean Gottlieb:

On June 30, 2025, the U.S. Department of Education, Office for Civil Rights (OCR), received the complaint you filed against Adtalem Global Education Group/Walden University (the University) alleging that the University discriminated against you on the basis of race.

OCR processes complaints in accordance with its Case Processing Manual (CPM) (February 19, 2025). Section 108(i) of OCR's CPM states that OCR will dismiss an allegation if the same or similar allegation based on the same operative facts has been filed either by the complainant or someone other than the complainant against the same recipient with state or federal court.

You provided OCR with a copy of your Second Amended Complaint pending in the Northern District of Illinois Federal District Court. OCR confirmed that the allegations raised in your OCR complaint are included in the pending civil action. Based on this information, OCR is dismissing your complaint as of the date of this letter.

You may refile your complaint within 60 days following termination of the court proceeding if there has been no decision on the merits or settlement of the complaint allegation. A dismissal with prejudice is considered a decision on the merits.

This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. Individuals who file complaints with OCR may have the right to file a private suit in court regardless of OCR's determination.

Please be advised that the University must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law enforced by OCR. If this happens, the individual may file a retaliation complaint with OCR.

Page 2

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information, that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

If you have any questions about this letter, you may contact me via email at sandra.roesti@ed.gov.

Sincerely,

Sandra Roesti
Team Leader



## UNITED STATES DEPARTMENT OF EDUCATION

### FEDERAL STUDENT AID
### SCHOOL ELIGIBILITY AND OVERSIGHT SERVICE GROUP

# PROGRAM PARTICIPATION AGREEMENT

### [PROVISIONAL APPROVAL]

| | |
|---|---|
| **Effective Date of Approval:** | The date on which this Agreement is signed on behalf of the Secretary of Education |
| **Approval Expiration Date:** | June 30, 2025 |
| **Reapplication Date:** | March 31, 2025 |
| **Name of Institution:** | Walden University |
| **Address of Institution:** | 100 Washington Avenue South Suite 1210, Minneapolis, MN, 55401 |
| **OPE ID Number:** | 02504200 |
| **Taxpayer Identification Number (TIN):** | 650353783 |

> The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program.

The postsecondary educational institution listed above, referred to hereafter as the "Institution," and the United States Secretary of Education, referred to hereafter as the "Secretary," agree that the Institution may participate in those student financial assistance programs authorized by Title IV of the Higher Education Act of 1965, as amended (Title IV, HEA Programs) indicated under this Agreement and further agrees that such participation is subject to the Institution's compliance with the terms and conditions set forth in this Agreement. As used in this Agreement, the term "Department" refers to the U.S. Department of Education.

# SCOPE OF COVERAGE

This Agreement applies to all locations of the Institution as stated on the most current ELIGIBILITY AND CERTIFICATION APPROVAL REPORT issued by the Department. This Agreement covers the Institution's eligibility to participate in each of the following listed Title IV, HEA programs, and incorporates by reference the regulations cited.

- **FEDERAL PELL GRANT PROGRAM,** 20 U.S.C. §§ 1070a *et seq.*; 34 C.F.R. Part 690.
- **FEDERAL FAMILY EDUCATION LOAN PROGRAM,** 20 U.S.C. §§ 1071 *et seq.*; 34 C.F.R. Part 682.
- **FEDERAL DIRECT STUDENT LOAN PROGRAM,** 20 U.S.C. §§ 1087a *et seq.*; 34 C.F.R. Part 685.
- **FEDERAL PERKINS LOAN PROGRAM,** 20 U.S.C. §§ 1087aa *et seq.*; 34 C.F.R. Part 674.
- **FEDERAL SUPPLEMENTAL EDUCATIONAL OPPORTUNITY GRANT PROGRAM,** 20 U.S.C. §§ 1070b *et seq.*; 34 C.F.R. Part 676.
- **FEDERAL WORK-STUDY PROGRAM,** 20 U.S.C. §§ 1087 *et seq.*; 34 C.F.R. Part 675.
- **TEACHER EDUCATION ASSISTANCE FOR COLLEGE AND HIGHER EDUCATION GRANT PROGRAM,** 20 U.S.C. §§ 1070g *et seq.*; 34 C.F.R. Part 686.
- **IRAQ AND AFGHANISTAN SERVICE GRANT,** 20 U.S.C. §§ 1070h *et seq.*

*Additional Considerations*

**PPA Addendum**

This PPA includes an Addendum on which owners of the institution have agreed to be jointly and severally liable for the performance by the institution of its obligations under this agreement. In addition, the following additional conditions are set forth in the Addendum: A. Provisional Certification due to CIO B. Future Audited Statements and School Group C. Growth Restrictions D. Financial Responsibility Conditions E. Bi-Weekly and Monthly Financial Reporting F. Monthly Student Roster Submission G. Accrediting Agency, Government, and Class Action Reporting H. Student Complaint Reporting Requirement I. Open Investigation J. Class Action Settlement Commitments K. Reservation for Additional Conditions L. Required Signatures

# PROVISIONAL CERTIFICATION

This provisional certification is granted for a limited period to permit the Institution to participate in the Title IV, HEA programs referenced in this Agreement. During the period of provisional certification, the participation of the Institution will be subject to revocation for cause. Cause for revocation may include, but is not limited to, a failure to comply with any provision set forth in this Agreement, a violation of Department regulations deemed material by the Department, or a material misrepresentation in the material submitted to the Department as part of the Institution's application process for this certification. In the event the Department chooses to revoke this Agreement and the Institution's participation in the Title IV, HEA programs, the Institution will have the right to show cause why this Agreement should not be revoked by presenting its objections in writing to the designated Department reconsideration official. The Institution agrees that this opportunity to show cause by a request for reconsideration of the Department's revocation decision, and not the procedures in 34 C.F.R. Part 668, Subpart G, shall be the sole administrative appeal regarding such revocation. The decision by the designated Department reconsideration official will constitute the final agency action.

### Special Requirements for Substantial Changes Made During Term of Provisional Certification

Any institution provisionally certified must apply for and receive approval by the Secretary for expansion or of any substantial change (as hereinafter identified) before it may award, disburse or distribute Title IV, HEA funds based on the substantial change. Substantial changes generally include, but are not limited to: (a) establishment of an additional location; (b) increase in the level of academic offering beyond those listed in the Institution's Eligibility and Certification Approval Report (ECAR); or (c) addition of any educational program (including degree, nondegree, or short-term training programs).

If the Institution applies for the Secretary's approval of a substantial change, the Institution must demonstrate that it has the financial and administrative resources necessary to assure the Institution's continued compliance with the standards of financial responsibility (34 C.F.R. § 668.15 and 34 C.F.R. Part 668, Subpart L) and administrative capability (34 C.F.R. § 668.16).

### Reasons and Special Conditions of Provisional Certification

#### Change in Ownership

The Institution has undergone a change in ownership.

# GENERAL TERMS AND CONDITIONS

1. The Institution understands and agrees that it is subject to and will comply with, as they become effective, the program statutes and implementing regulations for institutional eligibility as set forth in 34 C.F.R. Part 600 and for each Title IV, HEA program in which it participates, as well as the general provisions set forth in Part F and Part G of Title IV of the HEA, and the Student Assistance General Provisions regulations set forth in 34 C.F.R. Part 668. *The recitation of any portion of the statute or regulations in this Agreement does not limit the Institution's obligation to comply with other applicable statutes and regulations.*

2. a. The Institution certifies that on the date it signs this Agreement, it has adopted and implemented the drug prevention program described in 34 C.F.R. § 86.100.

   b. The Institution certifies that on the date it signs this Agreement, it is in compliance with the disclosure requirements of Section 485(f) of the HEA (Campus Security Policy and Campus Crime Statistics).

3. The Institution agrees to comply with --

   a. Title VI of the Civil Rights Act of 1964, as amended, and the implementing regulations, 34 C.F.R. Parts 100 and 101 (nondiscrimination on the basis of race, color or national origin);

   b. Title IX of the Education Amendments of 1972 and the implementing regulations, 34 C.F.R. Part 106 (nondiscrimination on the basis of sex);

   c. The Family Educational Rights and Privacy Act of 1974 and the implementing regulations, 34 C.F.R. Part 99;

   d. Section 504 of the Rehabilitation Act of 1973 and the implementing regulations, 34 C.F.R. Part 104 (nondiscrimination on the basis of disability); and

   e. The Age Discrimination Act of 1975 and the implementing regulations, 34 C.F.R. Part 110.

   f. The Standards for Safeguarding Customer Information, 16 C.F.R. Part 314, issued by the Federal Trade Commission (FTC), as required by the Gramm-Leach-Bliley (GLB) Act, P.L. 106-102. These Standards are intended to ensure the security and confidentiality of customer records and information. The Secretary considers any breach to the security of student records and information as a demonstration of a potential lack of administrative capability as stated in 34 C.F.R. § 668.16(c). Institutions are strongly encouraged to inform its students of any such breaches. Institutions are required, pursuant to the Student Aid Internet Gateway (SAIG) Agreement, to notify the Department of any suspected data breaches.

4. The Institution acknowledges that 34 C.F.R. Parts 602 and 668 require accrediting agencies, State regulatory bodies, and the Secretary to share information about institutions. The Institution agrees that the Secretary, any accrediting agency recognized by the Secretary, and any State regulatory body may share or report information to one another about the Institution without limitation.

5. The Institution acknowledges that the HEA prohibits the Secretary from recognizing the accreditation of any institution of higher education unless that institution agrees to submit any dispute involving an adverse action, such as the final denial, withdrawal, or termination of accreditation to arbitration prior to initiating any other legal action.

6. The Institution acknowledges that the Department is obligated to take appropriate measures in order to safeguard its systems and information as well as borrowers' personally identifiable information (PII) as required under Federal law, including but not limited to the requirements in the Privacy Act (*see* 5 U.S.C. § 552a(e)), E-Government Act of 2002 (*see* 44 U.S.C. § 3544), the Family Educational Rights and Privacy Act of 1974 (FERPA) (20 U.S.C. § 1232g; 34 C.F.R. Part 99), Federal Information Security Modernization Act (FISMA) of 2014 (44 U.S.C. § 3551, *et seq.*), and OMB Circular No. A-130. If the Institution has a cyber security incident that may negatively affect the Department's systems, the Department may terminate the Institution's access to the Department's systems. Access will be reconnected when the Department determines that the Institution has resolved any cyber security concerns and vulnerabilities to the Department's satisfaction.

7. The Institution acknowledges that any person who knowingly and willfully commits, or attempts to commit, any criminal action described in 20 U.S.C. § 1097, shall be subject to the penalties described therein.

# SELECTED PROVISIONS FROM
# GENERAL PROVISIONS REGULATIONS, 34 C.F.R. § 668.14

An institution's program participation agreement applies to each branch campus and other location of the institution that meets the applicable requirements of this part unless otherwise specified by the Secretary.

(b) By entering into a program participation agreement, an institution agrees that—

(1) It will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program;

(2) As a fiduciary responsible for administering Federal funds, if the institution is permitted to request funds under a Title IV, HEA program advance payment method, the institution will time its requests for funds under the program to meet the institution's immediate Title IV, HEA program needs;

(3) It will not request from or charge any student a fee for processing or handling any application, form, or data required to determine a student's eligibility for, and amount of, Title IV, HEA program assistance;

(4) It will establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under the Title IV, HEA programs, together with assurances that the institution will provide, upon request and in a timely manner, information relating to the administrative capability and financial responsibility of the institution to--

(i) The Secretary;

(ii) A guaranty agency, as defined in 34 C.F.R. Part 682, that guarantees loans made under the Federal Stafford Loan and Federal PLUS programs for attendance at the institution or any of the institution's branch campuses or other locations;

(iii) The nationally recognized accrediting agency that accredits or preaccredits the institution or any of the

institution's branch campuses, other locations, or educational programs;

(iv) The State agency that legally authorizes the institution and any branch campus or other location of the institution to provide postsecondary education; and

(v) In the case of a public postsecondary vocational educational institution that is approved by a State agency recognized for the approval of public postsecondary vocational education, that State agency;

(5) It will comply with the provisions of 34 C.F.R. § 668.15 relating to factors of financial responsibility;

(6) It will comply with the provisions of 34 C.F.R. § 668.16 relating to standards of administrative capability;

(7) It will submit reports to the Secretary and, in the case of an institution participating in the Federal Stafford Loan, Federal PLUS, or the Federal Perkins Loan Program, to holders of loans made to the institution's students under that program at such times and containing such information as the Secretary may reasonably require to carry out the purpose of the Title IV, HEA programs;

(8) It will not provide any statement to any student or certification to any lender in the case of an FFEL Program loan, or origination record to the Secretary in the case of a Direct Loan Program loan that qualifies the student or parent for a loan or loans in excess of the amount that the student or parent is eligible to borrow in accordance with sections 425(a), 428(a)(2), 428(b)(1)(A) and (B), 428B, 428H, and 455(a) of the HEA;

(9) It will comply with the requirements of Subpart D of this part concerning institutional and financial assistance information for students and prospective students;

(10) In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, the institution will make available to prospective students, at or before the time that those students apply for enrollment--

(i) The most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and

(ii) Relevant State licensing requirements of the State in which the institution is located for any job for which the course of instruction is designed to prepare such prospective students, as provided in 34 C.F.R. § 668.43(a)(5)(v);

(11) In the case of an institution participating in the FFEL Program, the institution will inform all eligible borrowers, as defined in 34 C.F.R. Part 682, enrolled in the institution about the availability and eligibility of those borrowers for State grant assistance from the State in which the institution is located, and will inform borrowers from another State of the source of further information concerning State grant assistance from that State;

(12) It will provide the certifications described in paragraph (c) of this section;

(13) In the case of an institution whose students receive financial assistance pursuant to section 484(d) of the HEA, the institution will make available to those students a program proven successful in assisting students in obtaining the recognized equivalent of a high school diploma;

(14) It will not deny any form of Federal financial aid to any eligible student solely on the grounds that the student is participating in a program of study abroad approved for credit by the institution;

(15) (i) Except as provided under paragraph (b)(15)(ii) of this section, the institution will use a default management plan approved by the Secretary with regard to its administration of the FFEL or Direct Loan programs, or both for at least the first two years of its participation in those programs, if the institution --

(A) Is participating in the FFEL or Direct Loan programs for the first time; or

(B) Is an institution that has undergone a change of ownership that results in a change in control and is participating in the FFEL or Direct Loan programs.

(ii) The institution does not have to use an approved default management plan if --

(A) The institution, including its main campus and any branch campus, does not have a cohort default rate in excess of 10 percent; and

(B) The owner of the institution does not own and has not owned any other institution that had a cohort default rate in excess of 10 percent while that owner owned the institution.

(16) For a proprietary institution, the institution will derive at least 10 percent of its revenues for each fiscal year from sources other than Federal funds, as provided in 34 C.F.R. § 668.28(a), or be subject to sanctions described in 34 C.F.R. § 668.28(c);

(17) The Secretary, guaranty agencies and lenders as defined in 34 C.F.R. Part 682, nationally recognized accrediting agencies, the Secretary of Veterans Affairs, State agencies recognized under 34 C.F.R. Part 603 for the approval of public postsecondary vocational education, and State agencies that legally authorize institutions and branch campuses or other locations of institutions to provide postsecondary education, have the authority to share with each other any information pertaining to the institution's eligibility for or participation in the Title IV, HEA programs or any information on fraud and abuse;

(18) It will not knowingly --

(i) Employ in a capacity that involves the administration of the Title IV, HEA programs or the receipt of funds under those programs, an individual who has been convicted of, or has pled *nolo contendere* or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds, or has been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds;

(ii) Contract with an institution or third-party servicer that has been terminated under section 432 of the HEA for a reason involving the acquisition, use, or expenditure of Federal, State, or local government funds, or that has been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds; or

(iii) Contract with or employ any individual, agency, or organization that has been, or whose officers or employees have been--

(A) Convicted of, or pled *nolo contendere* or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds; or

(B) Administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds;

(19) It will complete, in a timely manner and to the satisfaction of the Secretary, surveys conducted as a part of the Integrated Postsecondary Education Data System (IPEDS) or any other Federal collection effort, as designated by the Secretary, regarding data on postsecondary institutions;

(20) In the case of an institution that is co-educational and has an intercollegiate athletic program, it will comply with the provisions of 34 C.F.R. § 668.48;

(21) It will not impose any penalty, including, but not limited to, the assessment of late fees, the denial of access to classes, libraries, or other institutional facilities, or the requirement that the student borrow additional funds for which interest or other charges are assessed, on any student because of the student's inability to meet his or her financial obligations to the institution as a result of the delayed disbursement of the proceeds of a Title IV, HEA program loan due to compliance with statutory and regulatory requirements of or applicable to the Title IV, HEA programs, or delays attributable to the institution;

(22) (i) It will not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of Title IV, HEA program funds.

(A) The restrictions in paragraph (b)(22) of this section do not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal student assistance.

(B) For the purpose of paragraph (b)(22) of this section, an employee who receives multiple adjustments to compensation in a calendar year and is engaged in any student enrollment or admission activity or in making decisions regarding the award of Title IV, HEA program funds is considered to have received such adjustments based upon success in securing enrollments or the award of financial aid if those adjustments create compensation that is based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid.

(ii) Notwithstanding paragraph (b)(22)(i) of this section, eligible institutions, organizations that are contractors to eligible institutions, and other entities may make—

(A) Merit-based adjustments to employee compensation provided that such adjustments are not based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid; and

(B) Profit-sharing payments so long as such payments are not provided to any person or entity engaged in student recruitment or admission activity or in making decisions regarding the award of Title IV, HEA program funds.

(iii) As used in paragraph (b)(22) of this section,

(A) *Commission, bonus, or other incentive payment* means a sum of money or something of value, other than a fixed salary or wages, paid to or given to a person or an entity for services rendered.

(B) *Securing enrollments or the award of financial aid* means activities that a person or entity engages in at any point in time through completion of an educational program for the purpose of the admission or matriculation of students for any period of time or the award of financial aid to students.

(1) These activities include contact in any form with a prospective student, such as, but not limited to—contact through preadmission or advising activities, scheduling an appointment to visit the enrollment office or any other office of the institution, attendance at such an appointment, or involvement in a prospective student's signing of an enrollment agreement or financial aid application.

(2) These activities do not include making a payment to a third party for the provision of student contact information for prospective students provided that such payment is not based on—

(i) Any additional conduct or action by the third party or the prospective students, such as participation in preadmission or advising activities, scheduling an appointment to visit the enrollment office or any other office of the institution or attendance at such an appointment, or the signing, or being involved in the signing, of a prospective student's enrollment agreement or financial aid application; or

(ii) The number of students (calculated at any point in time of an educational program) who apply for enrollment, are awarded financial aid, or are enrolled for any period of time, including through completion of an educational program.

(C) *Entity or person engaged in any student recruitment or admission activity or in making decisions about the award of financial aid* means—

(1) With respect to an entity engaged in any student recruitment or admission activity or in making decisions about the award of financial aid, any institution or organization that undertakes the recruiting or the admitting of students or that makes decisions about and awards Title IV, HEA program funds; and

(2) With respect to a person engaged in any student recruitment or admission activity or in making decisions about the award of financial aid, any employee who undertakes recruiting or admitting of students or who makes decisions about and awards Title IV, HEA program funds, and any higher level employee with responsibility for recruitment or admission of students, or making decisions about awarding Title IV, HEA program funds.

(D) *Enrollment* means the admission or matriculation of a student into an eligible institution.

(23) It will meet the requirements established pursuant to Part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies;

(24) It will comply with the requirements of 34 C.F.R. § 668.22;

(25) It is liable for all--

(i) Improperly spent or unspent funds received under the Title IV, HEA programs, including any funds administered by a third-party servicer; and

(ii) Returns of Title IV, HEA program funds that the institution or its servicer may be required to make;

(26) If an educational program offered by the institution is required to prepare a student for gainful employment in a recognized occupation, the institution must—

(i) Demonstrate a reasonable relationship between the length of the program and entry level requirements for the recognized occupation for which the program prepares the student. The Secretary considers the relationship to be reasonable if the number of clock hours provided in the program does not exceed the greater of –

(A) One hundred and fifty percent of the minimum number of clock hours required for training in the

Docusign Envelope ID: 4295AD66-E5E9-4C83-82F0-EAEADED22433

recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement, or as established by any Federal agency;

or

(B) The minimum number of clock hours required for training in the recognized occupation for which the program prepares the student as established in a State adjacent to the State in which the institution is located; and

(ii) Establish the need for the training for the student to obtain employment in the recognized occupation for which the program prepares the student;

(27) In the case of an institution participating in a Title IV, HEA loan program, the institution --

(i) Will develop, publish, administer, and enforce a code of conduct with respect to loans made, insured or guaranteed under the Title IV, HEA loan programs in accordance with 34 C.F.R. § 601.21; and

(ii) Must inform its officers, employees, and agents with responsibilities with respect to loans made, insured or guaranteed under the Title IV, HEA loan programs annually of the provisions of the code required under paragraph (b)(27) of this section;

(28) For any year in which the institution has a preferred lender arrangement (as defined in 34 C.F.R. § 601.2(b)), it will at least annually compile, maintain, and make available for students attending the institution, and the families of such students, a list in print or other medium, of the specific lenders for loans made, insured, or guaranteed under Title IV of the HEA or private education loans that the institution recommends, promotes, or endorses in accordance with such preferred lender arrangement. In making such a list, the institution must comply with the requirements in 34 C.F.R. § 682.212(h) and 34 C.F.R. § 601.10;

(29) (i) It will, upon the request of an enrolled or admitted student who is an applicant for a private education loan (as defined in 34 C.F.R. § 601.2(b)), provide to the applicant the self-certification form required under 34 C.F.R. § 601.11(d) and the information required to complete the form, to the extent the institution possesses such information, including --

(A) The applicant's cost of attendance at the institution, as determined by the institution under part F of Title IV of the HEA;

(B) The applicant's estimated financial assistance, including amounts of financial assistance used to replace the expected family contribution as determined by the institution in accordance with Title IV, for students who have completed the Free Application for Federal Student Aid; and

(C) The difference between the amounts under paragraphs (b)(29)(i)(A) and (29)(i)(B) of this section, as applicable.

(ii) It will, upon the request of the applicant, discuss with the applicant the availability of Federal, State, and institutional student financial aid;

(30) The institution --

(i) Has developed and implemented written plans to effectively combat the unauthorized distribution of copyrighted material by users of the institution's network, without unduly interfering with educational and research use of the network, that include --

(A) The use of one or more technology-based deterrents;

(B) Mechanisms for educating and informing its community about appropriate versus inappropriate use of copyrighted material, including that described in 34 C.F.R. § 668.43(a)(10);

(C) Procedures for handling unauthorized distribution of copyrighted material, including disciplinary procedures; and

(D) Procedures for periodically reviewing the effectiveness of the plans to combat the unauthorized distribution of copyrighted materials by users of the institution's network using relevant assessment criteria. No particular technology measures are favored or required for inclusion in an institution's plans, and each institution retains the authority to determine what its particular plans for compliance with paragraph (b)(30) of this section will be, including those that prohibit content monitoring; and

(ii) Will, in consultation with the chief technology officer or other designated officer of the institution--

(A) Periodically review the legal alternatives for downloading or otherwise acquiring copyrighted material;

(B) Make available the results of the review in paragraph (b)(30)(ii)(A) of this section to its students through a Web site or other means; and

(C) To the extent practicable, offer legal alternatives for downloading or otherwise acquiring copyrighted material, as determined by the institution; and

(31) The institution will submit a teach-out plan to its accrediting agency in compliance with 34 C.F.R. § 602.24(c) and the standards of the institution's accrediting agency. The institution will update its teach-out plan upon the occurrence of any of the following events:

(i) The Secretary initiates the limitation, suspension, or termination of the participation of an institution in any Title IV, HEA program under 34 C.F.R. § 600.41 or Subpart G of this part or initiates an emergency action under 34 C.F.R. § 668.83.

(ii) The institution's accrediting agency acts to withdraw, terminate, or suspend the accreditation or preaccreditation of the institution.

(iii) The institution's State licensing or authorizing agency revokes the institution's license or legal authorization to provide an educational program.

(iv) The institution intends to close a location that provides 100 percent of at least one program.

(v) The institution otherwise intends to cease operations.

(c) In order to participate in any Title IV, HEA program (other than the LEAP and NEISP programs), the institution must certify that it--

(1) Has in operation a drug abuse prevention program that the institution has determined to be accessible to any officer, employee, or student at the institution; and

(2) (i) Has established a campus security policy in accordance with section 485(f) of the HEA; and

(ii) Has complied with the disclosure requirements of 34 C.F.R. § 668.47 as required by section 485(f) of the HEA.

(d) (1) The institution, if located in a State to which section 4(b) of the National Voter Registration Act (42 U.S.C. 1973gg-2(b)) does not apply, will make a good faith effort to distribute a mail voter registration form, requested and received from the State, to each student enrolled in a degree or certificate program and physically in attendance at the institution, and to make those forms widely available to students at the institution.

(2) The institution must request the forms from the State 120 days prior to the deadline for registering to vote within the State. If an institution has not received a sufficient quantity of forms to fulfill this section from the State within 60 days prior to the deadline for registering to vote in the State, the institution is not liable for not meeting the requirements of this section during that election year.

(3) This paragraph applies to elections as defined in Section 301(1) of the Federal Election Campaign Act of 1971 (2 U.S.C. 431(1)), and includes the election for Governor or other chief executive within such State.

(e) (1) A program participation agreement becomes effective on the date that the Secretary signs the agreement.

(2) A new program participation agreement supersedes any prior program participation agreement between the Secretary and the institution.

(f) (1) Except as provided in paragraphs (g) and (h) of this section, the Secretary terminates a program participation agreement through the proceedings in Subpart G of this part.

(2) An institution may terminate a program participation agreement.

(3) If the Secretary or the institution terminates a program participation agreement under paragraph (f) of this section, the Secretary establishes the termination date.

(g) An institution's program participation agreement automatically expires on the date that--

(l) The institution changes ownership that results in a change in control as determined by the Secretary under 34 C.F.R. Part 600; or

(2) The institution's participation ends under the provisions of 34 C.F.R. § 668.26(a)(1), (2), (4), or (7).

Docusign Envelope ID: 4295AD66-E5E9-4C83-82F0-EAEADED22433

(h) An institution's program participation agreement no longer applies to or covers a location of the institution as of the date on which that location ceases to be a part of the participating institution.

# WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

If an institution participates in the William D. Ford Federal Direct Loan (Direct Loan) Program, the institution and its representatives shall comply with, as they become effective, the statute, guidelines, and regulations governing the Title IV, Part D, William D. Ford Federal Direct Loan Program as required by 20 U.S.C. §§ 1087a *et seq.* (Part C) and 34 C.F.R. Part 685.

The institution will:

1. Provide for the establishment and maintenance of a Direct Loan Program at the institution under which the institution will:

   Identify eligible students who seek student financial assistance in accordance with Section 484 of the HEA.

   Estimate the need of students as required under Title IV, Part F of the HEA.

   Provide a certification statement of eligibility for students to receive loans that will not exceed the annual or aggregate limits, except the institution may exercise its authority, under exceptional circumstances identified by the Secretary, to refuse to certify a statement that permits a student to receive a loan, or certify a loan amount that is less than the student's determination of need, if the reason for such action is documented and provided in written form to a student.

   Establish a schedule for disbursement of loan proceeds to meet the requirements of Section 428G of the HEA.

   Reconcile institutional records with receipt and disbursement records on at least a monthly basis.

   Provide timely and accurate information to the Secretary concerning 1) the status of students while in attendance, 2) any new information pertaining to student or parent borrowers of which the institution becomes aware after the student leaves the institution, and 3) student eligibility and need for Federal funds under Title IV, Part D of the HEA, at such times and in such manner as prescribed by the Secretary.

2. Comply with requirements established by the Secretary relating to student loan information with respect to the Direct Loan Program.

3. Implement a quality assurance system, as established by the Secretary and developed in consultation with institutions of higher education, to ensure that the institution is complying with program requirements and meeting program objectives.

4. Not charge any fees of any kind, regardless of how they are described, to student or parent borrowers for loan application, or origination activities (if applicable), or the provision and processing of any information necessary for a student or parent to receive a loan under Title IV, Part D of the HEA.

5. Comply with the provisions regarding student claims and disputes of 34 C.F.R. § 685.300(d) (borrower defense claims in an internal dispute process), (e) (class action bans), (f) (pre-dispute arbitration agreements), (g) (submission of arbitral records), (h) (submission of judicial records), and (i) (definitions).

6. Originate loans to eligible students and parents in accordance with the requirements of Title IV, Part D of the HEA and use funds advanced to it solely for that purpose.

7. Provide that the note or evidence of obligation of the loan shall be the property of the Secretary.

8. Comply with other provisions that the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of Title IV, Part D of the HEA.

9. Accept responsibility and financial liability stemming from its failure to perform its functions under this Program Participation Agreement.

10. Accept responsibility and financial liability stemming from losses incurred by the Secretary for repayment of amounts discharged by the Secretary pursuant to 34 C.F.R. §§ 685.206, 685.214, 685.215, 685.216, and 685.222.

## CERTIFICATIONS REQUIRED FROM INSTITUITONS

The Institution should refer to the regulations cited below. Signature on this Agreement provides for compliance with, as they become effective, the certification requirements under 34 C.F.R. Part 82, "New Restrictions on Lobbying," 34 C.F.R. Part 84, "Governmentwide Requirements for Drug-Free Workplace (Financial Assistance), 2 C.F.R. Part 180, Subpart C, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," 2 C.F.R. Part 3485, "Nonprocurement Debarment and Suspension," and 34 C.F.R. Part 86, "Drug and Alcohol Abuse Prevention." Breach of any of these certifications constitutes a breach of this Agreement.

## PART 1  CERTIFICATION REGARDING LOBBYING; DRUG-FREE WORKPLACE; DEBARMENT, SUSPENSION AND OTHER RESPONSIBILITY MATTERS; AND DRUG AND ALCOHOL ABUSE PREVENTION

### *1. Lobbying*

As required by Section 1352, Title 31 of the U.S. Code, and implemented at 34 C.F.R. Part 82, for persons entering into a Federal contract, grant or cooperative agreement over $100,000, as defined at 34 C.F.R. Part 82, §§ 82.105 and 82.110, the undersigned certifies, to the best of his or her knowledge and belief, that:

(1) No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2) If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form - LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

(3) The Institution shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

### *2a. Drug-Free Workplace (Grantees Other Than Individuals)*

As required by the Drug-Free Workplace Act of 1988, and implemented at 34 C.F.R. Part 84, Subpart B, for recipients other than individuals, as defined at 34 C.F.R. Part 84, §§ 84.200 through 84.230 -
The Institution certifies that it will or will continue to provide a drug-free workplace by:

(a) Publishing a drug-free workplace statement notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the grantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

(b) Establishing an on-going drug-free awareness program to inform employees about-

  (1) The dangers of drug abuse in the workplace;

  (2) The Institution's policy of maintaining a drug-free workplace;

  (3) Any available drug counseling, rehabilitation, and employee assistance programs; and

  (4) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

(c) Making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph (a);

(d) Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant, the employee will -

  (1) Abide by the terms of the statement, and

  (2) Notify the employer in writing if he or she is convicted for a violation of a criminal drug statute occurring in the workplace no more than five calendar days after such conviction;

(e) Notifying the agency, in writing, within 10 calendar days after receiving notice under this subparagraph (d)(2) from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title, to: Director, Grants and Contracts Service, U.S. Department of Education, 400 Maryland Avenue, S.W., Washington, DC 20202. Notice shall include the identification number(s) of each affected grant;

(f) Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted -

  (1) Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1972, as amended; or

  (2) Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency;

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

### 2b. Drug-Free Workplace (Grantees Who Are Individuals)

As required by the Drug-Free Workplace Act of 1988, and implemented at 34 C.F.R. Part 84, Subpart C, for recipients who are individuals, as defined at 34 C.F.R. Part 84, § 84.300 -

1. As a condition of the grant, the Institution certifies that it will not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in conducting any activity related to the award; and

2. If any officer or owner of the Institution is convicted of a criminal drug offense resulting from a violation

occurring during the conduct of any award activity, the Institution will report the conviction, in writing, within 10 calendar days of the conviction, to: Director, Grants and Contracts Service, U.S. Department of Education, 400 Maryland Avenue, S.W., Washington, DC 20202. Notice shall include the identification number(s) of each affected grant.

### 3. Debarment, Suspension, and Other Responsibility Matters

As required by Executive Order 12549, Debarment and Suspension, and implemented at 2 C.F.R. Part 180, for prospective participants in primary covered transactions as defined at 2 C.F.R. Part 180, §§ 180.200 and 180.210, the Institution certifies that it and its principals (per 2 C.F.R. § 180.335):

(a) Are not presently debarred, suspended, proposed for debarment, voluntarily excluded, or disqualified from covered transactions by any Federal department or agency;

(b) Have not within a three-year period preceding this application been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public or private agreement or transaction; violation of Federal or State antitrust statutes, including those proscribing price fixing between competitors, allocation of customers between competitors, and bid rigging; commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, receiving stolen property, making false claims, or obstruction of justice; or commission of any other offense indicating a lack of business integrity or business honesty that seriously and directly affects their present responsibility.

(c) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (b) of this certification; and

(d) Have not within a three-year period preceding this application had one or more public transactions (Federal, State, or local) terminated for cause or default.

### 4. Drug and Alcohol Abuse Prevention

As required by the Drug-Free Schools and Communities Act Amendments of 1989, which added section 1213 to the Higher Education Act, and implemented at 34 C.F.R. Part 86, the undersigned Institution certifies that it has adopted and implemented a drug prevention program for its students and employees that, at a minimum, includes--

1. The annual distribution in writing to each employee, and to each student who is taking one or more classes for any kind of academic credit except for continuing education units, regardless of the length of the student's program of study, of:

   - Standards of conduct that clearly prohibit, at a minimum, the unlawful possession, use, or distribution of illicit drugs and alcohol by students and employees on its property or as part of any of its activities.
   - A description of the applicable legal sanctions under local, State, or Federal law for the unlawful possession or distribution of illicit drugs and alcohol.
   - A description of the health risks associated with the use of illicit drugs and the abuse of alcohol.
   - A description of any drug or alcohol counseling, treatment, or rehabilitation or re-entry programs that are available to employees or students.

     A clear statement that the Institution will impose disciplinary sanctions on students and employees (consistent with local, State, and Federal law), and a description of those sanctions, up to and including expulsion or termination of employment and referral for prosecution, for violation of the standards of conduct. A disciplinary sanction may include the completion of an appropriate rehabilitation program.

2. A biennial review by the Institution of its program to:

- Determine its effectiveness and implement changes to the program if they are needed.
- Ensure that its disciplinary sanctions are consistently enforced.

## PART 2 CERTIFICATION REGARDING DEBARMENT, SUSPENSION, DISQUALIFICATION, AND VOLUNTARY EXCLUSION -- LOWER TIER COVERED TRANSACTIONS

The Institution is to obtain the signatures of Lower Tier Contractors on reproduced copies of the certification below, and retain the signed certification(s) in the Institution's files.

---

### CERTIFICATION BY LOWER TIER CONTRACTOR
### (Before Completing Certification, Read Instructions for This Part, below)

(1)  The prospective lower tier participant certifies by submission of this proposal, that neither it nor its principals are presently debarred, suspended, proposed for debarment, voluntarily excluded, or disqualified from participation in this transaction by any Federal Department or Agency.

(2)  Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

| | |
|---|---|
| Name of Lower Tier Organization | PR/Award Number or Project Name |
| Name of Authorized Representative | Title of Authorized Representative |
| Signature of Authorized Representative | Date |

1. By signing and submitting this proposal, the prospective lower tier participant is providing the certification set out below.

2. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

3. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

4. The terms "covered transaction," "debarred," "suspended," "disqualified," "lower tier covered transaction," "participant," "person," "primary covered transaction," "principal," "proposal," "voluntarily excluded," as used in this clause, have the meanings set out in the Definitions and Coverage sections of rules implementing Executive Order 12549. You may contact the person to whom this proposal is submitted for assistance in obtaining a copy of those regulations.

5. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

6. The prospective lower tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Disqualification, and Voluntary Exclusion--Lower Tier Covered Transactions," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions.

7. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, disqualified, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant may decide the method and frequency by which it determines the eligibility of its principals. Each participant may, but is not required to, check the Nonprocurement List.

8. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

9. Except for transactions authorized under paragraph 5 of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, disqualified, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

NOTE: A completed copy of the "Certification Regarding Debarment, Suspension, Disqualification and Voluntary Exclusion--Lower Tier Covered Transactions" form must be retained by the Institution. The original blank certification must be returned with the PPA.

## IN WITNESS WHEREOF

the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

Signature of Institution's
Chief Executive Officer
(CEO)/President/Chancellor:                                    Date: 7/15/2024

Print Name and Title:     Dr. Susan Subocz
                          Associate President and Provost

For the Secretary: U.S.
Department of Education                                        Date: 7/23/2024

**Addendum: Walden University- 02504200**
This Addendum is a part of the PROGRAM PARTICIPATION AGREEMENT
Expiration Date: **6/30/2025**

## CONDITIONS IN WALDEN UNIVERSITY PROVISIONAL PROGRAM PARTICIPATION AGREEMENTS

### A. Provisional Certification due to CIO

When an institution undergoes a CIO, it participates under provisional certification. 34 C.F.R. § 668.13(c)(1)(i)(B). Any institution provisionally certified must apply for and receive approval by the Department for expansion or for a substantial change before it may award, disburse, or distribute Title IV, HEA funds based on the substantial change. Substantial changes generally include but are not limited to: (a) establishment of an additional location; (b) increase in the level of academic offering beyond what is listed in the institution's Eligibility and Certification Approval Report ("ECAR"); or (c) addition of any educational program (including degree, nondegree, or short-term training programs). Additional information on this condition is set forth below (*see* Growth Restrictions).

### B. Future Audited Financial Statements and School Group

Future audited financial statements should be submitted at the level of Adtalem under the locator school of the school group, Chamberlain University (OPE ID: 00638500).

### C. Growth Restrictions

During the period in which Walden participates under provisional certification as a result of the CIO and for any longer period in which Walden is subject to a financial protection condition (i.e., a letter of credit, cash escrow or offset), Walden is not allowed to make any of the following changes unless approved by the Department:

1. add new programs that are not already approved by the Department and included in Walden's ECAR as of the date of the CIO;

2. add new locations that are not already approved by the Department and included in Walden's ECAR as of the date of the CIO;

3. increase the credential level of its offerings; or

4. change the length of any programs (either to shorten or lengthen them).

In accordance with the Growth Restriction conditions set forth Walden's TPPPA, Walden may now seek the Department's approval to make such changes. However, the Department will review any such requests in light of Walden's failed composite score for FYE 6/30/2022 and likely failure for FYE 6/30/2023.

**Addendum: Walden University- 02504200**
This Addendum is a part of the PROGRAM PARTICIPATION AGREEMENT
Expiration Date: **6/30/2025**

### D. Financial Responsibility Condition

The Department has previously determined that Walden is not financially responsible under the standards set forth in 34 C.F.R. §§ 668.171(b)(1) (failure of annual financial statements) and 668.15(b)(7)(SDBS failure). As a result, Walden currently participates under the financial responsibility alternative standard described in 34 C.F.R. §§ 668.175(f)(provisional certification/15% LOC requirement). Walden has posted the following LOCs:

LOC # 2023110100 - for FYE 6/30/2022 audited financial statements (failure of composite score). The total amount of this LOC # is $157,919,984 on behalf of all schools owned by Adtalem, with $69,287,273 of this LOC apportioned to Walden.

LOC # 68180507 - for SDBS failure in the amount of $69,393,973.

Until such time that the Department notifies the institution otherwise, Walden will continue to participate under the terms and conditions of the Department's letters notifying Walden and Adtalem of the financial protection requirement.

### E. Bi-weekly and Monthly Financial Reporting

Walden must continue to submit the following reports on a monthly or bi-weekly basis as described below:

1. Bi-weekly cash balance submission that outlines Adtalem's available cash on hand. Please provide details of what is included in the cash balance.

2. Monthly report with the following information contained in a single report (Items 2.a., 2.b., 2.c., and 2.d. should be submitted at the level of Adtalem):

   a. Actual and projected cash flow statement that breaks-out each anticipated inflow and outflow by line item and amount as indicated on the sample cash flow statement, with business and financial disclosure notes (sample included);
   b. Any important financial transaction that has a material effect on Adtalem's financial condition;
   c. Explanation of variances as indicated on the enclosed "Cash Receipt & Disbursements Instructions."
   d. Any planned mergers, acquisitions, business expansions/contractions, and/or corporate restructuring;
   e. Following the Department's release of Walden from any limitation on adding new locations (either as a result of the institution moving from provisionally-certified status to fully-certified status or otherwise) any announced or upcoming location expansions;
   f. Any announced or upcoming location closures;

**Addendum: Walden University- 02504200**
This Addendum is a part of the PROGRAM PARTICIPATION AGREEMENT
Expiration Date: **6/30/2025**

    g.  Following the Department's release of Walden from any limitation on adding new programs (either as a result of the institution moving from provisionally-certified status to fully-certified status or otherwise) any new programs that Walden plans to offer at one or more locations that participate in the federal student aid programs; and

    h.  Any decision to cease enrollment in any program(s) and provide the teach out plan/teach out agreement and the schedule for teach out of the program(s).

Walden will be subject to these reporting requirements for the period it participates under provisional certification, either as a result of the CIO or otherwise. Walden should continue submitting these items on its established schedule.

### F. Monthly Student Roster Submission

Walden must continue to submit a Monthly Student Roster in Microsoft Excel (sample format with required information and instructions is enclosed). Documents containing Personally Identifiable Information ("PII") submitted to the Department via electronic delivery must be password protected. PII is any information about a student, which can be used to distinguish or trace the student's identity. This submission is due to the Department on the 20th of each month, beginning the first full month following the date of this letter. Please submit to Multi-RegionalSPD@ed.gov and CIOdocuments@ed.gov.

Walden will be subject to this reporting requirement for the period it participates under provisional certification, either as a result of the CIO or otherwise.

### G. Accrediting Agency, Government, and Class Action Reporting[1]

Walden must report:

---

[1] For purposes of this condition, the following definitions apply:

- *Investigations* - the Institution shall be considered to be under investigation when it receives a civil investigative demand, subpoena, request for documents and/or information, or other formal or informal inquiry, unless the communication from the accrediting agency or government or government entity clearly states that the Institution is not under investigation.

- *Legal proceeding* - court actions, arbitrations or proceedings internal to the accrediting agency or governmental agency.

- *Negative actions* – a final action by a government agency or accrediting agency that results in the denial, withdrawal, suspension, revocation, or termination of accreditation, preaccreditation, or participation in, or eligibility for, a government program, or any comparable action an accrediting agency or government agency may take against an institution or program, including probation and show cause.

**Addendum: Walden University- 02504200**
This Addendum is a part of the PROGRAM PARTICIPATION AGREEMENT
Expiration Date: **6/30/2025**

1. Accrediting Agency Actions
   a. All known open investigations, legal proceedings, and negative actions;
   b. Any investigations, legal proceedings, and negative actions commenced by any accrediting agency that were closed, settled, concluded, or resolved within the most recent seven year period; and
   c. The receipt of any notices or other correspondence relating to its status with its accrediting agency.
2. Government Actions
   a. All known open investigations, legal proceedings, and negative actions commenced by any local, state, tribal, federal, and foreign government or government entity;
   b. Any investigations, legal proceedings, and negative actions commenced by any local, state, tribal, federal, and foreign government or government entity that that were closed, settled, concluded, or resolved within the most recent seven year period; and
   c. The receipt of any notices or other correspondence relating to its status from any local, state, tribal, federal, and foreign government or government entity.
3. Class Actions
   a. Any threatened or pending litigation for which a plaintiff seeks or has been granted class certification; and
   b. Any class actions that were closed, settled, litigated, or otherwise concluded or resolved within the most recent seven year period.

**For Items 2 and 3,** Walden may limit its responses to investigations, legal proceedings, notices, and actions in the following subject areas:

- *Recruitment/marketing* – relating to statements, promises, representations, or claims made by any person or on any advertisement or marketing material, regardless of whether the institution had any relationship to the person making the statement or had any role in the creation of the advertising or marketing material.

- *Employment/Job prospects* – relating to the likelihood of finding a job, students' employability/job prospects, partnerships with employers, career services/job placement assistance, industry demand of graduates, earnings prospects, and job placement rates.

- *Program Costs and Financial Aid* - relating to tuition and fees, loans/grants, credit balances, and refunds.

- *Educational Services* - relating to quality of program or instructors, selectivity of program or school, course availability, internship/externship, and accommodations/equipment.

**Addendum: Walden University- 02504200**
This Addendum is a part of the PROGRAM PARTICIPATION AGREEMENT
Expiration Date: **6/30/2025**

- *Accreditation/ Licensure* - relating to the institution's approval or accreditation, any specific program being accredited, licensed, or recognized in any way, and programs required to have programmatic accreditation for a graduate to get a job in the field.

For **Items 1a, 2a and 3a** ("Open Matters"), Walden must provide a summary report listing all Open Matters and a copy of any associated documents within 30 days following the Secretary's execution of the PPPA.

For **Items 1b, 2b, and 3b** ("Closed Matters"), Walden must provide a summary report listing all Closed Matters and their disposition, including a description of any settlements and fines levied or paid (if any). In addition, Walden must provide a copy of any settlement agreement, judgment, or any other documentation that the matter is closed, settled, or otherwise concluded or resolved. All reports submitted must include a signed statement attesting that the information is true, accurate, and complete to the best of the Institution's knowledge. The report and supporting documentation must be submitted within 30 days following the Secretary's execution of the PPPA.

For **Items 1c and 2c** ("Notices"), Walden must provide a summary report identifying each Notice and a copy of any associated documents within 30 days following the Secretary's execution of the PPPA.
Thereafter, Walden must provide updates on Open Matters, Closed Matters and Notices on a quarterly basis.

Walden must provide the reports and information described in Items 1-3 for the period of its provisional certification.

Please submit the required information to FSAreporting@ed.gov (cc: Multi-RegionalSPD@ed.gov; CIOdocuments@ed.gov).

**Please note:** The notifications required in this section are in addition to the reporting of events or communications that constitute mandatory or discretionary triggers under 34 C.F.R. § 668.171(c) and (d) that must be reported under 34 C.F.R. § 668.171(f). Those triggering events should be reported to FSAFRN@ed.gov.

## H. Student Complaint Reporting Requirement[2]

---

[2] For the purposes of this condition, formal and informal student complaints in the following area include, but are not limited to:

- *Recruitment/marketing* – complaints relating to statements, promises, representations, or claims made by any person or on any advertisement or marketing material, regardless of whether the institution had any relationship to the person making the statement or had any role in the creation of the advertising or marketing material.

**Addendum: Walden University- 02504200**
This Addendum is a part of the PROGRAM PARTICIPATION AGREEMENT
Expiration Date: **6/30/2025**

Within 30 days following the Secretary's execution of the PPPA, Walden must submit a report ("Initial Report") that provides, for each of the five most recent award years, formal and informal student complaints in the following areas:

1. Recruitment/Marketing;
2. Employment/Job Prospects;
3. Program Cost and Financial Aid;
4. Educational Services; and
5. Accreditation/Licensure.

The Initial Report should include the following for each student complaint:

1. Subject matter of the complaint;
2. Recipient of the complaint (institution employees, agents, counsel or contractor; third party servicers; institution owners; local, state, federal, tribal and foreign governments or government entities; accrediting agencies);
3. Whether arbitration or litigation was commenced and the disposition of that proceeding; and
4. Whether any other proceeding (internal or external) was commenced and the results of that proceeding.

Walden must also submit a summary of the information in the Initial Report by year for each of the five most recent award years with the following information:

1. Number of complaints in each category;

2. Number of complaints resolved in each category; and

3. How the complaints in each category were resolved (e.g., litigation, arbitration, mediation, etc.).

---

- *Employment/Job prospects* – complaints relating to likelihood of finding a job, students' employability/job prospects, partnerships with employers, career services/job placement assistance, industry demand of graduates, earnings prospects, and job placement rates.

- *Program Costs and Financial Aid* - complaints relating to tuition and fees, loans/grants, credit balances, and refunds.

- *Educational Services* - complaints relating to quality of program or instructors, selectivity of program or school, course availability, internship/externship, and accommodations/equipment.

- *Accreditation/ Licensure* - complaints relating to the institution's approval or accreditation, any specific program being accredited, licensed, or recognized in any way, and programs required to have programmatic accreditation in order for a graduate to get a job in the field.

**Addendum: Walden University- 02504200**
This Addendum is a part of the PROGRAM PARTICIPATION AGREEMENT
Expiration Date: **6/30/2025**

Following submission of the Initial Report and summary statistics, Walden must submit updated reports and summary statistics on a quarterly basis for complaints commenced and resolved during that quarter.

All reports must be redacted of student and employee PII. Walden must provide, to the Department upon request, any information related to reports submitted pursuant to this condition.

Walden must continue to submit these reports for the period it participates on a provisional basis. Please submit these notifications to FSAreporting@ed.gov (cc: Multi-RegionalSPD@ed.gov; CIOdocuments@ed.gov).

## I. Open Investigation

The Department's Office of Enforcement has opened an investigation into Walden's compliance with Title IV, HEA requirements and regulations, including, but not limited to, alleged substantial misrepresentations made to students, prospective students, and the public. The Department reserves the right to add additional terms by an updated PPPA Addendum as a result of any determinations made by the Department after the conclusion of the investigation.

## J. Class Action Settlement Commitments

In a Class Action Settlement in *Carroll v. Walden*, Civil Action No. 1:22-cv-00051-JRR (D. Md.), Walden agreed to certain non-monetary relief. *See* Paragraph 15. The Settlement has not yet been approved by the Court. However, the commitments that Walden made are relevant to its administrative capability and fiduciary duty, including being truthful in its marketing and admissions practices. A violation of Walden's commitments on the non-monetary relief will constitute a violation of its PPPA.

## K. Reservation for Additional Conditions

The Department reserves the right to include additional conditions by an amendment or addendum to the PPPA during the period of provisional certification if the Department determines that additional conditions are reasonably necessary to ameliorate administrative or financial risk.

## L. Required Signatures

Following a CIO, the Department requires the TPPPA and the PPPA to be signed by an authorized representative of the institution and by an authorized representative of its owner

**Addendum: Walden University- 02504200**
This Addendum is a part of the PROGRAM PARTICIPATION AGREEMENT
Expiration Date: **6/30/2025**

entities.  In certain circumstances, the Department may require individuals who exercise control over the institution to also sign the TPPPA and the PPPA.[3]

The Department will require the PPPA to be signed by an authorized representative of Walden and by an authorized representative of WU, LLC; WUE, LLC; and Adtalem.

The Department may determine, on a case-by-case basis, that an entity owner above Level 1 (or an individual owner, if an individual owner signature is required) can be relieved of the Signature Requirement by posting financial protection.  However, if financial protection has not been posted prior to the time a signature is required, the institution's owners must sign the TPPPA and/or PPPA (as applicable).  The owners will be relieved of the signature requirement once the financial protection is posted. If the institution would like more information on this alternative, please email your School Participation Division using the contact information on Federal Student Aid's Partner Connect website. With your email, please submit audited financial statements from each entity that requests to be relieved of the signature requirement.  The financial statements should be on a stand-alone basis, or if prepared on a consolidated basis must include schedules and disclosures that clearly identify the total equity/net assets for each owner entity.

**The fact that an institution undergoes a CIO does not insulate the institution from liabilities that resulted from conduct under the prior ownership, including liabilities resulting from misconduct by prior owners or employees. Notwithstanding any agreements to the contrary between the parties to the CIO, the institution continues to be responsible for all Title IV liabilities, whether they were known or unknown at the time of the CIO, and whether they accrued prior to, or after the closing of the CIO. All entities (and or individuals, if applicable) that sign an institution's program participation agreement, including a TPPPA or PPPA, assume responsibility for the institution's obligations, including the obligation for all Title IV liabilities that are not repaid by the institution when due, or pursuant to an agreed repayment plan.**

In addition, the Department may use any financial protection that is posted to satisfy liabilities without regard to the ownership under which the conduct leading to the liabilities occurred, and the financial protection will not be released until the Department determines that all liabilities or potential liabilities have been satisfied.

By the signature of its authorized representative, the entity (or entities) identified below agrees (or agree) to be jointly and severally liable for the performance by the Institution of its obligations under this agreement.

---

[3]  Please refer to the guidance found at Electronic Announcement (General) 22-16 (Entity Signatures) and Electronic Announcement (General) 23-11 (Personal Liability - Individual Signatures) for additional information.

Docusign Envelope ID: 4295AD66-E5E9-4C83-82F0-EAEADED22433

**Addendum: Walden University- 02504200**
This Addendum is a part of the PROGRAM PARTICIPATION AGREEMENT
Expiration Date: **6/30/2025**

Walden University, LLC, by its authorized representative:

Authorized Signature: ⬛⬛⬛⬛⬛       Date: 7/15/2024

Print Name and Title: Dr. Susan Subocz

      Associate President and Provost

Walden e-Learning, LLC, by its authorized representative:

Authorized Signature: ⬛⬛⬛⬛⬛       Date: 7/15/2024

Print Name and Title: Michael Betz

      President

Adtalem Global Education Inc., by its authorized representative:

Authorized Signature: ⬛⬛⬛⬛⬛       Date: 7/22/2024

Print Name and Title: Stephen Beard

      President & CEO

**ADTALEM**
GLOBAL EDUCATION

# Enrollment Specialist

Remote   Admissions/Enrollment   Full-time   Walden University   2022-124155

## Job Description

## This Vacancy Has Now Expired. Please See Similar Roles Below...

### Company Description

Walden University is a member of Adtalem Global Education (NYSE: ATGE). More than 50 years ago, Walden University was founded to support adult learners in achieving their academic goals and making a greater impact in their professions and communities. Students from across the U.S. and more than 115 countries are pursuing a certificate, bachelor's, master's, or doctoral degree online at Walden. The university offers more than 100 online degree and certificate programs. Walden University is accredited by The Higher Learning Commission, hlcommission.org. For more information, please visit WaldenU.edu and WaldenFacts.com.

### Job Description

- Proactively contact and respond to prospective students via telephone, email and SMS
- Assess and qualify prospects to determine if Walden University programs meet the academic and professional goals of prospective applicants
- Ability to establish rapport and build relationships via phone in a high-volume call environment
- Track record of achieving measurable results in a fast-paced, deadline-driven department
- Remain compliant with standards and policies of the University while operating in a student-centric environment
- Collaborate with other departments to ensure positive application progression, student satisfaction and success

### Qualifications

- Bachelor's Degree preferred
- Minimum of 1 year of customer service experience required
- Experience with online education preferred
- Exceptional verbal and written communication skills required
- Experience working in Customer Relationship Management platforms required
- Salesforce experience preferred
- Proficient computer skills required, including experience with Microsoft Office programs
- Ability to prioritize and work in a fast-paced environment
- Requires the ability to work a flexible schedule, weekends, and evenings to accommodate student, departmental and company's needs

### Additional Information

In support of the pay transparency laws enacted across the country, the expected salary range for this position is between $18.15 and $32.86. Actual pay will be adjusted based on job-related factors permitted by law, such as experience and training; geographic location; licensure and certifications; market factors; departmental budgets; and responsibility. Our Talent Acquisition Team will be happy to answer any questions you may have, and we look forward to learning more about your salary requirements. The position qualifies for the below benefits.

Adtalem offers a robust suite of benefits including:

- Health, dental, vision, life and disability insurance

ADTALEM
GLOBAL EDUCATION

- Comprehensive Program + 6% employer match
- 5 Days of Paid Vacation Days each Calendar Year
  - 12 Paid Holidays + 2 floating holidays

For more information related to our benefits please visit: https://careers.adtalem.com/us/en/benefits.

We are proud to be an EEO employer M/F/D/V. At Adtalem, we welcome everyone and have a strong commitment towards diversity and inclusion. We encourage our Colleagues to be their true authentic selves and support laws that prohibit discrimination everywhere we do business. We also maintain a drug-free workplace.

## Join Our Talent Community!

Upload your resume to get noticed by recruiters and stay up to date on career opportunities with us.

**JOIN**

## Similar Jobs



### Graduate Admissions Specialist

📍 Miramar, FL

🏢 Admissions/Enrollment

**APPLY**

### Admissions / Enrollment Representative

📍 Lisle, IL

🏢 Admissions/Enrollment

**APPLY**

### Advisor, Office of Admissions

📍 Columbia, MD

🏢 Admissions/Enrollment

**APPLY**

### Customer Service Representative

📍 Columbia, MD

🏢 Admissions/Enrollment

**APPLY**

"Education Is The Passport To The Future, For Tomorrow Belongs To Those Who Prepare For It Today."
MALCOLM X

We believe in empowering students to achieve their goals, find success and make inspiring contributions to our global com

Enrollment Specialist
📍 Chicago, Remote (US)

Enrollment Specialist

Chicago, Remote (US)

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF IILINOIS

_____

Sean Gottlieb, Pro Se,                    )
169 Commack Road.,                        )
Apt 1065 Commack, NY 11725                )
seangottlieb@yahoo.com                    )
       Plaintiff Pro Se,             )
                                      )
                                      )      Civil Action No.   **1:25-CV-07752**
      v.                                )
                                        )
                                      )
Adtalem Global Education,                 )    1. Title VII of the Civil Rights Act of 1964,
500 W Monroe St, suite 1300               )       **42 U.S.C. § 2000e**
Chicago, IL 60661                         )    2. Age Discrimination in Employment
danielle.mckinley@adtalem.com             )       **29 U.S.C. § 621**
Phone # 312 651 1400                      )    3. Title VI Civil Rights Remedies Act
       Defendant                     )       **42 U.S.C. § 2000d-7**
_____)  4.  Violation of **(34 C.F.R. § 100.3(c)(1))**
                                                           5.  Violation of **(34 C.F.R. § 668.14)**

**Enrollment Specialists Hired With No Sales or Call-Center Background**

_____



**Name:** Amber Ovel – Enrollment Specialist, Walden University Start

**Date:** April 2025 – Present

**Experience:** Profile lists Texas A&M University education; background in higher-ed administration and student services. No sales or call-center work recorded.

**Source:** [LinkedIn](LinkedIn)

**Note:** Amber Ovel was directly hired **immediately** after I was refused employment on April 9, 2025, for allegedly lacking call center or sales experience. She does not have call center or sales experience, directly refuting Adtalem's claimed hiring prerequisite. Amber Ovel is young and white, and was hired within 2 weeks after I was refused employment, supporting my contention that I was discriminated against.

**Enrollment Specialists Hired Before April 10, 2025, With No Sales or Call-Center Background**

1. Vanirl Mitchell – Enrollment Advisor / Specialist LinkedIn Background in higher-education advising and peer mentoring; no sales or call-center positions listed.

2. Yolanda Criswell – Executive Enrollment Specialist LinkedIn Long-tenured enrollment advisor; résumé emphasizes student services and mentoring—no sales or call-center history.

3. Nicole Miller – Senior Enrollment Specialist LinkedIn Experience in business management and higher-ed roles; no sales or call-center jobs.

4. Amanda Linser – Executive Enrollment Specialist LinkedIn Career entirely within Walden/Adtalem enrollment; no sales or call-center employment.

5. Yeşim Clark, DBA – Executive Enrollment Specialist LinkedIn International business and academic background; cross-cultural training, no sales or call-center roles.

6. Andrea Edwards, M.S. – Enrollment Specialist LinkedIn Two decades in digital marketing/education support; no sales or call-center positions.

7. Maria Pecora – Executive Alumni Enrollment Specialist LinkedIn Focus on alumni/student success services; no sales or call-center background.

8. Tonya Myers – Senior Enrollment Specialist LinkedIn Nineteen years at Walden; career shows enrollment and advising only—no sales or call-center roles.

9. Tiffany Charles – Enrollment Specialist LinkedIn Profile lists Walden role and academic background; no sales or call-center work.

10. Latonya Stokes – Senior Enrollment Specialist LinkedIn Career entirely in higher-education advising; no sales or call-center employment.

11. Ali McLaughlin – Enrollment Specialist LinkedIn Enrollment advising/higher education roles only.

12. Amy June Winn – Enrollment Specialist LinkedIn Enrollment advising and student-support roles only.

13. Courtney Rogers – Enrollment Specialist [LinkedIn] Educational advising, administrative roles.

14. Danny Bonilla – Enrollment Specialist [LinkedIn] Higher education and student-focused roles only.

15. Destiny Woodhouse – Enrollment Specialist [LinkedIn] Background in educational administration.

16. Felipe Lozoya – Enrollment Specialist [LinkedIn] Higher-ed advising roles.

17. Jennifer Richardson – Enrollment Specialist [LinkedIn] Enrollment advising, higher-ed student services only.

18. Matthew McDermed – Enrollment Specialist [LinkedIn] Higher-ed roles with student interaction.

19. Melissa Harding – Enrollment Specialist [LinkedIn] Academic advising, education-focused positions only.

20. Valerie Arroyo – Enrollment Specialist [LinkedIn] Higher education, administrative/student services roles.

21. Charlene Pietz – Enrollment Specialist [LinkedIn] Higher-ed advising/student services only.

22. Kristen Bowerman – Enrollment Specialist [LinkedIn] Academic advising/administration roles only.

23. Shantell Igbawua – Enrollment Specialist [LinkedIn] Experience primarily in higher-ed advising.

---

**Summary of Findings:** All the above-listed Enrollment Specialists employed at Walden University/Adtalem have publicly accessible résumés on LinkedIn, clearly demonstrating they possess no sales or call-center experience.

Defendant Adtalem's stated justification for refusing to hire Plaintiff—that candidates must possess "sales, call-center, or enrollment experience"—is thus demonstrably false and applied in a blatantly selective manner.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Deny Defendant's Motion to Dismiss (ECF No. 53);
2. Allow this case to proceed to discovery and resolution on the merits.

Respectfully submitted,

/s/ *Sean Gottlieb*

**Sean Gottlieb, Pro Se**
Commack, NY 11725
seangottlieb@yahoo.com
Dated: September 24, 2025

BREG DCCA

# Hawaii Business Express
## Start, Manage, and Search Hawaii businesses

**DOCUMENTS CART:**
0 Items

## $0.00

(/documents/order.html)

# ADTALEM GLOBAL EDUCATION INC.    Back to search results

Foreign Profit Corporation

| Begins with... | ⌄ |
|---|---|

Search

| All Company Info | Forms | Buy Available Docs |
|---|---|---|

## General Info

You can purchase a *Certificate of Good Standing* for this business.

☐ 📄 Digital (PDF) for $7.50

☐ 🖨 Printed for $7.50

Add to Cart

📄 Download company info as PDF (/documents/business.pdf?fileNumber=148627F1)

📢 Receive Reminders / Alerts (/documents/notifyLogin?fileNumber=148627F1)

🔔 Receive Annual Report Reminders (/documents/notifyLogin?fileNumber=148627F1)

Privacy · Terms

**MASTER NAME**

ADTALEM GLOBAL EDUCATION INC.

**BUSINESS TYPE**

Foreign Profit Corporation

**FILE NUMBER**

148627 F1

**STATUS**

Active

**ORGANIZED IN**

Delaware UNITED STATES

**REGISTRATION DATE**

Jun 10, 2025

**PRINCIPAL ADDRESS**

233 S. WACKER DRIVE, SUITE 800
CHICAGO, Illinois 60606
UNITED STATES

**MAILING ADDRESS**

233 S. WACKER DRIVE, SUITE 800
CHICAGO, Illinois 60606
UNITED STATES

**AGENT NAME**

CORPORATION SERVICE COMPANY

**AGENT ADDRESS**

1003 BISHOP STREET
SUITE 1600, PAUAHI TOWER
HONOLULU, Hawaii 96813
UNITED STATES

# Officers

| Name | ⇅ | Office [More info] | ⇅ | Date | ⇅ |
|------|---|--------------------|---|------|---|
| MALAFRONTE,MICHAEL W. | | LEAD INDEPENDENT DIR | | Jun 10, 2025 | |
| WARDELL,LISA | | D | | Jun 10, 2025 | |
| BEARD,STEPHEN W. | | C/P/CEO/D | | Jun 10, 2025 | |
| BURKE,WILLIAM W. | | D | | Jun 10, 2025 | |
| VANDENBOSCH,BETTY | | D | | Jun 10, 2025 | |
| PHELAN,KENNETH J. | | D | | Jun 10, 2025 | |
| HRINAK,DONNA J. | | D | | Jun 10, 2025 | |
| KISER,GEORGETTE D. | | D | | Jun 10, 2025 | |
| KREHBIEL,WILLIAM "LIAM" | | D | | Jun 10, 2025 | |
| O'KEEFE,SHARON | | D | | Jun 10, 2025 | |
| BECK,DOUGLAS | | SVP/GC/CS/INSTITUTIO | | Jun 10, 2025 | |
| LILES,SCOTT | | P/ADTALEM MEDICAL AN | | Jun 10, 2025 | |
| PHELAN,ROBERT J | | SVP/CFO | | Jun 10, 2025 | |
| COX,KAREN | | P/CHAMBERLAIN UNIVER | | Jun 10, 2025 | |
| HERRERA,MAURICE | | SVP/CMO | | Jun 10, 2025 | |
| BETZ,MICHAEL | | P/WALDEN UNIVERSITY | | Jun 10, 2025 | |
| HILL,SARA | | CHIEF HUMAN RESOURCE | | Jun 10, 2025 | |
| TRENT,EVAN | | PRESIDENT OF ADTALEM | | Jun 10, 2025 | |
| GANGADHARAN,MANJUNATH | | CAO | | Jun 10, 2025 | |
| BACHMAN,LAWRENCE C. | | V/DGC/AS | | Jun 10, 2025 | |

# Other Filings

| Date | Description | Remarks |
|------|-------------|---------|
| Jun 10, 2025 | Application For Certificate of Authority For Foreign Corp. | Application For Certificate of Authority For Foreign Corp. |

> ❶ Note: Transactions may be available for purchase. Please see the **Buy Available Docs** tab for additional information.

BREG DCCA | Contact us ⬀ (http://cca.hawaii.gov/breg/contact/)

King Kalakaua Building
335 Merchant St Rm 201
Honolulu, Hawaii 96813

© 2018-2025. All rights reserved.

Accessibility (https://portal.ehawaii.gov/page/accessibility)    Feedback
Privacy (https://portal.ehawaii.gov/page/privacy-policy)
Terms (https://portal.ehawaii.gov/page/terms-of-use)

Powered by Tyler Technologies (https://www.tylertech.com)

# RE: [external] 7 days

- 

McKinley, Danielle [Legal]

To:  me · Tue, Jun 10 at 3:07 AM

## Message Body

Mr. Gottlieb,

As a preliminary matter, the company denies the allegations set forth in your communications.

Adtalem (and its institutions) is committed to maintaining a workplace free of discrimination. We take concerns regarding discrimination very seriously. When you initially raised your concerns, the company did look into your concerns and found they were unsubstantiated. At no time was the company legally required to provide you with a response to your communications or disclose its conclusions.

I would also like to use this communication as an opportunity to clarify that you were never extended an offer of employment for the Enrollment Specialist position. The decision to not move forward with your application was based on legitimate business reasons, including relevant experience. Generally, candidates that are selected for this role have sales, call center background, or enrollment experience, which you did not have. Additionally, you represented that you resided in Hawaii, and the time difference would pose challenges based on the expectations and requirements of the role.

To further substantiate that you were never extended an offer, before an offer of employment is extended, the company requires candidates to interview with the hiring manager(s) and business leader(s) who ultimately make offer decisions. You only participated in the screening process with a talent acquisition representative and were never interviewed by the hiring manager or business leader. Additionally, if candidates for the Enrollment Specialist role are advanced past the screening call, they are required to complete a "Writing Questionnaire," which you were not requested to complete.  Finally, if the company is considering extending an offer, the company initiates reference checks beforehand, which was never requested of you.

For the foregoing reasons, the company denies the allegations set forth in your communications. We wish you the best in your future endeavors.

**Danielle S. McKinley |***Associate General Counsel - Employment*
**T** (312) 906-6909 **E** Danielle.McKinley@adtalem.com
233 S. Wacker Dr. |Suite 800| Chicago, IL 60606 | adtalem.com

On Tuesday, June 10, 2025 at 08:30:50 AM GMT+2, Sean Gottlieb <seangottlieb@yahoo.com> wrote:


Ms McKinley,

Of course you and your company are denying the allegations; that is what you are paid to do. Defend the indefensible. Thank You for your communication.

I am writing in response to your recent statement claiming that the company previously investigated my concerns of discrimination and found them unsubstantiated, but was not legally required to inform me of such an investigation or its conclusions.
Let me be clear: this is the first time I have been told that any form of investigation was conducted. At no point prior to this EEOC inquiry was I informed—formally or informally—that my allegations were reviewed, much less that a conclusion had been reached. I categorically reject this revisionist claim. Since your company failed to investigate, it is only now you are fabricating that there was in fact an investigation as I move forward with an EEOC complaint. ( I knew that you were going to do this, and informed EEOC that this is in fact what you were going to do. It is the ONLY thing that you CAN do; Fabricate that an investigation was done, and I just wasn't notified about it).

Your current position appears to be a **post hoc fabrication**—a defensive claim made only now that an official EEOC investigation is underway. If an internal investigation did occur at Atalem ( which it hasnt) , it was done without transparency, without adherence to best practices, and without meeting even the most basic standards of procedural fairness or communication, by informing and involving the complainant.

The EEOC's own Enforcement Guidance (Section IV.C.3.b) clearly states that **employers must take prompt and effective remedial action once they are made aware of a discrimination complaint.** Ignoring a complaint, failing to acknowledge its receipt, and failing to inform the complainant of any investigation or resolution are all contrary to this obligation. So now, go ahead and create fake documents and backdate them to make it appear an investigation was done back when I complained, maybe that will cover the fact that no investigation took place and you are only saying that NOW because "shit is about to hit the fan."  I have also informed EEOC of this fact; that we should expect some fabricated documents that show an investigation was done, cleverly backdated to appear that it occurred immediately after I complained.

In this context, your assertion that you had no legal duty to inform me of the process or outcome is both **factually incorrect and legally questionable**. It further illustrates the very failure to engage in good-faith handling of discrimination complaints that I am now challenging through official channels.

You stated that the decision not to move forward with my application was based on "legitimate business reasons," specifically citing a lack of sales, call center, or enrollment experience. However, the **official job posting for this position—as published on Adtalem's own career portal—does not list any of these qualifications as requirements or prerequisites** for the role.

According to the listing, the stated qualifications include:

- Bachelor's Degree (Required)
- 1 to 5 years of customer service, account management, or relationship building experience (Preferred)
- 1 to 3 years of admissions experience (Preferred)
- Strong communication, time management, critical thinking, and consultative skills
- Familiarity with Microsoft Office tools
- Commitment to confidentiality and adherence to Adtalem's Code of Conduct

Notably, the job description **does not mention sales experience, call center background, or enrollment experience as required**—nor are these stated as minimum or core competencies. Therefore, your current justification once again appears to be **a post hoc rationalization** inconsistent with your published selection criteria, to somehow justify why I wasn't hired while being extremely qualified for the position. Qualified for the position ? Yes. I am exceptionally well-qualified for the Enrollment Specialist position, not only meeting the job's stated requirements but exceeding them in several areas due to my advanced education, extensive experience, and relevant skillset.

**Educational Qualifications**

The role requires a Bachelor's degree, which I exceed by holding:

- A **Bachelor of Science in Human Services** from the State University of New York, with a concentration in substance abuse counseling and family development.
- A **Master of Science in Law** from Abraham Lincoln University, giving me advanced knowledge of policy, compliance, ethics, and regulatory frameworks that are integral in academic and admissions environments.
- A **Postgraduate Diploma in Public Health** from Walden University, which further enhances my ability to understand population needs, health equity, and educational access — critical when advising students on academic programs.
- An **Associate Degree in Substance Abuse Counseling** from the University of Hawaii, equipping me with key interpersonal and behavioral skills essential for student guidance and success.

**Professional and Academic Experience**

I have well over **five years of combined experience in customer service, account management, and relationship-building**, exceeding the "1 to 5 years preferred" range. My time as an ESL Tutor with Cambly and a Law/English Tutor with Tutor.com has refined my communication, consultation, and student mentoring skills, all conducted remotely — a direct match for virtual student engagement.

I have conducted **in-depth consultations**, guided learners through decision-making processes, and helped them meet their goals — all integral parts of the enrollment process. I also bring with me strong **Microsoft Office** skills from years of professional use, including document preparation, spreadsheets for tracking student metrics, and presentation development for educational workshops.

**Alignment with Specific Duties**

1. **Master the enrollment process**: My public health and law coursework involved extensive exposure to financial aid policy, regulatory compliance, and education law — foundational for mastering the enrollment lifecycle.
2. **Effective Communication of Program Value**: I've guided students in understanding complex topics and educational paths in my tutoring roles. My background in human services also supports empathy and persuasion — vital when helping students make informed enrollment decisions.
3. **Problem-Solving & Critical Thinking**: My legal training developed my analytical mindset. I can interpret nuanced issues and resolve student concerns efficiently and fairly.
4. **Performance Standards & Conduct**: As a certified ESL and legal tutor, my work is constantly evaluated. I consistently exceed student satisfaction benchmarks.
5. **Student Qualification & Program Matching**: My ability to assess applicants' goals and match them to appropriate programs mirrors the enrollment advisor's duties.
6. **Data Management & Confidentiality**: I have managed confidential student data, from tutoring sessions to sensitive legal materials, and am trained in ethical handling per FERPA and institutional codes of conduct.
7. **Student Retention & Relationships**: I build strong, lasting educational relationships and support retention through personalized follow-ups and tailored academic support.
8. **Team Collaboration**: My graduate and undergraduate work included multiple group research assignments, while my tutoring roles often coordinate with academic administrators and other faculty for curriculum alignment.
9. **Training Participation**: I have completed numerous professional development sessions and certification trainings for legal and ESL instruction.

**Additional Assets**

My **training in DEI strategies**, crisis intervention, and public speaking uniquely position me to engage with a diverse student body, address concerns sensitively, and advocate effectively on their behalf. My background in case management, counseling, and compliance ensures I can support students not only academically but holistically.

**Conclusion: I Am Overqualified**

Given the breadth and depth of my qualifications — from a Master's in Law and postgraduate Public Health certification to years of direct student-facing work — I am more than just qualified. **I am overqualified.** I bring not only the baseline experience the role requires but also strategic, ethical, and policy-level insight that could enhance enrollment operations beyond expectations.

You stated that the decision not to move forward with my application was based on "legitimate business reasons," specifically citing a lack of sales, call center, or enrollment experience; **while the job listing doesn't mention any of those things as being Required?**

Any professional HR with even a basic amount of analytical skill would immediately realize that my skills and education far exceed the minimum stated requirements for the position of enrollment specialist.

I will seek a right to sue letter from the EEOC and we can then head to Federal Court; where you can try to explain how I don't meet the stated requirements for the position. Your assertion that I somehow don't meet the requirements for the position are preposterous.

I have engaged with the EEOC specifically requesting to waive the process and be issued a right to sue letter immediately. You will hear from me.


Sincerely,
Sean Gottlieb

**From:** Sean Gottlieb <seangottlieb@yahoo.com>
**Sent:** Tuesday, June 3, 2025 4:01 AM
**To:** McKinley, Danielle [Legal] <danielle.mckinley@adtalem.com>
**Subject:** [external] 7 days

Ms McKinley,

As a courtesy I am notifying you that in 7 days I will be filing a charge with the EEOC, the focus of my complaint being the Failure of your entire human resources team; ignoring my complaints of discrimination in the hiring process, by refusing to respond or acknowledge my complaints.

I can prove they never responded or investigated my complaints very easily, because They completely ignored my complaints ( filed months ago) and refused to even respond until now, when you responded; and While the EEOC does not mandate a one-size-fits-all investigation process, it provides the following **clear expectations**:

- **Employers must respond promptly and effectively** to all discrimination complaints, including those by **job applicants**. ( your employers failed to do this )
- The employer's obligation to prevent and address discrimination **begins when a complaint is made**, even informally. ( your employers failed to do this )
- Employers who fail to investigate or take corrective action **can be held liable** for allowing a discriminatory hiring process. ( your employers failed to do this )                *"Once an employer becomes aware of possible discrimination, the employer should take immediate and appropriate corrective action."* – EEOC Compliance Manual, Section 615.

So while the bar may be higher for the other claims I am making, this one is easy to prove, and it is actionable all by itself. Let your employers know that 7 days from now the EEOC charge will be filed. There is NO defense against this allegation, because they broke the law when they failed to acknowledge and investigate my claims of discrimination, by refusing to respond to my claims and ghosting me, for months. Respectfully, If I don't hear from you in 7 days with an indication of being open to an informal resolution, I file with the EEOC. When I file the charge with the EEOC, I don't want it said that I did not try to resolve it informally. This is that informal resolution attempt.

Respectfully.

Pro Se

Sincerely,

Sean Gottlieb

On Monday, June 2, 2025 at 06:34:44 PM GMT+2, McKinley, Danielle [Legal] <danielle.mckinley@adtalem.com> wrote:

Dear Mr. Gottlieb,

I am in receipt of your Complaint. Going forward, please have all communications directed to me. If you are represented by counsel, please forward this communication to them and I am happy to communicate with them directly.

**Danielle S. McKinley** |*Associate General Counsel - Employment*

**T** (312) 906-6909 **E** Danielle.McKinley@adtalem.com

233 S. Wacker Dr. |Suite 800| Chicago, IL 60606 | adtalem.com

**City of Chicago**

**COMMISSION ON HUMAN RELATIONS**

**IN THE MATTER OF:**

Sean Gottlieb

      **Complainant**

      **v.**

                                           **Case Number:** 25-E27

Adtalem Global Education

      **Respondent(s)**

## RESPONSE TO COMPLAINT

1.     **This is a response to**  Complainant's Initial Complaint dated June 2, 2025
    State whether you are responding to the initial complaint in the case or an amended complaint.

2.     **Name, mailing address, telephone, and fax of each respondent filing this response:**  For a business or other organization, be sure to include (a) the full legal name of each owner or operator and (b) the name and title of the representative who will serve as contact person.  Use additional pages if needed.

      **Response:**    Adtalem Global Education, Inc.
                  C/o Danielle McKinnley
                  Associate General Counsel - Employment
                  233 S. Wacker Dr., Suite 800
                  Chicago, IL 60606
                  (312) 906-6909
                  Danielle.McKinnley@adtalem.com

                  Jeneé Gaskin
                  Corporate Counsel – Employment
                  (312) 681-3218
                  Jenee.Gaskin@adtalem.com

3.     **Statements admitting or denying allegations of complaint.**  See the next page of this form.
    **Response**: See Attached Document.

4.     **Position statement.**  See the third page of this form.
    **Response**: See Attached Document.

5.     **Signature and certification.**  Signature of outside counsel is not sufficient.  If a respondent will be represented by an attorney, an attorney appearance must be filed and served.  See Rules 210.250 and 270.310.

I **certify that a reasonable inquiry of known and readily available information has been made and that the statements set forth in this response are true and correct except as to those stated to be on information and belief, as to which** I **certify that** I **believe them to be true.**

| Signature | Date Signed | Print name. Title & organization if signing for a business |
|---|---|---|
| | | Jeneé I. Gaskin, Corporate Counsel, |
| /s/ Jeneé I. Gaskin | 7/17/2025 | Adtalem Global Education Inc |

**This response contains 25 pages including this one.**

**You must SERVE a copy of this response on every other party and file proof of service.** A Notice of Filing and Certificate of Service form is available from the Commission. See Rules 270.210 and 270.220.

File original and one copy at     **Chicago Commission on Human Relations**
**740 N. Sedgwick, Suite 400, Chicago, IL 60654**
**Fax 312-744-1081, Phone 312-744-4111, TTY 312-744-1088**

**STATEMENTS ADMITTING OR DENYING ALLEGATIONS OF COMPLAINT**

1. I Sean Gottlieb, am a 52-year-old male applicant and an alumnus of Walden University.

**RESPONSE: Respondent admits only that Complainant is an alumnus of Walden University and applied for an Enrollment Specialist position at Walden University. Respondent is without sufficient information to admit or deny the truthfulness of the remaining allegations contained in this statement and therefore denies the remaining allegations contained herein.**

2. On Friday, April 5, 2025, I completed an interview with Mr. Jason Zaruba for the position of Enrollment Specialist at Walden University.

**RESPONSE: Respondent admits only that Complainant had a screening interview with Jason Zaruba, Senior Recruiter, for the Enrollment Specialist position on Friday April 4, 2025.**

3. At the conclusion of the interview, Mr. Zaruba explicitly offered me the position, stating that I would be hired at $26/hour, exceeding my requested range of $23-24/hour.

**RESPONSE: Respondent denies the allegations contained in this statement.**

4. He further indicated that I would receive a follow-up call to schedule a video meeting with the management team and to begin onboarding and training.

**RESPONSE: Respondent denies the allegations contained in this statement.**

5. Relying on this clear verbal offer, 1 shared the news with my family and celebrated the opportunity. My wife and I took our two daughters to dinner in celebration of my hiring. I tendered a notice of resignation to my current employer.

**RESPONSE: Respondent denies that Complainant received any offer of employment. Answering further, Respondent is without sufficient information to admit or deny the truthfulness of the remaining allegations contained in this statement and therefore denies the allegations contained herein.**

6. I subsequently received an email from Walden University on April 9, 2025, stating that I was no longer being considered for the position and that another candidate had been selected.

**RESPONSE: Respondent admits only that it sent a candidate rejection email to Complainant on April 9th, 2025, informing him that Walden was not moving him forward in the interview process.**

7. I sent a formal appeal and request for reconsideration, respectfully inquiring about the rescinded offer and emphasizing my qualifications, but received no response.

**RESPONSE: Respondent admits only that Complainant sent an email request for reconsideration directed to Sara Hill but was sent to the incorrect email address requesting reconsideration his application for employment on April 9, 2025. Respondent denies the remaining allegations contained in this statement.**

8. On the same day I was denied the position, Walden issued a graduate certificate in Public Health to me-further validating my credentials and confirming my recent, positive engagement with the institution.

**RESPONSE: Respondent admits that Complainant was granted a certificate in Public Health on February 9, 2025 for completing a course in the Public Health program. Respondent denies the remaining allegations contained in this statement.**

9. I am significantly more qualified than entry-level, and my educational and professional background far exceeds the minimum requirements of the position.

**RESPONSE: Respondent denies the allegations contained in this statement.**

10. 1 believe this withdrawal was based on my race and age, given the sudden reversal after a verbal offer, my extensive qualifications, the lack of any explanation or due process, and my demographic profile.

**RESPONSE: Respondent denies the allegations contained in this statement.**

11. It is worth noting that after notifying me that I am no longer being considered for the position and that the position has been filled by someone else; Walden University (Adtalem) continues to post the job offer almost on a weekly basis notifying the public that they are seeking to hire Enrollment specialists. All one has to do is go to Linkedin or Indeed, and it becomes apparent that Adtalem is still actively recruiting and hiring for the position of Enrollment specialist, after illegally rescinding the job offer made to me, and informing me the position had been filled.

**RESPONSE: Respondent states that the Enrollment Specialist position is hired on an ongoing basis. Respondent denies the remaining allegations contained in this statement.**

a. This is an action for employment discrimination and breach of implied contract arising from the Defendant's unlawful rescission of a verbal *offer* of employment made to Plaintiff on or about April 5, 2025, for the position of Enrollment Specialist at Walden University. Plaintiff asserts that Defendant's actions violated Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 et seq.), and applicable common law doctrines related to detrimental reliance and promissory estoppel.

**RESPONSE: Respondent denies that it violated any law and further denies the allegations contained in this subparagraph.**

b. On or about April 5, 2025, Plaintiff completed an interview for the position of Enrollment Specialist with Mr. Jason Zaruba, a representative of Walden University. At the conclusion of the interview, Mr. Zaruba verbally informed Plaintiff: "You have the job," and further discussed details including starting salary{$26/hour}, scheduling of a follow-up video call, and training logistics. Plaintiff reasonably understood the verbal offer to be a binding commitment and, in reliance thereon, celebrated with his family and ceased his active job search. Plaintiff holds an Associate Degree in Counseling, a Bachelor's in Human Services, a Master's in Law, a Postgraduate Diploma in Public Health, and a TEFL Certificate. He is also an alumnus of Walden University.

**RESPONSE: Respondent admits only that Complainant had a screening interview with Jason Zaruba, Senior Recruiter, for the Enrollment Specialist position on Friday April 4, 2025. Respondent is without sufficient information to admit or deny the truthfulness of Complainant's allegations related to his family and educational background other than as a**

**graduate of Walden University and therefore denies the allegations. Respondent denies that Complainant was offered the Enrollment Specialist job and the remaining allegations contained in this subparagraph.**

c.  Despite being told he was hired, Plaintiff received an email on April 9, 2025, from Defendant stating that the company had chosen to move forward with another candidate. The abrupt reversal of the hiring decision, without explanation and following explicit verbal confirmation, has caused Plaintiff significant emotional distress, reputational harm, and financial harm.

**RESPONSE: Respondent admits only that it sent a candidate rejection email to Complainant on April 9th, 2025, informing him that Walden was not moving him forward in the interview process. Respondent denies the remaining allegations contained in this subparagraph.**

d.  Upon information and belief, the Defendant's decision to rescind the offer was motivated in part by unlawful considerations of Plaintiff's age (over 40) and race (black), in violation of federal employment discrimination laws.

**RESPONSE: Respondent denies the allegations contained in this statement.**

e.  Plaintiff's educational background-comprising an Associate Degree in Counseling, Bachelor's Degree in Human Services/Social Work, a Master's Degree in Law, a Postgraduate Diploma in Public Health, and a TEFL (Teaching English as a foreign Language) certificate-constitutes a robust, interdisciplinary academic foundation that both satisfies and surpasses the essential qualifications for the role of Enrollment Specialist at Walden University. Each credential, considered individually and cumulatively, aligns directly with the core competencies outlined in the job description, including proficiency in academic advising, client-centered communication, and procedural knowledge of enrollment systems and institutional compliance. Plaintiff's Bachelor's Degree in Human Services-which encompassed rigorous academic training in client engagement, needs assessments, educational resource navigation, communication ethics, case management, and cultural competency-is specifically tailored to the duties of the enrollment Specialist position

**RESPONSE: Respondent is without sufficient information to admit or deny the truthfulness of the allegations contained in this paragraph and therefore denies the allegations contained herein.**

Core coursework included:
Client Interviewing and Intake, Case Documentation and Reporting, Cultural Awareness in Service Delivery, Ethical Practices in Human Services, Systems Navigation and Social Service Administration. These courses provided Plaintiff with direct, practical experience in assessing prospective client (or student) needs, documenting interactions with accuracy and confidentiality, and conveying complex programmatic information in an accessible and professional manner-functions that lie at the heart of enrollment operations. Plaintiff's Master's Degree in Law enhanced his capabilities in legal reasoning, institutional analysis, and policy adherence-skills that are crucial in a university setting governed by federal regulations, including the Family Educational Rights and Privacy Act (FERPA). This legal training positioned Plaintiff to operate with precision and accountability in managing admissions materials, advising students on program requirements, and maintaining compliance with federals standards in enrollment and financial aid. Plaintiff's postgraduate Diploma in Public Health provided a macro-level framework for understanding systems of access and equity, central to higher education policy and practice. The curriculum emphasized population-based strategies, community outreach, and the elimination of structural barriers-competencies that are highly applicable to Walden University's mission of expanding access to nontraditional and underserved student populations. Plaintiff's training equips him to identify enrollment disparities, engage diverse populations, and support inclusive recruitment efforts. Plaintiff's TEFL certificate attests to his ability to communicate with and advise

students from diverse linguistic and cultural backgrounds. Given the global and multicultural reach of Walden University, this credential holds direct relevance to the role of Enrollment Specialist, especially in advising international and ESL (English as a Second Language) applicants. The TEFL coursework developed Plaintiff's pedagogical skill, cultural sensitivity, and cross-cultural engagement-each indispensable in this front-facing enrollment role. Plaintiff not only meets the qualifications outlined in the Enrollment Specialist job posting but substantially exceeds them. The fact that he is also an alumnus of Walden University reinforces his unique value and institutional fit for the role. The absence of any substantive explanation for the recission, "This is a violation of the Chicago Human Rights Law, Chapter 6-10 of the Chicago Municipal Code. I am seeking relief available under law."

**RESPONSE: Respondent is without sufficient information to admit or deny the truthfulness of the allegations contained in this paragraph and therefore denies the allegations contained herein.**

I certify that a reasonable inquiry of known and readily available information has been made and that the statements set forth in this response are true and correct except as to those stated to be on information and belief, as to which I certify that I believe them to be true.

**/s/ Jeneé Gaskin**     **7/17/2025**     **Corporate Counsel – Employment**
                                                                **Adtalem Global Education, Inc.,**

**City of Chicago**
**COMMISSION ON HUMAN RELATIONS**

**IN THE MATTER OF:**

**Sean Gottlieb**
      **Complainant**

      **v.**

**Adtalem Global Education**
      **Respondent(s)**

      **Case Number:** 25-E27

**NOTICE OF FILING & CERTIFICATE OF SERVICE**

**Document(s) filed:**

Respondent's Response to Complaint and Position Statement.

**Name of each party filing the document(s)**

Adtalem Global Education, Inc.

**Certificate of Service**

**I certify that I served a copy of the document(s) listed above on each person listed below, directed to the address or fax number stated below, by the following method of service:**

_X_      I put a copy in a U.S. mailbox with postage prepaid on _7/17/2025_ (date).

___      I sent a copy by fax at or about _____ (time) on _____(date).

___      I personally delivered a copy on _____(date).

_X_      Other delivery method and

       Date:_ email 7/17/2025 _____

**Name and delivery address of each person served**

Sean Gottlieb
169 Commack Rd., Apt 1065
Commack, New York 11725
seangottlieb@yahoo.com

**Signature and contact information of the person causing services:**

*Jeneé Gaskin,*   Corporate Counsel-(312) 681-3218-  Jenee.Gaskin@adtalem.com


File original and one copy at          Chicago Commission on Human Relations 740 N. Sedgwick, 4th Floor,
                                       Chicago, IL 60654
                                       Fax 312-744-1081, Phone 312-744-4111, TTY 312-744-1088

                                       cchrfilings@cityofchicgo.org



July 17, 2025

**VIA US POSTAL SERVICE AND EMAIL:** cchrfilings@cityofchicgo.org
Investigator Ingrid Upchurch
Chicago Commission on Human Relations
740 N. Sedgwick, Suite 400
Chicago, IL 60654
Ingrid.UpChruch@cityofchicago.org

RE:     Sean Gottlieb v. Adtalem Global Education, Inc
        CCHR Complaint No. 25-E-27

Dear Investigator Upchurch:

This serves as Adtalem Global Education Inc.'s ("Adtalem" or "Respondent") position statement[1] in response to the Complaint (the "Complaint") filed by Sean Gottlieb ("Complainant") alleging race, color and age discrimination in violation of the Chicago Human Rights Ordinance. Adtalem denies the allegations contained in the Complaint and that it violated any state or municipal laws. Furthermore, Adtalem is an equal opportunity employer that makes all employment decisions based on legitimate business reasons without regard to any protected characteristics.

Complainant was treated equitably throughout the interview process and the decision not to advance his candidacy was based on an assessment of insufficient relevant experience, geographic limitations, and demonstrated deficiencies in communication and active listening skills.

**FACTUAL BACKGROUND**

### A. Relevant Policies and Procedures

*Anti-Discrimination and Harassment Policy*

Adtalem is a leading healthcare educator with academic curriculums spanning across medical and healthcare industries in the United States and abroad. Adtalem and its institutions, including Walden University, LLC ("Walden") are committed to providing equal employment opportunities for all colleagues

---

[1] This submission is submitted to assist the CCHR in investigating the Complaint so that the Complaint may be resolved as expeditiously as possible. Adtalem requests that the CCHR treat this submission as confidential and not disclose it to individuals or entities outside of the CCHR without the prior written consent of Adtalem. Inclusion of information in this submission does not constitute a waiver of any objection or privilege Adtalem may have in response to future discovery or information requests, or to the introduction of evidence in this or any subsequent proceeding; nor does it constitute a waiver of any objection as to timeliness of the Complaint or any other legal argument Adtalem may assert in the future. Furthermore, this submission, although believed to be true and correct in all respects, does not constitute an affidavit or admission, and is not intended to be used as evidence in any court or other proceeding. Adtalem retains its rights to present new, revised, or additional facts or arguments based upon subsequently acquired information, to present different or additional arguments on its behalf, or to respond to any new issues or evidence that may arise.



and applicants free from any form of discrimination. (See Exhibit A, <u>Anti-Discrimination and Harassment Policy.</u>)

*Talent Acquisition Process*

At Adtalem and its institutions, candidate applications are initially reviewed by a recruiter who assess alignment with job requirements and relevant experience. If the recruiter believes a candidate may be qualified, the recruiter contacts the candidate to schedule a telephonic screening interview. If the recruiter deems the candidate suitable, their information is forwarded to the hiring manager, who – along with the business leader – makes all hiring decisions and may initiate further interviews. Talent Acquisition representatives do not make offer decisions and offers are never communicated during the initial telephonic screening interview.

Additionally, for the Enrollment Specialist position (the position Complainant was applying for), candidates are required to complete a "Writing Questionnaire" if advanced past the screening interview. Additionally, reference checks are initiated after an offer is extended, as employment is contingent upon successful completion of a background check. Notably, neither of these steps occurred because Complainant never made it past the initial screening interview and an offer of employment was never extended to him.

## B. Complainant's Application for Employment

Complainant enrolled in Walden University's Master of Public Health program and is currently pursuing his master's degree. In March 2025, Complainant sent an email to Roger McKinney, VP of Finance for Walden, informing him that Complainant had applied for the Enrollment Specialist role at Walden and requested contact information for Walden's human resources department. Complainant's email was ultimately forwarded to the Talent Acquisition team, which prompted Complainant's application to be considered. (See Exhibit B, <u>Complainant's Email to Roger McKinney</u>).

Jason Zaruba ("Mr. Zaruba"), Senior Recruiter, reviewed Complainant's application and resume. (See Exhibit C, <u>Complainant's Application and Resume</u>). Despite Complainant's lack of relevant experience (sales, call center, enrollment) and the time zone difference due to residing in Hawaii, Mr. Zaruba scheduled a screening interview with Complainant for April 4, 2025 at Walden's request. During the screening interview, Complainant repeatedly interrupted Mr. Zaruba, hindering Mr. Zaruba's ability to ask questions. When Mr. Zaruba was able to speak, Complainant failed to provide direct or relevant responses to Mr. Zaruba's questions. At the conclusion of the interview, Mr. Zaruba informed Complainant that the next step would be for Mr. Zaruba to provide Complainant's information to the hiring managers for their consideration of a second interview.

Due to Complainant's lack of relevant experience, as well as demonstrated deficiencies in communication and active listening skills, the decision was made not to advance Complainant's candidacy. On April 9, 2025, Mr. Zaruba sent a candidate rejection email informing Complainant that the company did not plan to move him forward in the process. (See Exhibit D, <u>April 9, 2025 Candidate Rejection Email</u>).



### C. Complainant's Allegations

On April 9, 2025, Complainant attempted to email the Chief Human Resource Officer, Sara Hill[2] expressing disappointment over not being selected for the Enrollment Specialist role and requesting reconsideration and clarification regarding why he was not selected for the role. After receiving no response, on April 11, 2025, Complainant emailed Adtalem's Talent Acquisition Team stating he was taking legal action against the company and alleging discrimination, with notice that the U.S. Equal Employment Opportunity Commission ("EEOC") would be involved.

In response, Adtalem reviewed Complainant's concerns and found them unsubstantiated, confirming that the interview process and Adtalem's Anti-Discrimination and Harassment policy were properly followed. Given the nature of communications, the company elected not to engage with Complainant further and determined that any response would be handled through formal legal channels, such as the EEOC or litigation, and its counsel.

### ARGUMENT

Complainant alleges that the decision not to hire him for the Enrollment Specialist role was based on his race, color and age. However, the decision was based on legitimate, non-discriminatory business reasons. Furthermore, Mr. Zaruba conducted the screening interview by telephone and had no knowledge of Complainant's race, color, or age.[3]

To state a claim of discrimination in violation of the Chicago Human Rights Ordinance, Complainant must show: 1) he belongs to a protected class; 2) he applied for and was qualified for a job for which the employer was seeking applicants; 3) despite his qualifications, he was rejected; and 4) after the rejection, the employer continued to search for applicants with complainant's qualifications. *Mark v. Truman Middle College et al.*, CHR No. 91-E-0007 (9-19-92). Chicago Municipal Code Title 6, Chapter6-10, §6-10-010 et seq. (2023). If Complainant establishes a prima facie case the burden shifts to the Respondent to articulate a nondiscriminatory reason for its action. *Id*. If the Respondent articulates one or more legitimate non-discriminatory reasons, then the burden shifts back to Complainant to establish that Respondent's articulated reasons are pretextual for discrimination. *Id*.

Even assuming that Complainant has met the first three elements of a prima facie case, he cannot establish the fourth requirement. Complainant met the minimum qualification of having a bachelor's degree, but Complainant lacked relevant sales, call center, or enrollment experience which the job posting listed as preferred requirements for the role. To the extent Adtalem has continued to search for applicants, it is looking for candidates with qualifications beyond the Complainants'.

---

[2] Complainant inadvertently sent his emails to shill@adtalem.com, an incorrect address for the Chief Human Resources Officer, and as a result, the message was not received.
[3] The Company does not request the race, color, or age information of Candidates in compliance with state and federal law. Candidates may voluntarily self-identify.

3



Even if Complainant could establish a primate facie case for discrimination, Adtalem had a legitimate non-discriminatory reason not to move forward with Complainant's candidacy, including its assessment that Complainant demonstrated insufficient relevant experience and demonstrated deficiencies in communication and active listening skills. Additionally, at the time Complainant applied for the position, Complainant represented he lived in a time zone that could pose operational challenges. Moreover, fourteen individuals were hired between March 19, 2025 (when Complainant applied) and April 30, 2025. These individuals varied by race and age, including African Americans and individuals over the age of 40. Because those hired were of varying races including African American and over the age of 40, Complainant cannot show that Respondent's reasons were pretext for race, color, or age discrimination.

## CONCLUSION

Based on the foregoing, Adtalem respectfully submits that the Complaint should be found without merit and dismissed for no cause. To the extent that Adtalem's response does not specifically respond to any allegation in Complainant's Complaint, Adtalem hereby expressly denies such allegation. Should you require any additional information by which to reach this determination, feel free to contact me at (312) 681-3218 or Jenee.Gaskin@adtalem.com.

Sincerely,

*/s/ Jeneé Gaskin*

Jeneé I. Gaskin
Corporate Counsel - Employment

4

**ADTALEM**
GLOBAL EDUCATION

| Policy Name: | | Policy Against Discrimination, Harassment and Retaliation/Victimization (Illinois Colleagues) | | | | | |
|---|---|---|---|---|---|---|---|
| Policy Category: *(Select One)* | | Legal-Employment | | | | | |
| Policy Owner: | | Legal-Employment | | | | | |
| Policy Administrator: | | Associate General Counsel - Employment | | | | | |
| History: | Effective Date: | 01/03/25 | Approval Date: | 01/03/25 | Date Last Modified: | 12/28/2022 | Publication Date: 01/03/25 |

## I. Purpose

Adtalem Global Education is committed to providing a work environment that is free of unlawful discrimination, including harassment. Adtalem Global Education expects every employee, other workers, and representatives (including vendors, students, and visitors) to show respect for all other colleagues or any other covered persons (including unpaid interns, students, independent contractors, volunteers, temporary workers, consultants, and individuals who perform services for Adtalem based on a contract). Adtalem Global Education includes each of its companies and educational institutions, which are referred to collectively as "Adtalem" in this policy. Professional conduct furthers Adtalem's mission, promotes productivity, minimizes disputes, and enhances our reputation. Accordingly, this policy forbids harassment, which includes sexual harassment, discrimination, morale harassment, bullying, mobbing, retaliation/victimization and any unwelcome conduct that is based on an individual's protected class, as described by the federal, state and/or local laws of the countries in which we operate, which may include, but are not limited to, characteristics such as a person's actual or perceived race, traits associated with race (including hair texture and protective hair styles such as braids, locks, and twists), color, religion, creed, national origin, ancestry, ethnicity, sex, pregnancy, sexual orientation (actual or perceived heterosexuality, homosexuality, or bisexuality), gender (including gender-related identity, gender nonconformity, and status as a transgender or transsexual individual), age (40 and over), physical or mental disability (including unlawful discrimination against an individual because of the individual's association with a disability), family responsibilities (as defined in the Illinois Human Rights Act), reproductive health decisions, citizenship status, work authorization status, past, current, or prospective service in the uniformed services, military status, unfavorable discharge from military service, genetic information, order of protection status, marital status, arrest record (including expunged or sealed criminal records), conviction record (unless there is a substantial relationship between the previous criminal offense and the position or the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public), or any other characteristic protected under applicable federal, state, or local law, or any other protected status of an individual or that individual's associates or relatives. **Adtalem will not tolerate any form of discrimination or harassment that violates this policy, including misconduct that does not necessarily rise to the level of unlawful behavior.**

## II. Scope

This policy applies to all colleagues, applicants for employment, interns (whether paid or unpaid), managers, officers, directors, clients, volunteers, vendors or any other third-party doing business on

1

EXHIBIT A

behalf of or with Adtalem, regardless of immigration status. In the remainder of this document, the term "colleagues" refers to this collective group. This policy prohibits colleagues from engaging in the behavior listed herein.

## III. Policy Statement

### A. Prohibited Conduct.

The conduct prohibited by this policy, whether verbal, physical, or visual, includes any discriminatory employment action and any unwelcome conduct that is inflicted on someone because of that individual's protected status. Among the types of unwelcome conduct prohibited by this policy are epithets, slurs, negative stereotyping, intimidating acts, and the circulation or posting of written or graphic materials that show hostility toward individuals because of their protected status. This policy prohibits colleagues from engaging in discriminatory, harassing, bullying or retaliatory conduct. Further, this policy covers harassment, including sexual harassment, that occurs while in the workplace, at Adtalem-sponsored events, and at any workplace or working location at which colleagues and other covered persons work, including business travel and off-site meetings.

<u>Sexual Harassment</u>

Sexual harassment deserves special mention. Sexual harassment is illegal and Adtalem takes sexual harassment very seriously. Adtalem has a strict zero tolerance policy against all forms of sexual harassment. Sexual harassment means any harassment based on someone's actual or perceived sex or gender. It includes harassment that is not sexual in nature (for example, offensive remarks about an individual's sex or gender), as well as any unwelcome sexual advances or requests for sexual favors or any other conduct of a sexual nature, when any of the following is true:

- Submission to the advance, request, or conduct is made either explicitly or implicitly a term or condition of employment.
- Submission to or rejection of the advance, request, or conduct is used as a basis for employment decisions.
- Such advances, requests, or conduct have the purpose or effect of substantially or unreasonably interfering with a colleague's work performance by creating an intimidating, hostile, or offensive work environment.
- When there is sexual misconduct of any kind, which means any behavior of a sexual nature which also involves coercion or abuse.

Adtalem will not tolerate any form of sexual harassment, regardless of whether it is:

- Verbal (for example, epithets, derogatory statements, slurs, sexually related comments, or jokes, unwelcome sexual advances, or request for sexual favors).
- Physical (for example, assault or inappropriate physical contact).
- Visual (for example, displaying sexually suggestive posters, cartoons, or drawings, sending inappropriate adult-themed gifts, leering, or making sexual gestures).
- Online (for example, derogatory statements or sexually suggestive postings in any social media platform including Facebook, Twitter, Instagram, etc.).

This list is illustrative only, and not exhaustive. Sexual conduct becomes sexual harassment when the behavior is unwelcome. Behavior may be unwelcomed in the sense that the victim did not solicit or invite it, or in the sense that the victim regarded the conduct as undesirable or offensive. Welcome behavior can quickly become unwelcome behavior. What starts off as welcome behavior (consensual

EXHIBIT A

joking) can cross a line and become unwelcome behavior. Also, consent can be revoked at any time. When someone experiencing sexual harassment behavior says, "stop talking to me like this", it must stop. **No form of sexual harassment will be tolerated.**

Sexual harassment is prohibited at the workplace, at employer-sponsored events, and at any workplace or working location at which employees and other covered persons work. Please note that what is considered a "working environment" for purposes of this policy, is not limited to the physical location where colleagues are assigned to perform their duties.

Additional Examples of Sexual Harassment:

- Physical acts of a sexual nature, such as touching, pinching, patting, kissing, grabbing, brushing against another colleague's body, or poking another colleague's body.
- Unwanted sexual advances or propositions, such as pressure to go out on a date, asking about sexual fantasies, preferences or history, or turning work discussions into sexual topics.
- Sexually oriented gestures, noises, remarks, or jokes, or comments about a person's sexuality or sexual experience.
- Sexual or discriminatory displays or publications anywhere in the workplace, such as displaying pictures, posters, calendars, graffiti, promotional material, reading materials, or any other materials that are sexually demeaning or pornographic. This includes such sexual displays on workplace computers or cell phones and sharing such displays while in the workplace.

This policy also forbids harassment based on gender regardless of whether it rises to the level of a legal violation. Examples of gender-based harassment forbidden by this policy include (1) offensive sex- oriented verbal kidding, or teasing, (2) repeated unwanted sexual flirtations, advances or propositions, (3) verbal abuse of a sexual nature, (4) graphic or degrading comments about an individual's appearance or sexual activity, (5) offensive visual conduct, including leering, (6) offensively suggestive or obscene letters, notes or invitations, (7) offensive physical contact such as patting, grabbing, and (8) sexual favoritism.

**B. Colleague Responsibility**

Everyone at Adtalem can help assure that our workplace is free from prohibited discrimination or harassment by avoiding in engaging prohibited conduct and reporting any observed prohibited conduct.

**C. Avoiding Prohibited Conduct**

Everyone is expected to avoid any behavior or conduct that could reasonably be interpreted as prohibited harassment; no colleagues, not even the highest-ranking individuals at Adtalem are exempt from the requirements of this policy.

**D. Internal Complaint Procedures**

If a colleague feels he or she has experienced or witnessed any conduct that violates this policy, first and foremost, colleagues always have right to tell the person to stop. Colleagues also have the right to, and should, immediately notify their supervisor, any manager, or utilize the following resources offered by Adtalem:

EXHIBIT A

- Contact the Coaching Resource Center at crc@adtalem.com
- Contact AskHR at askHR@adtalem.com
- Contact the Office of Equity and Access at (630) 829-0233 or equity@adtalem.com
- Contact Adtalem's Speak Up Hotline (which allows colleagues to submit concerns or complaints anonymously) by calling (800) 461-9330, texting (773) 904-1074, or by visiting www.speakupadtalem.com

Any manager or supervisor who is aware of conduct that violates this policy or who receives a report of conduct inconsistent with this policy must report it based on the above procedures. This policy does not require reporting harassment directly to a colleague's immediate supervisor or to any individual who is creating the harassment. These individuals will ensure that a prompt investigation is conducted.

All complaints should be as detailed as possible, including the names of all individuals involved and any witnesses. Adtalem will directly and thoroughly investigate the facts and circumstances of all claims of perceived harassment and will take prompt corrective action, if appropriate.

**E. Supervisor Responsibility**

Each supervisor is responsible for maintaining the workplace free of harassment. This is accomplished by promoting a professional environment and by dealing with harassment as with all other forms of employee misconduct. It must be remembered that supervisors are the first line of defense against harassment. By setting the right example, a supervisor may discourage his or her colleagues from acting in appropriately. In addition to being subject to discipline if they engaged in harassing conduct themselves, supervisors and managers may be subject to discipline for failing to report suspected harassment that they observe or become aware of, or otherwise knowingly allow harassment to continue. Any manager or supervisor who observes harassing conduct **must** report the conduct to the Coaching Resource Center, at crc@adtalem.com so that an investigation can be made, and corrective action taken, if appropriate.

Also, supervisors must ensure that no retaliation will result against a colleague making a harassment complaint. Supervisors and managers will also be subject to discipline for engaging in any retaliation.

**F. Response**

All reports, whether that information was reported in verbal or written form, describing conduct that is inconsistent with this policy will be investigated promptly, thoroughly, and effectively. To that end, parties involved in the situation, including the reporting party, anyone identified as the target of the behavior (if different than the reporting party) and anyone who allegedly violated this policy will be offered an opportunity to be interviewed or to otherwise respond to a report under this policy, as permitted and/or required by federal and state/local laws. Investigations may be expected to be completed within the time frame required, if any, by federal, state, or local law. Complaints and allegations of misconduct will be kept confidential (to the extent possible). Adtalem may put certain interim measures in place on a case-by-case basis such as a leave of absence or a transfer, where legally permitted, while the investigation proceeds. Adtalem will take further appropriate action once the report has been investigated. That action may be a conclusion that a violation occurred. Adtalem might also conclude, depending on the circumstances, either that no violation of policy occurred or that it cannot conclude whether or not a violation occurred.

4

All colleagues, including managers and supervisors, are required to cooperate with any internal or external investigation of harassment. Failure to do so may result in disciplinary action, up to and including termination. Adtalem will not tolerate retaliation against colleagues who file complaints, support another's complaint, or participate in an investigation regarding a violation of this policy.

If an investigation reveals a violation of this policy or other inappropriate conduct has occurred, then Adtalem will take corrective action, including discipline up to and including dismissal, reassignment, changes in reporting relationships, training, or other measures Adtalem deems appropriate under the circumstances, regardless of the job positions of the parties involved. If the person who engaged in harassment is not employed by Adtalem, then Adtalem will take whatever corrective action is reasonable and appropriate under the circumstances.

## G. Policy Against Retaliation

Unlawful retaliation can be any action that could discourage an employee from coming forward to make or support a harassment, including a sexual harassment, claim. Adverse action need not be job-related or occur in the workplace to constitute unlawful retaliation (e.g., threats of physical violence outside of work hours).

Adtalem forbids any colleague from treating any other colleague or former colleague or applicant adversely for reporting harassment, providing information, for assisting another colleague or applicant in making a report, for cooperating in a harassment investigation, or for filing an administrative claim with a state, federal or local governmental agency. Colleagues who experience or witness any conduct they believe to be retaliatory are to immediately follow the reporting procedures stated above. Adtalem is committed to enforcing this policy against all forms of harassment. However, the effectiveness of our efforts depends largely on colleagues telling us about inappropriate workplace conduct. If colleagues feel that they or someone else may have been subject to conduct that violates this policy, they should report it immediately. If colleagues do not report harassing conduct, Adtalem may not become aware of a possible violation of this policy and may not be able to take appropriate corrective action.

Even if the alleged harassment does not turn out to rise to the level of a violation of law, Adtalem will not tolerate such retaliation against anyone who, in good faith, reports or provides information about suspected harassment. Colleagues who retaliate against anyone involved in a harassment investigation will be subjected to disciplinary action, up to and including dismissal. However, the retaliation provision is not intended to protect persons making intentionally false charges of harassment.

## H. Leave Requests

Adtalem recognizes that victims of sexual harassment may need time off to obtain or attempt to obtain a protection or restraining order or any other legal assistance to help ensure their health, and safety. Adtalem will work in collaboration with colleagues to provide reasonable and flexible leave options when a colleague is a victim of sexual harassment.

Adtalem will also provide reasonable accommodations for a victim of sexual harassment who requests an accommodation for the safety of the victim or to maintain their work performance while at work. Reasonable accommodations may include the implementation of safety measure, including a transfer, reassignment, modified schedule, changed workstation, an implemented safety procedure, another adjustment to job structure, or work requirement in response to the sexual harassment.

EXHIBIT A

**I. Confidentiality**

In investigating and in imposing any corrective action, Adtalem will attempt to preserve confidentiality to the extent that the needs of the situation permit.

**J. Acceptance of Policy**

All colleagues have a personal responsibility to conduct themselves in a manner that is compliant with this policy and to report any observations of conduct inconsistent with this policy. Questions concerning this policy should be directed to askHR at 1-855-882-4770.

## IV. Legal Protections and External Remedies

Harassment is not only prohibited by Adtalem but is also prohibited by state, federal, and, where applicable, local law.

Aside from the internal process at Adtalem, colleagues may also choose to pursue legal remedies with their local governmental entities. For example, a colleague may contact the Illinois Department of Human Rights (IDHR), the Chicago Commission on Human Relations (CCHR), or the Equal Employment Opportunity Commission (EEOC) about filing a formal complaint. An IDHR complaint must be filed within 180 days of the alleged incident(s) unless it is a continuing offense. A complaint must be filed with the CCHR within 365 days of the alleged incident(s) (the act must have occurred in Chicago). A complaint with the EEOC must be filed within 300 days. In addition, an appeal process is available through the Illinois Human Rights Commission (IHRC) after IDHR has completed its investigation of the complaint.

Illinois Department of Human Rights (IDHR) Chicago: 312-814-6200 or 800-662-3942
Chicago TTY: 866-740-3953
Springfield: 217-785-5100
Springfield TTY: 866-740-3953
Marion: 618-993-7463
Marion TTY: 866-740-3953
Website: www.ILLINOIS.GOV/DHR

Illinois Human Rights Commission (IHRC) Chicago: 312-814-6269
Chicago TTY: 312-814-4760
Springfield: 217-785-4350
Springfield TTY: 217-557-1500

United States Equal Employment Opportunity Commission (EEOC) Chicago: 800-669-4000
Chicago TTY: 800-869-8001
Website: www.EEOC.gov

Chicago Commission on Human Relations
Chicago: 312 – 744-4111
Email: cchr@cityofchicago.org
Website: www.chicago.gov/cchr

Additionally, Illinois has a Sexual Harassment and Discrimination Helpline. If colleagues, or someone they know, has experienced or witnessed unwelcome conduct of a sexual nature in the workplace, they can call the State of Illinois Sexual Harassment and Discrimination Helpline for assistance. Calls are

EXHIBIT A

confidential and can be made anonymously. Helpline representatives can help caller navigate their reporting options and share additional information related to counseling, legal assistance, and frequently asked questions. The contact information for the helpline is:

Call: 877-236-7703

Visit: www.Illinois.gov/SexualHarassment

**Local Protections**

Many localities enforce laws protecting individuals from harassment and discrimination. An individual should contact the county, city, or town in which they live to find out if such a law exists. A colleague who has been physically harassed or threatened while on the job may also have grounds for criminal charges, such as assault or battery. If the harassment involves unwanted physical touching, coerced physical confinement or coerced sex acts, the conduct may constitute a crime. Contact the local police department.

## V. Resources & Tools

- Adtalem Colleague Handbook
- Code of Conduct and Ethics
- SpeakUp - Reporting Document

## VI. Modifications to Policy

Adtalem has the maximum discretion permitted by law to interpret, administer, change, modify, or delete this policy at any time. No statement or representation by a supervisor or manager or any other colleague, whether oral or written, can modify this policy.

## VII. Related Information

N/A

EXHIBIT A

| | |
|---|---|
| **From:** | Wiener, Joshua |
| **To:** | Zaruba, Jason |
| **Subject:** | FW: [external] Fwd: Application for enrollment specialist position |
| **Date:** | Monday, March 24, 2025 8:04:49 AM |
| **Attachments:** | Enrollment Specialist - Walden University.pdf |

Fyi....can you get this person in the recruiting funnel?

**From:** ROGER MCKINNEY <rogmckinney@aol.com>
**Sent:** Wednesday, March 19, 2025 3:20 PM
**To:** Smith, Matt <Matt.Smith@mail.waldenu.edu>; Wiener, Joshua
<Joshua.Wiener@mail.waldenu.edu>
**Subject:** [external] Fwd: Application for enrollment specialist position

You don't often get email from rogmckinney@aol.com. Learn why this is important

See below.

Begin forwarded message:

> **From:** Sean Gottlieb <sean.gottlieb@waldenu.edu>
> **Date:** March 19, 2025 at 3:37:23 AM CDT
> **To:** ROGER MCKINNEY <rogmckinney@aol.com>
> **Subject: Application for enrollment specialist position**

Mr Mckinney,

Let me begin by offering you my profound thanks for the many times that you
have personally intervened and assisted me in some way. It is through your
assistance, and the assistance of your team that I have made it this far in this
program, with the latest being your approval of me being awarded the Graduate
certificate in Public Health, with the aim of securing employment so that I may be
able to pay the tuition and self-sponsor for the remaining 3 classes I need to
graduate with the MPH.

With employment in mind, I am not limiting my search to Public Health related
positions. I actually found a position at Walden that I think I would be perfect for
( Enrollment Specialist ). Is there a name that you may be able to provide me of
someone in the human resources area that I can reach out to about the position ? I
have already applied ( see attached ). Any information you supply would be
greatly appreciated. Thank you and have a great day.

Best Regards,

Sean Gottlieb

EXHIBIT B

# SEAN  GOTTLIEB

**91-1767 Paekko Street,  Ewa beach Hawaii  · Tel # 929-256-5101**
seangottlieb@yahoo.com · www.linkedin.com/in/sean-gottlieb-8379621b8

## EXPERIENCE

### LAW / ENGLISH TUTOR – TUTOR.COM – **December 2023 thru Present**

-In-depth understanding of legal principles and concepts. - Ability to explain complex legal topics in an accessible manner. - Experience in guiding students through case studies, legal writing, and exam preparation. - Strong research and analytical skills. - Proficient in teaching English grammar, vocabulary, reading comprehension, and Law. - Expertise in preparing students for standardized English tests. - Ability to create engaging and effective lesson plans tailored to student needs. - Skilled in using positive reinforcement and interactive teaching methods.

### ESL LANGUAGE TUTOR – CAMBLY – **March 2020 thru Present**

-Conducting individualized lessons tailored to the student's needs and proficiency level.
-Helping students improve their conversational English by engaging in natural conversations.
- Correcting students' pronunciation, grammar, and vocabulary mistakes.
-Providing feedback and constructive criticism to help students improve their language skills.
-Introducing and explaining new concepts and vocabulary to students.
-Maintaining a positive and supportive learning environment for students.

## EDUCATION

### POSTGRADUATE DIPLOMA – PUBLIC HEALTH
**WALDEN UNIVERSITY – 2025**

### MASTER OF SCIENCE - LAW
**ABRAHAM LINCOLN UNIVERSITY – 2022**

### BACHELOR OF SCIENCE – HUMAN SERVICES
**THE STATE UNIVERSITY OF NEW YORK – 2016**

### ASSOCIATE OF ARTS – SUBSTANCE ABUSE COUNSELING
**THE UNIVERSITY OF HAWAII – 2013**

## SKILLS

Epidemiology & Disease Prevention, Health Promotion & Education, Environmental Health & Safety, Biostatistics & Data Analysis, Public Health Research Methods, Healthcare Compliance & Ethics, Legal Research & Analysis, Contract Law & Compliance, Risk Management & Legal Compliance, Regulatory Affairs in Public Health, Healthcare Law & Ethics, Case Analysis & Interpretation, Policy Development & Implementation, Dispute Resolution & Mediation, Advocacy & Human Rights Law, Case Management, Social Services Coordination, Crisis Intervention & Conflict Resolution, Community Outreach & Engagement, Nonprofit Management & Program Development, Counseling & Support Services, Diversity, Equity & Inclusion (DEI) Strategies, Grant Writing & Funding Strategies.

EXHIBIT C

Are you a current colleague? If yes, please apply via The Commons.
No

Have you ever been employed by Adtalem Global Education affiliates, subsidiaries or divisions?
No

Are you an alumnus/member of any of the Adtalem Global Education institutions?
Yes

What is the highest level of education you've completed?
Master's Degree

What is your pay expectation for this position?
$20 Hourly

What state are you located in?
Hawaii

How many years of admissions/enrollment experience do you have?
5+Years

Do you have experience in higher education?
Yes

Do you have experience with Salesforce or another contact management system?
No

Are you available to work one evening per week?
Yes

Do you have experience making outbound calls?
Yes

How many years of experience do you have in customer service?
5+ years

Let us know where you're located.

EXHIBIT C

EXHIBIT C

Do you have experience making outbound calls?

Yes

How many years of experience do you have in customer service?

5+ years

Let us know where you're located.

Address Line 1: House number and street address/PO Box address

91-1767 Paeko Street

Address Line 2: City

Ewa Beach

Address Line 3: State or province abbreviation

Hawaii

Address Line 4: Zip code

96706

Address Line 5: Country abbreviation

USA

I represent that all information entered on this form and on any other forms or resumes completed by me in connection with my request to be considered for employment or a contract with Adtalem Global Education or its affiliates to be true and correct. I understand and agree that any false statements or omissions of information will be reason for discharge if I am employed and for contract termination if I am under contract.

Yes

Are you legally authorized to work in the United States?

Yes

Will you now or in the future require sponsorship for employment visa status (e.g., visa status is H-1B, TN, F-1, other)?

No



On Wednesday, April 9, 2025 at 04:56:46 PM GMT+2, Walden University Hiring Team <notifications@recruiting.adtalem.com> wrote:

Dear Sean,

Thank you for taking the time to meet with our team about the Enrollment Specialist position at Walden University. We enjoyed meeting you and appreciate your patience throughout our recruitment process. Unfortunately, after careful consideration, our team chose to move forward with another candidate that more closely aligns with the position.

We will keep you in mind for other positions that you may qualify for. In addition, we encourage you to review our career site as new positions open often.

Thank you again for your interest and we wish you the best of luck in your job search.

Kind Regards,

The Talent Acquisition Team



EXHIBIT D

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION WHISTLEBLOWER SUBMISSION PURSUANT TO SECTION 21F OF THE SECURITIES EXCHANGE ACT OF 1934**

**Whistleblower:** Sean Gottlieb 169 Commack Road, Apt 1065 Commack, NY 11725 seangottlieb@yahoo.com Date of Submission: September 15, 2025

**Subject of Complaint:** Adtalem Global Education Inc. (NYSE: ATGE) Lisa Wardell, Board Director and Former CEO

## I. NARRATIVE SUMMARY AND REQUEST FOR ENFORCEMENT

This whistleblower submission is made to report **knowing and willful violations of federal securities laws by Adtalem Global Education Inc. ("Adtalem") and its officers/directors**— including **criminal violations under 18 U.S.C. § 1001, Section 10(b) of the Securities Exchange Act, Rule 10b-5, and Regulation S-K**—arising out of Adtalem's deliberate non-disclosure of material federal litigation, its violation of obligations under a federal funding agreement, and the insider sale of company stock by a director while unlawfully concealing these risks from the market.

Adtalem, as a publicly listed company, was **required by law** to disclose material litigation and regulatory risks that jeopardized its federal funding eligibility and ongoing operations. Instead, its leadership willfully concealed this information to facilitate insider stock sales and to fraudulently maintain investor confidence. Their actions constitute **criminal fraud and result in exposure to both civil and criminal penalties** under the Securities Exchange Act and Title 18 of the United States Code.

## II. DETAILED LEGAL BASIS FOR VIOLATIONS (CRIMINAL AND CIVIL)

### (A) Falsification and Concealment of Material Facts

**18 U.S.C. § 1001—Criminal False Statements** Adtalem and its executives **knowingly and willfully concealed a fact material to SEC and Department of Education oversight**: the existence of a pending Title VI/Title VII federal discrimination lawsuit and an immediate threat to its Title IV funding, both of which directly affect core business operations and shareholder value. *It is a federal crime to "knowingly and willfully falsify, conceal, or cover up by any trick, scheme, or device a material fact" within the jurisdiction of the executive branch or any agency thereof, including the SEC and DOE. See 18 U.S.C. § 1001.*

**Criminal exposure** is heightened by contemporaneous insider sales, as the concealment enabled financial gain for insiders at the expense of public investors.

**(B) Violations of the Securities Exchange Act and Rule 10b-5**

**Section 10(b), Rule 10b-5, and SEC Regulations (17 C.F.R. § 240.10b-5)** It is unlawful:

- To employ any device, scheme, or artifice to defraud;

- To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements not misleading;

- To engage in any act, practice, or course of business which operates as a fraud or deceit upon any person.

**Materiality Standard:** "Information is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision." (*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)). **Failure to disclose an active federal lawsuit** that challenges both the company's compliance with federal civil rights law and its continued receipt of federal funds is, by any definition, a material fact. Adtalem's officers (including Lisa Wardell) certified "under penalty of perjury" in Form 144 and 10-Q/8-K filings that there was no material non-public information—notwithstanding the company's willful concealment.

**(C) Regulation S-K, Item 103: Legal Proceedings**

SEC rules require disclosure of "any pending legal proceedings" that are material to the business. The federal lawsuit—*Sean Gottlieb v. Adtalem* (N.D. Ill. No. 1:25-cv-07752)—alleges **systemic civil rights and federal grant fraud**, breach of Title VI as a funding condition, and immediate risk to Title IV eligibility. **No such disclosure appeared in any Adtalem 8-K, 10-Q, or 10-K** during the relevant period.

**(D) Insider Trading & False Certifications under Rule 10b5-1**

On or about August 21-28, 2025, while in possession of this non-public, material adverse information, Board Director Lisa Wardell filed a Form 144 and sold nearly $4.2 million in Adtalem stock. She falsely certified that no material adverse non-public information was known, as required by law.

**Such conduct constitutes willful and intentional fraud, and exposes the company and director to criminal prosecution and SEC enforcement.**

---

## III. TIMELINE OF MATERIAL EVENTS

| Date | Event / Evidence |
|---|---|
| Apr–Jun 2025 | Plaintiff Sean Gottlieb files formal race and age discrimination complaint with Adtalem/Walden. |

| Date | Event / Evidence |
|------|------------------|
| Jun 10, 2025 | Adtalem's General Counsel, Danielle McKinley, issues a written statement: "At no time was the company legally required to provide you with a response to your communications or disclose its conclusions." |
| Jul 5, 2025 | Gottlieb files federal lawsuit in N.D. Illinois, alleging Title VI, Title VII, and PPA breach—case is served. |
| Jul–Aug 2025 | No disclosure of the litigation or regulatory risk appears in Adtalem's SEC filings or investor communications. |
| Aug 21–28, 2025 | Director Lisa Wardell executes Form 144, sells $4.2 million in Adtalem stock, certifying absence of material undisclosed information. |
| Aug 7, 2025 | Adtalem issues 8-K/earnings—withholds all mention of pending federal suit or PPA violation. |
| Sep 2025 | Second Amended Complaint filed: attaches PPA, further establishes risk of federal funding loss. |
| Sep 15, 2025 | This TCR Whistleblower Submission filed. |

## IV. FACTUAL EVIDENCE (Supporting Exhibits)

- **Second Amended Complaint, NDIL Case 1:25-cv-07752**

- **June 10, 2025 Legal Admission**: Email from Adtalem Legal Counsel, on official letterhead, admitting refusal to comply with federally mandated civil rights complaint procedures.

- **Walden University Title IV Program Participation Agreement (PPA)**: Signed, effective July 2024, requiring strict compliance with Title VI as a funding precondition.

- **SEC Filings**:

  - Form 8-K & 10-Q (Q2 and Q3 2025): No mention of federal litigation, PPA violations, or regulatory investigations.

  - Form 144: Signed by Lisa Wardell stating no material adverse information withheld.

- **Insider Trading Records**: Dates, sale amount, and board certifications.

- **Timeline and analysis showing Adtalem's pattern of fraudulent concealment and deceptive disclosures.**

## V. HOW ADTALEM AND ITS OFFICERS BROKE FEDERAL LAW — CRIMINAL LIABILITY EXPLAINED

- **Intentional Concealment of a Core Federal Lawsuit**: Adtalem's CEO, General Counsel, Board, and Director Lisa Wardell had actual knowledge of a lawsuit and specific regulatory findings that placed Adtalem in immediate jeopardy of losing federal funding and public reputation. They lied to federal agencies and the marketplace by omission.

- **False Statements under Oath**: On SEC filings (144, 10-Q), executives **swore under penalty of perjury** that there was no undisclosed material risk. This is a direct violation of 18 U.S.C. § 1001 and the Securities Exchange Act (Section 32(a): criminal penalties for knowing false filings).

- **Insider Trading While in Possession of Material Non-Public Information**: Lisa Wardell sold stock after the lawsuit was filed and after a legal admission of liability—well before any public disclosure. This fits the classic Rule 10b-5 "fraud-in-connection-with-the-purchase-or-sale" scenario and demonstrates willful intent to personally benefit from concealing adverse information.

- **Conspiracy and Scheme to Defraud**: The board and legal department coordinated public silence, non-disclosure, and false certifications—potentially constituting a conspiracy to defraud investors and federal stakeholders (see 18 U.S.C. § 371).

## VI. REQUEST FOR INVESTIGATION AND ENFORCEMENT

Pursuant to Section 21F of the Securities Exchange Act and the Dodd-Frank SEC Whistleblower Program, I request:

1. **A Formal SEC Enforcement Investigation** of Adtalem and its leadership for criminal and civil fraud, including but not limited to:

   o Willful concealment of material litigation

   o Regulatory risk to federal funding

   o False certifications on SEC filings

   o Fraudulent insider trading

   o Conspiracy

|  |  |
|---|---|
| **Form 144 Filer Information** | UNITED STATES<br>SECURITIES AND EXCHANGE COMMISSION<br>Washington, D.C. 20549 |
| **Form 144** | **Form 144**<br><br>NOTICE OF PROPOSED SALE OF SECURITIES<br>PURSUANT TO RULE 144 UNDER THE SECURITIES ACT OF 1933 |

## 144: Issuer Information

| | |
|---|---|
| Name of Issuer | ADTALEM GLOBAL EDUCATION INC. |
| SEC File Number | 001-13988 |
| Address of Issuer | 233 South Wacker Drive<br>Suite 800<br>Chicago<br>ILLINOIS<br>60606 |
| Phone | 312-651-1400 |
| Name of Person for Whose Account the Securities are To Be Sold | LISA W. WARDELL |

See the definition of "person" in paragraph (a) of Rule 144. Information is to be given not only as to the person for whose account the securities are to be sold but also as to all other persons included in that definition. In addition, information shall be given as to sales by all persons whose sales are required by paragraph (e) of Rule 144 to be aggregated with sales for the account of the person filing this notice.

| | |
|---|---|
| Relationship to Issuer | 1. Director |

## 144: Securities Information

| Record | Title of the Class of Securities To Be Sold | Name and Address of the Broker | Number of Shares or Other Units To Be Sold | Aggregate Market Value | Number of Shares or Other Units Outstanding | Approximate Date of Sale | Name the Securities Exchange |
|---|---|---|---|---|---|---|---|
| #1 | Common | Morgan Stanley Smith Barney LLC Executive Financial Services<br>1 New York Plaza<br>8th Floor<br>New York<br>NEW YORK<br>10004 | 25,477 | $3,372,663.09 | 35,955,712 | 08/28/2025 | NYSE |

## 144: Securities To Be Sold

Furnish the following information with respect to the acquisition of the securities to be sold and with respect to the payment of all or any part of the purchase price or other consideration therefor:

| Record | Title of the Class | Date you Acquired | Nature of Acquisition Transaction | Name of Person from Whom Acquired | Is this a Gift ? | Date Donor Acquired | Amount of Securities Acquired | Date of Payment | Nature of Payment * |
|---|---|---|---|---|---|---|---|---|---|

| #1 | Common | 11/08/2024 | Restricted stock vesting under a registered plan | Issuer | ☐ | — | 1,262 | 11/08/2024 | Services Rendered |
| #2 | Common | 08/25/2024 | Performance Stock Units | Issuer | ☐ | — | 11,298 | 08/25/2024 | Services Rendered |
| #3 | Common | 08/25/2025 | Restricted stock vesting under a registered plan | Issuer | ☐ | — | 5,128 | 08/25/2025 | Services Rendered |
| #4 | Common | 08/26/2024 | Restricted stock vesting under a registered plan | Issuer | ☐ | — | 7,789 | 08/26/2024 | Services Rendered |

* If the securities were purchased and full payment therefor was not made in cash at the time of purchase, explain in the table or in a note thereto the nature of the consideration given. If the consideration consisted of any note or other obligation, or if payment was made in installments describe the arrangement and state when the note or other obligation was discharged in full or the last installment paid.

## 144: Securities Sold During The Past 3 Months

Furnish the following information as to all securities of the issuer sold during the past 3 months by the person for whose account the securities are to be sold.

| Record | Name and Address of Seller | Title of Securities Sold | Date of Sale | Amount of Securities Sold | Gross Proceeds |
|---|---|---|---|---|---|
| #1 | LISA W. WARDELL<br>233 South Wacker Drive<br>Suite 800<br>Chicago<br>ILLINOIS<br>60606 | Common | 08/27/2025 | 18,392 | $2,486,889.00 |
| #2 | Lisa Wardell<br>233 South Wacker Drive<br>Suite 800<br>Chicago<br>ILLINOIS<br>60606 | Common | 08/21/2025 | 12,900 | $1,714,465.47 |

## 144: Remarks and Signature

| Remarks | |
|---|---|
| Date of Notice | 08/28/2025 |
| Date of Plan Adoption or Giving of Instruction, If Relying on Rule 10b5-1 | |

**ATTENTION:**

The person for whose account the securities to which this notice relates are to be sold hereby represents by signing this notice that he does not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed. If such person has adopted a written trading plan or given trading instructions to satisfy Rule 10b5-1 under the Exchange Act, by signing the form and indicating the date that the plan was adopted or the instruction given, that person makes such representation as of the plan adoption or instruction date.

| Signature | /s/ Lisa Wardell |
|---|---|

*ATTENTION: Intentional misstatements or omission of facts constitute Federal Criminal Violations (See 18 U.S.C. 1001)*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): August 6, 2025**

# ADTALEM GLOBAL EDUCATION INC.
(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **001-13988** | **36-3150143** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **233 South Wacker Drive** | |
| **Chicago, IL** | **60606** |
| (Address of principal executive offices) | (Zip Code) |

**(312) (651-1400)**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock $0.01 Par Value | ATGE | New York Stock Exchange |
| Common Stock $0.01 Par Value | ATGE | NYSE Texas |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01**       **Entry Into a Material Definitive Agreement**

On August 6, 2025, Adtalem Global Education Inc. ("Adtalem") entered into Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement (the "Amendment"), by and among Adtalem, the other guarantors party thereto, the lenders and issuing banks party thereto and Morgan Stanley Senior Funding, Inc., as administrative agent and collateral agent, which amended our Credit Agreement, dated as of August 12, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time), in order to, among other things, (i) increase available commitments under our revolving facility by $100.0 million (resulting in aggregate outstanding commitments of $500.0 million under the revolving facility after giving effect to the Amendment), (ii) extend the maturity and commitment termination date of our revolving facility to August 6, 2030 (subject to an earlier springing maturity if we do not refinance, redeem or repay certain other material indebtedness on the date that is 91 days prior to the stated maturity thereof) and (iii) reduce the pricing on any drawn revolving loans to, at our option, SOFR plus an applicable margin ranging from 2.25% to 3.00% or an alternate base rate plus an applicable margin ranging from 1.25% to 2.00% depending on Adtalem's net first lien leverage ratio for such period.

The foregoing description of the Amendment does not purport to be complete and is qualified in its entirety by reference to the full text of the Amendment, a copy of which is filed as Exhibit 4.1, and is incorporated herein by reference.

**Item 2.02**       **Results of Operations and Financial Condition**

On August 7, 2025, Adtalem issued a press release announcing its fourth quarter and full year fiscal 2025 academic, operating and financial results. The press release is attached hereto as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference.

The information furnished pursuant to this Item 2.02, including Exhibit 99.1 shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities under that Section and shall not be deemed to be incorporated by reference into any filing of Adtalem under the Securities Act of 1933, as amended, or the Exchange Act.

**Item 2.03**       **Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant**

The information set forth in Item 1.01 of this Current Report on Form 8-K is incorporated into this Item 2.03.

*Cautionary Disclosure Regarding Forward-Looking Statements*

Certain statements contained in this Form 8-K and related press release are forward-looking statements as defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to any historical or current fact, which includes statements regarding Adtalem's future growth. Forward-looking statements generally can be identified by the use of forward-looking terminology such as "future," "believe," "project," "expect," "anticipate," "estimate," "plan," "intend," "may," "will," "would," "could," "can," "continue," "preliminary," "potential," "range," and similar terms. These forward-looking statements are subject to risk and uncertainties that could cause actual results to differ materially from those described in the statements. Important factors that could cause actual results to differ materially from the expectations expressed or implied by our forward-looking statements are disclosed in Item 1A. "Risk Factors" of our most recent Annual Report on Form 10-K filed with the Securities and Exchange Commission (SEC) and our other filings with the SEC. You should evaluate forward-looking statements in the context of these risks and uncertainties and are cautioned not to place undue reliance on such forward-looking statements. We caution you that these factors may not contain all of the factors that are important to you. We cannot assure you that we will realize the results, performance or developments we expect or anticipate or, even if substantially realized, that they will result in the consequences or affect us or our operations in the way we expect. All forward-looking statements are based on information available to us as of the date any such statements are made, and Adtalem assumes no obligation to publicly update or revise its forward-looking statements even if experience or future changes make it clear that any projected results expressed or implied therein will not be realized, except as required by law.

**Item 9.01**        **Financial Statements and Exhibits**

4.1      Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement, dated as of August 6, 2025, among Adtalem Global Education Inc., the other guarantors party thereto, the lenders and issuing banks party thereto and Morgan Stanley Senior Funding, Inc., as administrative agent and collateral agent.

99.1     Press Release of Adtalem Global Education Inc., dated August 7, 2025.

104      Cover Page Interactive Data File (formatted in Inline XBRL and included as Exhibit 101)

*Certain schedules and similar attachments have been omitted in reliance on Instruction 4 of Item 1.01 of Form 8-K and Item 601(a)(5) of Regulation S-K. Adtalem will provide, on a supplemental basis, a copy of any omitted schedule or attachment to the Securities and Exchange Commission or its staff upon request.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ADTALEM GLOBAL EDUCATION INC.**

By:  /s/ Robert J. Phelan
　　　Robert J. Phelan
　　　Senior Vice President and Chief Financial Officer
　　　(Principal Financial Officer)

Date: August 7, 2025

Exhibit 4.1

## AMENDMENT NO. 4 TO CREDIT AGREEMENT AND INCREMENTAL ASSUMPTION AGREEMENT

This **AMENDMENT NO. 4 TO CREDIT AGREEMENT AND INCREMENTAL ASSUMPTION AGREEMENT** (this "**Agreement**"), dated as of August 6, 2025, is made by and among Adtalem Global Education Inc., a Delaware corporation (the "**Borrower**"), the Loan Parties party hereto, Morgan Stanley Senior Funding, Inc. ("**MSSF**"), as Administrative Agent, Issuing Bank and Swingline Lender under the Existing Credit Agreement (as defined below), each other Issuing Bank party hereto, the 2025 Refinancing Revolving Facility Lenders (as defined below) and the 2025 Incremental Revolving Facility Lenders (as defined below).

### PRELIMINARY STATEMENTS:

(1)     The Borrower, the Lenders and Issuing Banks party thereto from time to time and MSSF, as Administrative Agent, Collateral Agent and Swingline Lender, are party to that certain Credit Agreement, dated as of August 12, 2021 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of June 27, 2023, as further amended by that certain Amendment No. 2 to Credit Agreement, dated as of January 26, 2024, as further amended by that certain Amendment No. 3 to Credit Agreement, dated as of August 21, 2024, and as further amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "**Existing Credit Agreement**").

(2)     The Borrower has requested that the 2025 Incremental Revolving Facility Lenders provide $100,000,000 of 2025 Incremental Revolving Facility Commitments (as defined below) in accordance with Section 2.21(a) of the Existing Credit Agreement.

(3)     The Borrower has requested that, immediately following the incurrence of the 2025 Incremental Revolving Facility Commitments, the 2025 Refinancing Revolving Facility Lenders agree to refinance and replace all of the outstanding Revolving Facility Commitments and 2025 Incremental Revolving Facility Commitments (collectively, the "**Existing Revolving Facility Commitments**") with the 2025 Refinancing Revolving Facility Commitments (as defined below) on substantially the same terms and conditions as the outstanding Existing Revolving Facility Commitments, except as set forth herein, in accordance with Section 2.21(l) of the Existing Credit Agreement.

(4)     With respect to this Agreement, MSSF, Truist Securities, Inc., MUFG Bank, LTD. and US Bank National Association will act as joint lead arrangers and joint bookrunners (in such capacities, the "**2025 Revolving Facility Arrangers**"), Keybanc Capital Markets Inc., Associated Bank, N.A., Barclays Bank PLC, Fifth Third Bank, National Association and The Northern Trust Company will act as syndication agents and PNC Bank, National Association and Valley National Bank will act as documentation agents.

(5)     Each Lender that executes and delivers a signature page to this Agreement as a "2025 Refinancing Revolving Facility Lender" will be deemed (i) to have agreed to the terms of this Agreement and the Amended Credit Agreement and (ii) to have agreed to exchange its Existing Revolving Facility Commitments for 2025 Refinancing Revolving Facility Commitments in the amount set forth on Schedule 1 hereto.

(6)      The Administrative Agent, the Borrower, the other Loan Parties party hereto and the 2025 Refinancing Revolving Facility Lenders desire to memorialize the terms of this Agreement and to make certain other changes set forth herein by amending, in accordance with Sections 10.08(b) and (e) of the Existing Credit Agreement, the Existing Credit Agreement as set forth below.

(7)      Pursuant to Section 10.08(e) of the Existing Credit Agreement, the Borrower and the Administrative Agent have agreed to amend Section 10.08(b)(iv)(1) of the Existing Credit Agreement to cure an ambiguity, omission, defect or inconsistency.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and subject to the conditions set forth herein, the parties hereto hereby agree as follows:

SECTION 1.      <u>Defined Terms</u>. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Amended Credit Agreement. In addition, as used in this Agreement, the following terms have the meanings specified:

"**2025 Incremental Revolving Facility Commitment**" shall mean, with respect to each 2025 Incremental Revolving Facility Lender, the Incremental Revolving Commitment of such 2025 Incremental Revolving Facility Lender to the Borrower on the Amendment No. 4 Effective Date. The amount of each 2025 Incremental Revolving Facility Lender's 2025 Incremental Revolving Facility Commitment as of the Amendment No. 4 Effective Date is set forth on <u>Schedule 1</u> hereto. The aggregate amount of the 2025 Incremental Revolving Facility Commitments as of the Amendment No. 4 Effective Date is $100,000,000.

"**2025 Incremental Revolving Facility Lenders**" shall mean, collectively, the financial institutions set forth on <u>Schedule 1</u> hereto with a 2025 Incremental Revolving Facility Commitment on the Amendment No. 4 Effective Date.

"**2025 Refinancing Revolving Facility Commitment**" shall mean, with respect to each 2025 Refinancing Revolving Facility Lender, the Commitment of such 2025 Refinancing Revolving Facility Lender to make 2025 Refinancing Revolving Facility Loans to the Borrower on and after the Amendment No. 4 Effective Date until the Revolving Facility Maturity Date. The amount of each 2025 Refinancing Revolving Facility Lender's 2025 Refinancing Revolving Facility Commitment as of the Amendment No. 4 Effective Date is set forth on <u>Schedule 1</u> hereto. The aggregate amount of the 2025 Refinancing Revolving Facility Commitments as of the Amendment No. 4 Effective date is $500,000,000.

"**2025 Refinancing Revolving Facility Loans**" shall mean a Revolving Facility Loan that is made pursuant to Section 3 of this Agreement and the terms and conditions set forth in the Existing Credit Agreement.

"**2025 Refinancing Revolving Facility Lenders**" shall mean, collectively, the financial institutions set forth on <u>Schedule 1</u> hereto with a 2025 Refinancing Revolving Facility Commitment on the Amendment No. 4 Effective Date.

"**2025 Revolving Facility Lenders**" shall mean, collectively, the 2025 Incremental Revolving Facility Lenders and the 2025 Refinancing Revolving Facility Lenders.

2

SECTION 2.     2025 Incremental Revolving Facility Commitments. Subject to the terms and conditions set forth herein and in the Existing Credit Agreement, each 2025 Incremental Revolving Facility Lender agrees to make 2025 Incremental Revolving Facility Commitments to the Borrower on the Amendment No. 4 Effective Date in an aggregate principal amount equal to the amount set forth under "2025 Incremental Revolving Commitment Amount" opposite such 2025 Incremental Revolving Facility Lender's name on Schedule I hereto.

SECTION 3.     2025 Refinancing Revolving Facility Commitments. Subject to the terms and conditions set forth herein and in the Existing Credit Agreement, (i) immediately after the 2025 Incremental Revolving Facility Commitments are made pursuant to Section 2 above, each 2025 Refinancing Revolving Facility Lender agrees to make 2025 Refinancing Revolving Facility Commitments available to the Borrower on the Amendment No. 4 Effective Date in an aggregate principal amount equal to the amount set forth under the "2025 Refinancing Revolving Commitment Amount" opposite such 2025 Refinancing Revolving Facility Lender's name on Schedule I hereto and (ii) immediately upon the making of such 2025 Refinancing Revolving Facility Commitments pursuant to the foregoing clause (i), all of the Existing Revolving Facility Commitments shall automatically terminate in full. From and after the Amendment No. 4 Effective Date, each reference to a "Revolving Facility Loan" or "Revolving Facility Commitment" in the Amended Credit Agreement shall be deemed to include the 2025 Refinancing Revolving Facility Loans and the 2025 Refinancing Revolving Facility Commitments, as applicable, and related terms will have correlative meaning *mutatis mutandis* (in each case, unless context otherwise requires).

SECTION 4.     Amendments to Credit Agreement. Effective as of the Amendment No. 4 Effective Date:

(i)     the following terms are amended and restated in their entirety or are hereby incorporated as a defined term in the Amended Credit Agreement in the appropriate alphabetical order as follows:

"**2025 Refinancing Revolving Facility Commitment**" shall mean, with respect to each 2025 Refinancing Revolving Facility Lender, the Commitment of such 2025 Refinancing Revolving Facility Lender to make 2025 Refinancing Revolving Facility Loans to the Borrower on and after the Amendment No. 4 Effective Date until the Revolving Facility Maturity Date. The amount of each 2025 Refinancing Revolving Facility Lender's 2025 Refinancing Revolving Facility Commitment as of the Amendment No. 4 Effective Date is set forth on Schedule 1 to Amendment No. 4. The aggregate amount of the 2025 Refinancing Revolving Facility Commitments as of the Amendment No. 4 Effective date is $500,000,000.

"**2025 Refinancing Revolving Facility Lenders**" shall mean, collectively, the financial institutions set forth on Schedule 1 to Amendment No. 4 with a 2025 Refinancing Revolving Facility Commitment.

"**2025 Refinancing Revolving Facility Loan**" shall mean a Loan made by a 2025 Refinancing Revolving Facility Lender pursuant to Section 2.01(b).

"**Amendment No. 4**" shall mean that certain Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement, dated as of August 6, 2025, by and among the Borrower, the Loan Parties party thereto, the 2025 Refinancing Revolving Facility Lenders party thereto and the Administrative Agent.

3

"**Amendment No. 4 Effective Date**" shall mean August 6, 2025.

"**Applicable Margin**" shall mean for any day (i) with respect to any 2024 Second Repricing Term Loan on and after the Amendment No. 3 Effective Date, 2.75% per annum in the case of any Term SOFR Loan and 1.75% per annum in the case of any ABR Loan, (ii) with respect to any 2025 Refinancing Revolving Facility Loan on and after the Amendment No. 4 Effective Date, 2.25% per annum in the case of any Term SOFR Loan, Eurocurrency Loan, Alternate Currency Loan or RFR Loan and 1.25% per annum in the case of any ABR Loan; *provided*, *however*, that on and after the first Adjustment Date occurring after delivery of the financial statements and certificates required by Section 5.04 upon the completion of the first full fiscal quarter of the Borrower ending after the Amendment No. 4 Effective Date, the "Applicable Margin" with respect to the 2025 Refinancing Revolving Facility Loans will be determined pursuant to the Pricing Grid, and (iii) with respect to any Other Term Loan or Other Revolving Loan, the "Applicable Margin" set forth in the Incremental Assumption Agreement relating thereto.

"**Consolidated Debt**" at any date shall mean the sum of (without duplication) all Indebtedness (other than letters of credit or bank guarantees, to the extent undrawn) consisting of Capitalized Lease Obligations, Indebtedness for borrowed money, purchase money Indebtedness and any guarantees with respect to any of the foregoing of the Borrower and its Subsidiaries determined on a consolidated basis on such date in accordance with GAAP.

"**Defaulting Lender**" shall mean, subject to Section 2.22, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder (unless such Lender has delivered to the Administrative Agent and the Borrower within such two (2) Business Day period a notice identifying which conditions precedent to funding were not satisfied and the Event of Default (if any) associated therewith) or (ii) pay to the Administrative Agent, any Issuing Bank, the Swingline Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swingline Loans) within two Business Days of the date when due, (b) has notified the Borrower, the Swingline Lender, Administrative Agent or any Issuing Bank in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-in Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent

4

that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.22) upon delivery of written notice of such determination to the Borrower, each Issuing Bank, the Swingline Lender and each Lender.

"**Issuing Bank**" shall mean (i) Morgan Stanley Bank, N.A., Truist Bank, MUFG Bank, Ltd., U.S. Bank National Association, KeyBank National Association, Associated Bank, N.A., Barclays Bank PLC, Fifth Third Bank, National Association, The Northern Trust Company, PNC Bank, National Association and Valley National Bank and (ii) each other Issuing Bank designated pursuant to Section 2.05(l), in each case in its capacity as an issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.05(i). An Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"**Letter of Credit Commitment**" shall mean, with respect to each Issuing Bank, the commitment of such Issuing Bank to issue Letters of Credit pursuant to Section 2.05. The amount of each Lender's Letter of Credit Commitment as of the Amendment No. 4 Effective Date is set forth on Schedule 1 to Amendment No. 4. No Issuing Bank shall be required to issue Letters of Credit in an amount in excess of its Letter of Credit Commitment

"**Letter of Credit Sublimit**" shall mean the aggregate Letter of Credit Commitments of the Issuing Banks, in an amount not to exceed $500,000,000 (or the equivalent thereof in an Alternate Currency) or such larger amount not to exceed the Revolving Facility Commitment as the Administrative Agent and the applicable Issuing Bank may agree.

"**Loan Documents**" shall mean (i) this Agreement, (ii) the Guarantee Agreement, (iii) the Security Documents, (iv) each Incremental Assumption Agreement, (v) the Intercreditor Agreement, (vi) any First Lien/Second Lien Intercreditor Agreement, (vii) any Note issued under Section 2.09(e), (viii) the Letters of Credit, (ix) Amendment No. 1, (x) Amendment No. 2, (xi) Amendment No. 3, and (xii) Amendment No. 4.

"**Material Intellectual Property**" shall mean any intellectual property that is material to the operation of the business of the Borrower and their respective Subsidiaries, taken as a whole.

"**Pricing Grid**" shall mean, from and after the first Adjustment Date occurring after delivery of the financial statements and certificates required by Section 5.04 upon the completion of the first full fiscal quarter of the Borrower ending after the Amendment No. 4 Effective Date, with respect to the 2025 Refinancing Revolving Facility Loans, the per annum rates set forth in the table below:

5

| Net First Lien Leverage Ratio | Applicable Margin for ABR 2025 Refinancing Revolving Facility Loans | Applicable Margin for Term SOFR 2025 Refinancing Revolving Facility Loans, Eurocurrency Revolving Loans, Alternate Currency Loans and RFR Loans |
|---|---|---|
| Greater than or equal to 2.23:1.00 | 2.00% | 3.00% |
| Less than 2.23:1.00 but greater than or equal to 1.73:1.00 | 1.75% | 2.75% |
| Less than 1.73:1.00 but greater than or equal to 1.23:1.00 | 1.50% | 2.50% |
| Less than 1.23:1.00 | 1.25% | 2.25% |

For the purposes of the Pricing Grid, changes in the Applicable Margin resulting from changes in the Net First Lien Leverage Ratio shall become effective on the date (the "**Adjustment Date**") that is three Business Days after the date on which the relevant financial statements are delivered to the Lenders pursuant to Section 5.04 for each fiscal quarter beginning with the first full fiscal quarter of the Borrower ended after the Closing Date, and shall remain in effect until the next change to be effected pursuant to this paragraph. If any financial statements referred to above are not delivered within the time periods specified in Section 5.04, then, at the option of the Administrative Agent or the Required Lenders, until the date that is three Business Days after the date on which such financial statements are delivered, the pricing level that is one pricing level higher than the pricing level theretofore in effect shall apply as of the first Business Day after the date on which such financial statements were to have been delivered but were not delivered. Each determination of the Net First Lien Leverage Ratio pursuant to the Pricing Grid shall be made in a manner consistent with the determination thereof pursuant to Section 6.11.

"**Revolving Facility Maturity Date**" shall mean, as the context may require, (a) with respect to the 2025 Revolving Refinancing Facility Commitments, August 6, 2030; provided that, if the First Lien Notes or the Term Loans have not been refinanced, redeemed or repaid in full prior to the date that is 91 days prior to the applicable stated maturity date thereof, the 2025 Refinancing Revolving Facility Commitments shall mature on such date and (b) with respect to

any other Classes of Revolving Facility Commitments, the maturity dates specified therefor in the applicable Incremental Assumption Agreement.

"**Term SOFR Adjustment**" shall mean a percentage equal to 0.00%.

"**Unrestricted Subsidiary**" shall mean (1) any Subsidiary of the Borrower identified on Schedule 1.01(E), (2) any other Subsidiary of the Borrower, whether now owned or acquired or created after the Closing Date, that is designated by the Borrower as an Unrestricted Subsidiary hereunder by written notice to the Administrative Agent; *provided* that the Borrower shall only be permitted to so designate a new Unrestricted Subsidiary after the Closing Date so long as (a) no Default or Event of Default has occurred and is continuing or would result therefrom, (b) immediately after giving effect to such designation, the Borrower shall be in Pro Forma Compliance with the Financial Covenant as of the last day of the most recently ended fiscal quarter of the Borrower for which financial statements are available, (c) such Unrestricted Subsidiary shall be capitalized (to the extent capitalized by the Borrower or any of its Subsidiaries) through Investments as permitted by, and in compliance with, Section 6.04, and any prior or concurrent Investments in such Subsidiary by the Borrower or any of its Subsidiaries shall be deemed to have been made under Section 6.04, (d) without duplication of clause (c), any assets owned by such Unrestricted Subsidiary at the time of the initial designation thereof shall be treated as Investments pursuant to Section 6.04 and (e) such Subsidiary shall have been designated an "unrestricted subsidiary" (or otherwise not be subject to the covenants and defaults) under (A) the First Lien Note Documents, (B) any indenture or credit agreement in respect of Permitted Refinancing Indebtedness with respect to the First Lien Notes constituting Material Indebtedness or (C) any indenture or credit agreement in respect of any Junior Financing constituting Material Indebtedness; *provided further* that notwithstanding anything in this Agreement to the contrary, at no time may any Unrestricted Subsidiary own or exclusively license or have exclusive rights in any Material Intellectual Property; *provided* that, for the avoidance of doubt, the restriction set forth in the preceding proviso shall not restrict any Unrestricted Subsidiary from holding a non-exclusive license in Material Intellectual Property; and (3) any subsidiary of an Unrestricted Subsidiary. The Borrower may designate any Unrestricted Subsidiary to be a Subsidiary for purposes of this Agreement (each, a "**Subsidiary Redesignation**"); *provided* that (i) no Default or Event of Default has occurred and is continuing or would result therefrom, and (ii) the Borrower shall have delivered to the Administrative Agent an officer's certificate executed by a Responsible Officer of the Borrower, certifying to the best of such officer's knowledge, compliance with the requirements of preceding clause (i).

(ii)    clause (e) of the definition of "Excluded Securities" is hereby amended and restated in its entirety as follows:

(e)    any Equity Interests of any person that is not a Wholly Owned Subsidiary to the extent that (A) a pledge thereof to secure the Obligations is prohibited by (i) any applicable organizational documents, joint venture agreement or shareholder agreement or (ii) any other contractual obligation with an unaffiliated third party not in violation of Section 6.09(c) (other than, in the case of this subclause (A)(ii), customary non-assignment provisions which are ineffective under Article 9 of the Uniform Commercial Code or other applicable Requirements of Law), (B) any organizational documents, joint venture

7

agreement or shareholder agreement (or other contractual obligation referred to in subclause (A)(ii) above) prohibits such a pledge without the consent of any other party; *provided*, that this clause (B) shall not apply if (1) such other party is a Loan Party or a Wholly Owned Subsidiary or (2) consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary to obtain any such consent) and for so long as such organizational documents, joint venture agreement or shareholder agreement or replacement or renewal thereof is in effect, or (C) a pledge thereof to secure the Obligations would give any other party (other than a Loan Party or a Wholly Owned Subsidiary) to any organizational documents, joint venture agreement or shareholder agreement governing such Equity Interests (or other contractual obligation referred to in subclause (A)(ii) above) the right to terminate its obligations thereunder (other than, in the case of other contractual obligations referred to in subclause (A)(ii), customary non-assignment provisions which are ineffective under Article 9 of the Uniform Commercial Code or other applicable Requirements of Law); *provided*, the Equity Interests of any Wholly Owned Subsidiary shall not constitute Excluded Equity Interests solely on the basis of such Subsidiary becoming a non-Wholly Owned Subsidiary unless the transaction by which such Subsidiary became a non-Wholly Owned Subsidiary complied with Section 10.18(b);

(iii) Section 2.05(a) is hereby amended by adding the following proviso at the end of the first sentence thereof:

"; *provided, further*, that no Issuing Bank shall be obligated to issue Letters of Credit if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Bank from issuing such Letter of Credit, the issuance of such Letter of Credit would violate any Requirements of Law binding upon such Issuing Bank or the issuance of the Letter of Credit would violate one or more policies or procedures of such Issuing Bank applicable to letters of credit generally that are customary for the industry";

(iv) Section 10.08(b)(iv)(1) is hereby amended and restated in its entirety as follows:

"the provisions of Section 2.18 or 8.02 in a manner that would by its terms alter the pro rata sharing or application of payments required thereby or".

(v) the first sentence of Section 10.15(a) is hereby amended and restated in its entirety as follows:

"The Borrower and each other Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, the Collateral Agent, any Lender, or any Affiliate of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York sitting in New York County, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding (whether in tort, law or equity) may be heard and determined in

8

such New York State court or, to the fullest extent permitted by applicable law, in such federal court"; and

(vi) Section 10.16 is hereby amended by adding the following paragraph after the last paragraph thereof:

"For the avoidance of doubt, nothing in the preceding paragraph shall prohibit any person from voluntarily disclosing or providing any information within the scope of the referenced confidentiality provision to any governmental, regulatory or self-regulatory organization (any such entity, a "**Regulatory Authority**") to the extent that any such prohibition on disclosure set forth in such confidentiality provision shall be prohibited by the laws or regulations applicable to such Regulatory Authority."

SECTION 5.    Use of Proceeds. The Borrower shall use the proceeds of the 2025 Refinancing Revolving Facility Commitments to (i) refinance and replace all of the outstanding Existing Revolving Facility Commitments under the Existing Credit Agreement immediately prior to the effectiveness of this Agreement and (ii) after the Amendment No. 4 Effective Date, for general corporate purposes and for any other purpose not prohibited by the Amended Credit Agreement.

SECTION 6.    Representations and Warranties. Each Loan Party represents and warrants that:

(a) it has the corporate or other organizational power and authority to execute, deliver and perform this Agreement and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Agreement;

(b) it has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid and binding agreement of it in accordance with its terms, except to the extent that the enforceability hereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law) and similar principles, rights and defenses under the laws of the relevant jurisdiction; and

(c) the representations and warranties made by each Loan Party set forth in Article III of the Existing Credit Agreement or in any other Loan Document are true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "*Material Adverse Effect*" shall be true and correct in all respects) on and as of the Amendment No. 4 Effective Date with the same effect as though made on and as of such date, except to the extent such representation or warranty expressly relates to an earlier date in which case such representations and warranties are true and correct in all material respects as of (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) as of such earlier date.

SECTION 7.    Conditions to Effectiveness on the Amendment No. 4 Effective Date. This Agreement shall become effective on and as of the first Business Day (such date, the "**Amendment No. 4 Effective Date**") on which the following conditions shall have been satisfied:

(a) the Administrative Agent (or its counsel) shall have received counterparts of this Agreement, duly executed and delivered by (i) the Administrative Agent, the Swingline Lender and

9

each Issuing Bank, (ii) the 2025 Revolving Facility Lenders and (iii) the Borrower and each Guarantor;

(b) the Administrative Agent shall have received a customary opinion of (i) Skadden, Arps, Slate, Meagher & Flom LLP, special New York and Delaware counsel for the Loan Parties and (ii) in house counsel of the Loan Parties serving as General Counsel or Corporate Secretary, in each case, dated as of the Amendment No. 4 Effective Date, addressed to the Administrative Agent and the 2025 Revolving Facility Lenders in form and substance substantially consistent with those delivered in connection with Amendment No. 3 or otherwise reasonably acceptable to the Administrative Agent;

(c) no Default or Event of Default shall have occurred and be continuing as of the Amendment No. 4 Effective Date or immediately after giving effect to the transactions contemplated herein;

(d) each of the representations and warranties set forth in Section 6 of this Agreement shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the Amendment No. 4 Effective Date;

(e) the Administrative Agent shall have received a certificate of the secretary or assistant secretary (or equivalent officer) on behalf of each Loan Party, dated the Amendment No. 4 Effective Date, certifying (i) that either (1) attached thereto is a true and complete copy of the organizational documents of such Loan Party and, with respect to the articles or certificate of incorporation or organization (or similar document) certified (to the extent applicable) as of a recent date by the Secretary of State of the state of its organization, or (2) the organizational documents of such Loan Party, copies of which were previously delivered and certified to the Administrative Agent on the Closing Date, as applicable, remain in full force and effect and have not been modified or amended in any manner since the delivery thereof, (ii) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors (or equivalent governing body) of such Loan Party authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which such Loan Party is a party, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Amendment No. 4 Effective Date, and (iii) either (1) as to the incumbency and specimen signature of each officer or authorized person executing this Agreement or any other Loan Document or any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate of another officer or authorized person as to the incumbency and specimen signature of the officer or authorized person executing the certificate in this clause (f)) or (2) that the officers of such Loan Party most recently certified to the Administrative Agent remain so authorized and continue to hold the offices previously identified;

(f) the Administrative Agent shall have received a certificate dated the Amendment No. 4 Effective Date and signed by a Responsible Officer of the Borrower, confirming that the conditions set forth in Sections 7(c) and (d) of this Agreement have been satisfied;

(g) the 2025 Revolving Facility Lenders, the 2025 Revolving Facility Arrangers and the Administrative Agent shall have received the fees in the amounts previously agreed in writing by the Borrower and the 2025 Revolving Facility Lenders, the 2025 Revolving Facility Arrangers and/or the Administrative Agent, as applicable, due and payable to them on or prior to the

10

Amendment No. 4 Effective Date, including, to the extent invoiced, reimbursement for all reasonable and documented out-of-pocket costs and expenses required to be paid or reimbursed under Section 10.05 of the Existing Credit Agreement for which invoices have been received by the Borrower at least three (3) Business Days (or such shorter period as reasonably acceptable to the Borrower) in advance of the Amendment No. 4 Effective Date;

(h)  the Borrower shall have paid to the Administrative Agent, for the ratable account of each Revolving Facility Lender immediately prior to the Amendment No. 4 Effective Date, all accrued and unpaid interest and undrawn commitment fees and other amounts accrued and unpaid on the Existing Revolving Facility Commitments to, but not including, the Amendment No. 4 Effective Date;

(i)  the Administrative Agent shall have received a notice of refinancing with respect to the Existing Revolving Facility Commitments at least five (5) Business Days (or such shorter period as agreed to by the Administrative Agent) prior to the Amendment No. 4 Effective Date; and

(j)  so long as reasonably requested in writing by the Administrative Agent or any of the 2025 Revolving Facility Arrangers at least ten (10) Business Days prior to the Amendment No. 4 Effective Date, the Administrative Agent and the 2025 Revolving Facility Arrangers shall have received prior to the Amendment No. 4 Effective Date, all documentation and other information with respect to the Loan Parties that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act and the Beneficial Ownership Regulation.

11

SECTION 8.     <u>Reaffirmation</u>. By signing this Agreement, the Borrower and each Loan Party party hereto hereby confirms that the obligations of the Loan Parties under the Existing Credit Agreement as modified or supplemented hereby and the other Loan Documents (i) are entitled to the benefits of the guarantees and the security interests set forth or created in the Amended Credit Agreement, the Security Documents and the other Loan Documents, and (ii) notwithstanding the effectiveness of the terms hereof, the Security Documents and the other Loan Documents, are, and shall continue to be, in full force and effect and are hereby ratified and confirmed in all respects. Each Loan Party ratifies and confirms that all Liens granted, conveyed, or assigned to the Collateral Agent by such Person pursuant to any Loan Document to which it is a party remain in full force and effect, are not released or reduced, and continue to secure full payment and performance of the Obligations as modified hereby, subject to Section 5.10 of the Existing Credit Agreement. Without limiting the generality of the foregoing, the Security Documents and all of the Collateral described therein do and shall continue to secure the payment of all Obligations (which, for the avoidance of doubt, include the Obligations in respect of the 2025 Refinancing Revolving Facility Loans incurred under this Agreement) of the Loan Parties under the Loan Documents, in each case, as amended by this Agreement.

SECTION 9.     <u>Reference to and Effect on the Loan Documents</u>.  (a) On and after the Amendment No. 4 Effective Date, each reference in the Amended Credit Agreement to "*hereunder*", "*hereof*", "*Agreement*", "*this Agreement*" or words of like import and each reference in the other Loan Documents to "*Credit Agreement*", "*Credit Agreement*", "*thereunder*", "*thereof*" or words of like import shall, unless the context otherwise requires, mean and be a reference to the Amended Credit Agreement. From and after the Amendment No. 4 Effective Date, this Agreement shall be a Loan Document under the Existing Credit Agreement and the Amended Credit Agreement.

(b)  The execution, delivery and effectiveness of this Agreement shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or the Administrative Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents.

(c)  The 2025 Refinancing Revolving Facility Lenders shall constitute a "*Lender*", the 2025 Refinancing Revolving Facility Loans shall constitute "*Revolving Facility Loans*" and "*Loans*" and the "*2025 Refinancing Revolving Facility Commitments*" shall constitute "*Revolving Facility Commitments*" and "*Commitments*", in each case, for all purposes of the Amended Credit Agreement and the other Loan Documents. The 2025 Refinancing Revolving Facility Loans shall be on the terms contemplated hereby and by the Amended Credit Agreement.

SECTION 10.     <u>Execution in Counterparts; Electronic Execution</u>. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by telecopier or other electronic transmission (PDF or TIFF format) shall be effective as delivery of a manually executed counterpart of this Agreement. Any signature to this Agreement may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendment, extension or renewal of this Agreement. Each of the parties hereto represents and warrants to the other parties hereto that it has the corporate capacity and authority to execute this Agreement through electronic means and there are no restrictions for doing so in such party's constitutive documents. The words

12

"execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Requirements of Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 11.    <u>Amendments; Headings; Severability</u>. This Agreement may not be amended nor may any provision hereof be waived except in accordance with Section 10.08 of the Amended Credit Agreement. The Section headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting this Agreement. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 12.    <u>Governing Law; Jurisdiction</u>. This Agreement shall be construed in accordance with and governed by the law of the State of New York, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction. Each party agrees that the terms and provisions of <u>Section 10.15</u> the Existing Credit Agreement are incorporated by reference herein and apply *mutatis mutandis* to all of the activities in connection with this Agreement and each party hereto shall be bound thereby with respect to this Agreement, the performance of services hereunder and the transactions contemplated hereby.

SECTION 13.    **<u>WAIVER OF JURY TRIAL</u>.  Section 10.11 of the Existing Credit Agreement is hereby incorporated *mutatis mutandis*.**

13

SECTION 14.    No Novation. This Agreement shall not extinguish any obligations for the payment of money outstanding under the Existing Credit Agreement other than the Existing Revolving Facility Commitments, or discharge or release the Lien or priority of any Security Document or any other security therefor, and nothing herein contained shall be construed as a substitution or novation of the obligations outstanding under the Existing Credit Agreement or instruments securing the same, which shall remain in full force and effect, except, in each case, to the extent modified hereby or by instruments executed concurrently herewith and except to the extent repaid as provided herein. Nothing implied in this Agreement or in any other document contemplated hereby shall be construed as a release or other discharge of any of the Loan Parties under any Loan Document from any of its obligations and liabilities as a borrower, guarantor or pledgor under any of the Loan Documents, other than with respect to the obligations in respect of the Existing Revolving Facility Commitments as set forth herein.

SECTION 15.    Notices. All notices hereunder shall be given in accordance with the provisions of Section 10.01 of the Amended Credit Agreement. The parties hereto hereby waive any notice periods that may have otherwise been applicable with respect to termination of the Existing Revolving Facility Commitments.

SECTION 16.    Lead Arranger. Morgan Stanley Senior Funding, Inc. has acted as "lead left" arranger in connection with this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

ADTALEM GLOBAL EDUCATION INC., as Borrower

By:  /s/ Robert J. Phelan
    Name:  Robert J. Phelan
    Title:   Senior Vice President and Chief Financial Officer

CHAMBERLAIN COLLEGE OF NURSING AND
    HEALTH SCIENCES, LLC., as a Guarantor

By:  /s/ Keith Borchers
    Name:  Keith Borchers
    Title:   Vice President and Chief Financial Officer

CHAMBERLAIN UNIVERSITY LLC, as a Guarantor

By:  /s/ Keith Borchers
    Name:  Keith Borchers
    Title:   Vice President and Chief Financial Officer

ADTALEM GLOBAL HEALTH, INC., as a Guarantor

By:  /s/ Robert J. Phelan
    Name:  Robert J. Phelan
    Title:  Vice President and Chief Financial Officer

ROSS UNIVERSITY SERVICES, INC., as a Guarantor

By:  /s/ Manjunath Gangadharan
    Name:  Manjunath Gangadharan
    Title:  Treasurer

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

INTERNATIONAL EDUCATION HOLDINGS, INC., as a
   Guarantor


By:  /s/ Manjunath Gangadharan
     Name:  Manjunath Gangadharan
     Title: Treasurer

WALDEN E-LEARNING, LLC, as a Guarantor


By:  /s/ Robert J. Phelan
     Name:  Robert J. Phelan
     Title:  Vice President and Chief Financial Officer


WALDEN UNIVERSITY, LLC, as a Guarantor


By:  /s/ Roger McKinney
     Name:  Roger McKinney
     Title:  Vice President and Chief Financial Officer


ADTALEM CANADA LLC, as a Guarantor

BY: ADTALEM GLOBAL EDUCATION INC., as its sole
   member

By:  /s/ Robert J. Phelan
     Name:  Robert J. Phelan
     Title:  Senior Vice President and Chief Financial Officer


*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**MORGAN STANLEY SENIOR FUNDING, INC.,**
as Administrative Agent
By: _/s/ Steven DiMilia_
Name:  Steven DiMilia
Title:  Authorized Signatory

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**MORGAN STANLEY BANK, N.A.,**
2025 Refinancing Revolving Facility Lender, Swingline
Lender and Issuing Bank

By: /s/ Michael King
Name:  Michael King
Title:  Authorized Signatory

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**TRUIST BANK**,
as an Issuing Bank, a 2025 Refinancing Revolving
Facility Lender and a 2025 Incremental Revolving
Facility Lender


By: /s/ Troy R. Weaver
Name: Troy R. Weaver
Title: Managing Director


*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**MUFG BANK, LTD.,**
as an Issuing Bank and a 2025 Refinancing Revolving
Facility Lender
By:  /s/ John Ryan
Name:  John Ryan
Title:  Vice President

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**U.S. BANK NATIONAL ASSOCIATION,**
as an Issuing Bank, a 2025 Refinancing Revolving
Facility Lender and a 2025 Incremental Revolving Facility
Lender

By: /s/ Thomas Trost
Name:  Thomas Trost
Title:  Vice President

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**KEYBANK NATIONAL ASSOCIATION,**
as an Issuing Bank, a 2025 Refinancing Revolving
Facility Lender and a 2025 Incremental Revolving Facility
Lender

By:  /s/ Sara M. Yeagley
Name:  Sara M. Yeagley
Title:  Vice President

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**ASSOCIATED BANK, N.A.,**
as an Issuing Bank, a 2025 Refinancing Revolving
Facility Lender and a 2025 Incremental Revolving Facility
Lender

By:  /s/ Drew Lear
Name:  Drew Lear
Title:  Senior Vice President

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**BARCLAYS BANK PLC,**
as an Issuing Bank and a 2025 Refinancing Revolving
Facility Lender
By: /s/ Adam W. Schroeder
Name: Adam E. Schroeder
Title: Vice President

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**FIFTH THIRD BANK, NATIONAL ASSOCIATION,**
as an Issuing Bank, a 2025 Refinancing Revolving
Facility Lender and a 2025 Incremental Revolving Facility
Lender

By: /s/ Daniel Johnston
Name:  Daniel Johnston
Title:  SVP

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**THE NORTHERN TRUST COMPANY,**
as an Issuing Bank and a 2025 Refinancing Revolving
Facility Lender
By: /s/ Lisa DeCristofaro
Name:  Lisa DeCristofaro
Title:  SVP

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**PNC BANK, NATIONAL ASSOCATION,**
as an Issuing Bank, a 2025 Refinancing Revolving Facility
Lender and a 2025 Incremental Revolving
Facility Lender
By: ./s/ Robert G. Stevens
Name:  Robert G. Stevens
Title:  Vice President

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**VALLEY NATIONAL BANK,**
as an Issuing Bank, a 2025 Refinancing Revolving Facility
Lender and a 2025 Incremental Revolving
Facility Lender
By: /s/ Phillip McCauley
Name: Phillip McCauley
Title: Senior Vice President

*[Signature Page to Amendment No. 4 to Credit Agreement and Incremental Assumption Agreement]*

**SCHEDULE 1**

**Commitments**

| 2025 Incremental Revolving Facility Lenders | 2025 Incremental Revolving Facility Commitment Amount | 2025 Incremental Revolving Facility Commitment Percentage |
|---|---|---|
| Truist Bank | $31,553,398.06 | 31.55% |
| U.S. Bank National Association | $31,553,398.06 | 31.55% |
| KeyBank National Association | $19,417,475.73 | 19.42% |
| Associated Bank, N.A. | $2,427,184.47 | 2.43% |
| Fifth Third Bank, National Association | $485,436.89 | 0.49% |
| PNC Bank, National Association | $4,854,368.93 | 4.85% |
| Valley National Bank | $9,708,737.86 | 9.71% |
| Total: | $100,000,000 | 100.00% |

| 2025 Refinancing Revolving Facility Lenders | 2025 Refinancing Revolving Facility Commitment Amount | Letter of Credit Commitment | 2025 Refinancing Revolving Facility Commitment Percentage/ Letter of Credit Commitment Percentage |
|---|---|---|---|
| Morgan Stanley Bank, N.A. | $65,000,000 | $65,000,000 | 13% |
| Truist Bank | $65,000,000 | $65,000,000 | 13% |
| MUFG Bank, Ltd. | $65,000,000 | $65,000,000 | 13% |
| U.S. Bank National Association | $65,000,000 | $65,000,000 | 13% |
| KeyBank National Association | $40,000,000 | $40,000,000 | 8% |

| | | |
|---|---|---|
| Associated Bank, N.A. | $40,000,000 | $40,000,000 | 8% |
| Barclays Bank PLC | $40,000,000 | $40,000,000 | 8% |
| Fifth Third Bank, National Association | $40,000,000 | $40,000,000 | 8% |
| The Northern Trust Company | $40,000,000 | $40,000,000 | 8% |
| PNC Bank, National Association | $20,000,000 | $20,000,000 | 4% |
| Valley National Bank | $20,000,000 | $20,000,000 | 4% |
| Total: | $500,000,000 | $500,000,000 | 100.00% |

**Exhibit 99.1**



**Investor Contact :** Jay Spitzer
Investor.Relations@Adtalem.com
+1 312-906-6600

**Media Contact:** Jason Carr
AdtalemMedia@Adtalem.com
+1 773-858-7932

**Adtalem Global Education Announces Exceptional Fiscal Year 2025 Results;**

**Initiates Fiscal Year 2026 Guidance**

*Total enrollment up 10.2% YoY for fourth quarter 2025*

*Revenue up 12.9% YoY for fiscal 2025*

*Fiscal 2025 diluted earnings per share $6.18; Adjusted EPS $6.67, growth of 33.1% YoY*

<u>Fourth quarter highlights</u>
- Revenue $457.1 million, up 11.5% year-over-year
- Total student enrollment 91,780, up 10.2% year-over-year
- Chamberlain tenth straight quarter of total enrollment growth, up 5.8% year-over-year
- Walden eighth straight quarter of total enrollment growth, up 15.0% year-over-year
- Medical and Veterinary sustained total enrollment growth, up 1.0% year-over-year
- GAAP net income $54.2 million; adjusted EBITDA $110.2 million, up 13.2% year-over-year

<u>Fiscal year highlights</u>
- Revenue $1,788.3 million, up 12.9% year-over-year
- Chamberlain achieved record total enrollment, more than 40,500 enrolled
- Walden total enrollment up double digits every quarter, achieving more than 48,500 enrolled
- Medical and Veterinary approx. 5,000 students enrolled on average
- Growth with Purpose momentum, GAAP net income $237.1 million; adjusted EBITDA $459.7 million, up 21.8% year-over-year

<u>Fiscal year capital allocation</u>
- Repurchased $211 million of shares completing prior authorization; new $150 million Board authorization through May 2028
- Repriced $253 million Term Loan B on Aug. 21, 2024, reducing interest rate by 75 bps; repaid $100 million of outstanding Term Loan B balance on Jan. 17, 2025
- Net leverage 0.8x as of June 30, 2025

<u>Fiscal year '26 guidance</u>
- Revenue $1,900 million to $1,940 million
- Adjusted earnings per share $7.60 to $7.90

**CHICAGO – Aug. 7, 2025 –** Adtalem Global Education Inc. (NYSE: ATGE), the leading healthcare educator in the United States, today reported fourth quarter and fiscal 2025 results (ended June 30, 2025) achieving exceptional results through sustained total enrollment growth, increased operational efficiency and strong student outcomes through disciplined strategic execution.

"Fiscal 2025 marked a defining moment for Adtalem—an inflection point that demonstrated the strength and scaled ability of our Growth with Purpose strategy," said Steve Beard, chairman and chief executive officer of Adtalem Global Education. "We delivered strong financial results while deepening our impact—graduating more healthcare professionals into roles where they're urgently needed. Our disciplined investments and student outcomes, coupled with strategic partnerships, are creating repeatable high return pathways from education to employment. With a resilient operating model and growing momentum, we are well-positioned to sustain performance and deliver long-term value for our students, shareholders and the U.S. healthcare system."

<u>**Financial Highlights**</u>

Selected financial data for the three months ended June 30, 2025:

- Revenue was $457.1 million, an increase of 11.5% compared with the prior year.
- Operating income was $76.9 million, compared with $68.5 million in the prior year; adjusted operating income was $87.5 million, compared with $80.1 million in the prior year.
- Net income was $54.2 million, compared with $49.4 million in the prior year; adjusted net income was $62.4 million, compared with $52.8 million in the prior year.
- Diluted earnings per share was $1.44, compared with $1.28 in the prior year; adjusted earnings per share was $1.66, compared with $1.37 in the prior year.
- Adjusted EBITDA was $110.2 million, compared with $97.4 million in the prior year; adjusted EBITDA margin was 24.1%, compared with 23.8% in the prior year.

Selected financial data for the fiscal year ended June 30, 2025:

- Revenue was $1,788.3 million, an increase of 12.9% compared with the prior year.
- Operating income was $341.5 million, compared with $217.1 million in the prior year; adjusted operating income was $370.2 million, compared with $308.8 million in the prior year.
- Net income was $237.1 million, compared with $136.8 million in the prior year; adjusted net income was $255.6 million, compared with $201.8 million in the prior year.
- Diluted earnings per share was $6.18, compared with $3.39 in the prior year; adjusted earnings per share was $6.67, compared with $5.01 in the prior year.
- Adjusted EBITDA was $459.7 million, compared with $377.5 million in the prior year; adjusted EBITDA margin was 25.7%, compared with 23.8% in the prior year.

**Business Highlights**

- Chamberlain University and SSM Health announced the Aspiring Nurse Program – a groundbreaking partnership designed to address critical healthcare workforce needs. The innovative partnership funds nursing education[1], enhances clinical readiness and creates a

pathway to employment across SSM Health's care sites in Missouri, Oklahoma, Illinois and Wisconsin. The partnership offers a direct, employment-focused pathway for aspiring nurses, creating a sustainable talent pipeline that will graduate more than 400 new nurses annually.

- Walden University and Chamberlain University earned the prestigious "Opportunity Colleges and Universities" designation in the 2025 Carnegie Classification. This selective recognition from the Carnegie Foundation and American Council on Education, awarded to only 16% of institutions assessed, confirms Chamberlain and Walden's ability to serve broad student populations while delivering strong economic outcomes for graduates.

- Walden University's Doctor of Social Work (DSW) program has achieved accreditation by the Council on Social Work Education (CSWE), making it one of only four DSW programs in the U.S. to receive this recognition. This accreditation validates the quality of the DSW program and the professional excellence of its graduates.

- Adtalem's Medical and Veterinary schools (American University of the Caribbean School of Medicine, Ross University School of Medicine and Ross University School of Veterinary Medicine) graduated more than 1,100 students in fiscal year 2025. Medical students from 42 states and 30 countries and veterinary students from 43 states and four countries, were amongst the graduating class.[2]

- American University of the Caribbean School of Medicine (AUC) has collaborated with Massachusetts General Hospital Institute of Health Professions (MGH Institute of Health Professions) to create the MGHIHP-AUC-Gateway for Innovation Careers in Medical Technology ("MAGIC") partnership, providing AUC students the ability to pursue a Master's in Healthcare Data Analytics (MSDA) which can be completed while students complete their Doctor of Medicine (MD) degree. The partnership places AUC students and alumni at the forefront of the AI digital transformation in healthcare, shaping the future of medicine.

**Segment Highlights**
**Chamberlain**

| *$ in millions* | Three Months Ended June 30, | | | Year Ended June 30, | | |
|---|---|---|---|---|---|---|
| | **2025** | **2024** | **% Change** | **2025** | **2024** | **% Change** |
| Revenue | $184.3 | $167.0 | 10.3% | $725.8 | $633.5 | 14.6% |
| Operating Income | $35.7 | $40.5 | (11.7)% | $151.5 | $137.8 | 9.9% |
| Adj. Operating Income | $35.7 | $40.5 | (11.7)% | $153.4 | $137.8 | 11.3% |
| Adj. EBITDA | $45.0 | $47.3 | (4.8)% | $191.4 | $166.2 | 15.2% |
| Total Students (3) | 38,891 | 36,750 | 5.8% | | | |

- Total student enrollment increased 5.8% compared with the prior year, driven by continued growth in pre-licensure and post-licensure nursing programs.

**Walden**

| *$ in millions* | Three Months Ended June 30, | | | Year Ended June 30, | | |
|---|---|---|---|---|---|---|
| | **2025** | **2024** | **% Change** | **2025** | **2024** | **% Change** |
| Revenue | $182.2 | $156.3 | 16.6% | $693.4 | $595.3 | 16.5% |
| Operating Income | $44.0 | $30.1 | 46.3% | $177.9 | $77.2 | 130.5% |
| Adj. Operating Income | $46.8 | $37.4 | 25.1% | $183.6 | $130.5 | 40.6% |
| Adj. EBITDA | $52.7 | $41.1 | 28.0% | $206.5 | $146.8 | 40.7% |
| Total Students (3) | 48,116 | 41,845 | 15.0% | | | |

- Total student enrollment increased 15.0% compared with prior year, driven by growth in healthcare and non-healthcare programs.

**Medical and Veterinary**

| *$ in millions* | Three Months Ended June 30, | | | Year Ended June 30, | | |
|---|---|---|---|---|---|---|
| | **2025** | **2024** | **% Change** | **2025** | **2024** | **% Change** |
| Revenue | $90.6 | $86.6 | 4.7% | $369.1 | $355.8 | 3.7% |
| Operating Income | $14.9 | $11.9 | 24.7% | $68.8 | $71.1 | (3.2)% |
| Adj. Operating Income | $15.1 | $12.0 | 25.8% | $69.3 | $71.5 | (3.2)% |
| Adj. EBITDA | $20.0 | $16.5 | 21.7% | $88.8 | $88.9 | (0.1)% |
| Total Students (3) | 4,773 | 4,726 | 1.0% | | | |

- Total student enrollment increased 1.0% compared with the prior year, driven by growth at medical and veterinary.

**Fiscal Year 2026 Outlook**

Adtalem initiates guidance for fiscal year 2026, revenue in the range of $1,900 million to $1,940 million, approximately 6.0% to 8.5% growth year-over-year. Adjusted earnings per share to be in the range of $7.60 to $7.90, approximately 14.0% to 18.5% growth year-over-year.

**Conference Call and Webcast Information**

Adtalem will hold a conference call to discuss its fourth quarter and fiscal year 2025 results today at 4:00 p.m. CT (5:00 p.m. ET).

The call can be accessed by dialing +1 877-407-6184 (U.S. participants) or +1 201-389-0877 (international participants) and stating "Adtalem earnings call" or by using conference ID: 13754556. The call will be simulcast through the Adtalem investor relations website at: https://investors.adtalem.com.

Adtalem will archive a replay of the call for 30 days. To access the replay, dial +1 877-660-6853 (U.S.) or +1 201-612-7415 (international), conference ID: 13754556, or visit the Adtalem investor relations website.

**About Adtalem Global Education**

Adtalem Global Education is the leading provider of healthcare education in the U.S., shaping the future of healthcare by preparing a workforce with high-quality academic programs. We innovate education pathways, align with industry needs and empower individuals to reach their full potential. Our commitment to excellence and access is reflected in our expansive network of institutions, serving over 90,000 students and supported by a strong community of approximately 365,000 alumni and nearly 10,000 dedicated employees. Visit Adtalem.com for more information and follow us on LinkedIn, Instagram and Facebook.

**Cautionary Disclosure Regarding Forward-Looking Statements**

Certain statements contained in this release are forward-looking statements as defined in the Private Securities Litigation Reform Act of 1995. Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to any historical or current fact, which includes statements regarding Adtalem's future growth. Forward-looking statements generally can be identified by the use of forward-looking terminology such as "future," "believe," "project," "expect," "anticipate," "estimate," "plan," "intend," "may," "will," "would," "could," "can," "continue," "preliminary," "potential," "range," and similar terms. These forward-looking statements are subject to risk and uncertainties that could cause actual results to differ materially from those described in the statements. Important factors that could cause actual results to differ materially from the expectations expressed or implied by our forward-looking statements are disclosed in Item 1A. "Risk Factors," of our Annual Report on Form 10-K. You should evaluate forward-looking statements in the context of these risks and uncertainties and are cautioned to not place undue reliance on such forward-looking statements. We caution you that these factors, performance or developments we expect or anticipate or, even if substantially realized, that they will

result in the consequences or affect us or our operations in the way we expect. All forward-looking statements are based on information available to use as of the date any such statements are made, and Adtalem assumes no obligation to publicly update or revise its forward-looking statements even if experience or future changes make it clear that any projected results expressed or implied therein will not be realized, except as required by law.

A reconciliation of non-GAAP guidance measures to corresponding GAAP measures is not available on a forward-looking basis without unreasonable effort due to the uncertainty of special items that may be incurred in the future, although these special items could be material to Adtalem's results in accordance with GAAP.

[1] For students who apply and qualify after graduating, passing NCLEX and fulfilling employment obligations with SSM Health of up to 4 years. Full coverage requires funding 100% of tuition and fees with student loans.

[2] States include the District of Columbia; countries based on student citizenship.

[3] Represents total students attending sessions during each institution's most recent enrollment period in Q4 FY 2025 and Q4 FY 2024.

###

**Adtalem Global Education Inc.**
**Consolidated Balance Sheets**
**(unaudited)**
**(in thousands, except par value)**

| | June 30, | |
|---|---|---|
| | **2025** | **2024** |
| **Assets:** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 199,601 | $ 219,306 |
| Restricted cash | 1,563 | 1,896 |
| Accounts and financing receivables, net | 146,189 | 126,833 |
| Prepaid expenses and other current assets | 68,837 | 70,050 |
| Total current assets | 416,190 | 418,085 |
| Noncurrent assets: | | |
| Property and equipment, net | 256,131 | 248,524 |
| Operating lease assets | 191,194 | 176,755 |
| Deferred income taxes | 32,956 | 49,088 |
| Intangible assets, net | 765,474 | 776,694 |
| Goodwill | 961,262 | 961,262 |
| Other assets, net | 129,145 | 103,184 |
| Assets held for sale | — | 7,825 |
| Total noncurrent assets | 2,336,162 | 2,323,332 |
| Total assets | $ 2,752,352 | $ 2,741,417 |
| **Liabilities and shareholders' equity:** | | |
| Current liabilities: | | |
| Accounts payable | $ 105,017 | $ 102,626 |
| Accrued payroll and benefits | 76,374 | 71,373 |
| Accrued liabilities | 77,286 | 96,957 |
| Deferred revenue | 214,091 | 185,272 |
| Current operating lease liabilities | 35,159 | 31,429 |
| Total current liabilities | 507,927 | 487,657 |
| Noncurrent liabilities: | | |
| Long-term debt | 552,669 | 648,712 |
| Long-term operating lease liabilities | 186,172 | 167,712 |
| Deferred income taxes | 31,856 | 29,526 |
| Other liabilities | 40,103 | 38,675 |
| Total noncurrent liabilities | 810,800 | 884,625 |
| Total liabilities | 1,318,727 | 1,372,282 |
| Commitments and contingencies | | |
| Total shareholders' equity | 1,433,625 | 1,369,135 |
| Total liabilities and shareholders' equity | $ 2,752,352 | $ 2,741,417 |

**Adtalem Global Education Inc.**
**Consolidated Statements of Income**
**(unaudited)**
**(in thousands, except per share data)**

| | Three Months Ended June 30, | | Year Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2025 | 2024 | 2025 | 2024 |
| Revenue | $ 457,106 | $ 409,907 | $ 1,788,290 | $ 1,584,652 |
| Operating cost and expense: | | | | |
|    Cost of educational services | 198,930 | 182,540 | 771,430 | 698,548 |
|    Student services and administrative expense | 180,863 | 154,597 | 672,004 | 632,965 |
|    Restructuring expense | 388 | 653 | 3,314 | 1,870 |
|    Business integration expense | — | 3,594 | — | 34,215 |
|     Total operating cost and expense | 380,181 | 341,384 | 1,446,748 | 1,367,598 |
| Operating income | 76,925 | 68,523 | 341,542 | 217,054 |
| Interest expense | (10,853) | (14,749) | (52,318) | (63,659) |
| Other income, net | 2,511 | 1,894 | 9,290 | 10,542 |
| Income from continuing operations before income taxes | 68,583 | 55,668 | 298,514 | 163,937 |
| Provision for income taxes | (14,121) | (5,068) | (65,837) | (26,224) |
| Income from continuing operations | 54,462 | 50,600 | 232,677 | 137,713 |
| Discontinued operations: | | | | |
|    (Loss) income from discontinued operations before income taxes | (346) | (1,091) | 5,870 | (762) |
|    Benefit from (provision for) income taxes | 96 | (90) | (1,482) | (174) |
|    (Loss) income from discontinued operations | (250) | (1,181) | 4,388 | (936) |
| Net income and comprehensive income | $ 54,212 | $ 49,419 | $ 237,065 | $ 136,777 |
| | | | | |
| Earnings (loss) per share: | | | | |
| Basic: | | | | |
|    Continuing operations | $ 1.51 | $ 1.34 | $ 6.27 | $ 3.49 |
|    Discontinued operations | $ (0.01) | $ (0.03) | $ 0.12 | $ (0.02) |
|    Total basic earnings per share | $ 1.50 | $ 1.31 | $ 6.39 | $ 3.47 |
| Diluted: | | | | |
|    Continuing operations | $ 1.45 | $ 1.31 | $ 6.07 | $ 3.42 |
|    Discontinued operations | $ (0.01) | $ (0.03) | $ 0.11 | $ (0.02) |
|    Total diluted earnings per share | $ 1.44 | $ 1.28 | $ 6.18 | $ 3.39 |
| | | | | |
| Weighted-average shares outstanding: | | | | |
|    Basic shares | 36,034 | 37,642 | 37,085 | 39,413 |
|    Diluted shares | 37,584 | 38,595 | 38,334 | 40,307 |

**Adtalem Global Education Inc.**
**Consolidated Statements of Cash Flows**
**(unaudited)**
**(in thousands)**

|  | Year Ended June 30, | |
|---|---|---|
|  | **2025** | **2024** |
| **Operating activities:** | | |
| Net income | $ 237,065 | $ 136,777 |
| (Income) loss from discontinued operations | (4,388) | 936 |
| Income from continuing operations | 232,677 | 137,713 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Stock-based compensation | 41,590 | 25,947 |
| Amortization and impairments to operating lease assets | 32,543 | 32,641 |
| Depreciation | 40,702 | 39,676 |
| Amortization of acquired intangible assets | 11,220 | 35,644 |
| Amortization and write-off of debt discount and issuance costs | 5,985 | 5,663 |
| Provision for bad debts | 63,237 | 53,175 |
| Deferred income taxes | 18,413 | 11,073 |
| Loss on disposals and impairments of property and equipment | 2,527 | 466 |
| Gain on investments | (1,074) | (1,365) |
| Loss on assets held for sale | 490 | 647 |
| Changes in assets and liabilities: | | |
| Accounts and financing receivables | (80,820) | (76,355) |
| Prepaid expenses and other current assets | 5,546 | (8,781) |
| Cloud computing implementation assets | (32,823) | (27,154) |
| Accounts payable | 140 | 18,330 |
| Accrued payroll and benefits | 5,144 | 19,422 |
| Accrued liabilities | (15,948) | 27,422 |
| Deferred revenue | 34,273 | 40,622 |
| Operating lease liabilities | (24,792) | (36,692) |
| Other assets and liabilities | (5,296) | (9,727) |
| Net cash provided by operating activities-continuing operations | 333,734 | 288,367 |
| Net cash provided by operating activities-discontinued operations | 4,165 | 7,408 |
| Net cash provided by operating activities | 337,899 | 295,775 |
| **Investing activities:** | | |
| Capital expenditures | (50,327) | (48,893) |
| Proceeds from sales of marketable securities | 3,120 | 1,732 |
| Purchases of marketable securities | (2,048) | (689) |
| Proceeds from sale of assets | 7,334 | — |
| Net cash used in investing activities-continuing operations | (41,921) | (47,850) |
| **Financing activities:** | | |
| Proceeds from exercise of stock options | 10,027 | 17,089 |
| Employee taxes paid on withholding shares | (14,200) | (7,731) |
| Proceeds from stock issued under Colleague Stock Purchase Plan | 1,282 | 810 |
| Repurchases of common stock for treasury | (213,125) | (261,966) |
| Proceeds from issuance of long-term debt | 9,873 | 1,896 |
| Repayments of long-term debt | (109,873) | (51,896) |
| Net cash used in financing activities | (316,016) | (301,798) |
| Net decrease in cash, cash equivalents and restricted cash | (20,038) | (53,873) |
| Cash, cash equivalents and restricted cash at beginning of period | 221,202 | 275,075 |
| Cash, cash equivalents and restricted cash at end of period | $ 201,164 | $ 221,202 |

**Adtalem Global Education Inc.**
**Segment Revenue**
**(unaudited)**
**(in thousands)**

| Revenue: | Three Months Ended June 30, | | | | Year Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2025 | 2024 | Increase/(Decrease) $ | % | 2025 | 2024 | Increase/(Decrease) $ | % |
| Chamberlain | $ 184,266 | $ 167,035 | $ 17,231 | 10.3 % | $ 725,774 | $ 633,522 | $ 92,252 | 14.6 % |
| Walden | 182,193 | 156,309 | 25,884 | 16.6 % | 693,430 | 595,332 | 98,098 | 16.5 % |
| Medical and Veterinary | 90,647 | 86,563 | 4,084 | 4.7 % | 369,086 | 355,798 | 13,288 | 3.7 % |
| Total consolidated revenue | $ 457,106 | $ 409,907 | $ 47,199 | 11.5 % | $ 1,788,290 | $ 1,584,652 | $ 203,638 | 12.9 % |

**Adtalem Global Education Inc.**
**Non-GAAP Financial Measures and Reconciliations**

We believe that certain non-GAAP financial measures provide investors with useful supplemental information regarding the underlying business trends and performance of Adtalem's ongoing operations as seen through the eyes of management and are useful for period-over-period comparisons. We use these supplemental non-GAAP financial measures internally in our assessment of performance and budgeting process. However, these non-GAAP financial measures should not be considered as a substitute for, or superior to, measures of financial performance prepared in accordance with GAAP. The following are non-GAAP financial measures used in the subsequent GAAP to non-GAAP reconciliation tables:

*Adjusted net income (most comparable GAAP measure: net income)* – Measure of Adtalem's net income adjusted for restructuring expense, business integration expense, amortization of acquired intangible assets, write-off of debt discount and issuance costs, litigation reserve, asset impairments, loss on assets held for sale, debt modification costs, strategic advisory costs, tax benefit due to change in unrecognized tax benefits, and loss (income) from discontinued operations.

*Adjusted earnings per share (most comparable GAAP measure: diluted earnings per share)* – Measure of Adtalem's diluted earnings per share adjusted for restructuring expense, business integration expense, amortization of acquired intangible assets, write-off of debt discount and issuance costs, litigation reserve, asset impairments, loss on assets held for sale, debt modification costs, strategic advisory costs, tax benefit due to change in unrecognized tax benefits, and loss (income) from discontinued operations.

*Adjusted operating income (most comparable GAAP measure: operating income)* – Measure of Adtalem's operating income adjusted for restructuring expense, business integration expense, amortization of acquired intangible assets, litigation reserve, asset impairments, strategic advisory costs, loss on assets held for sale, and debt modification costs.

*Adjusted EBITDA (most comparable GAAP measure: net income)* – Measure of Adtalem's net income adjusted for loss (income) from discontinued operations, interest expense, other income, net, provision for income taxes, depreciation, amortization of acquired intangible assets, amortization of cloud computing implementation assets, stock-based compensation, restructuring expense, business integration expense, litigation reserve, asset impairments, strategic advisory costs, loss on assets held for sale, and debt modification costs. Provision for income taxes, interest expense, and other income, net is not recorded at the reportable segments, and therefore, the segment adjusted EBITDA reconciliations begin with adjusted operating income.

*Free cash flow (most comparable GAAP measure: net cash provided by operating activities-continuing operations)* – Defined as net cash provided by operating activities-continuing operations less capital expenditures.

*Net debt* – Defined as long-term debt less cash and cash equivalents.

*Net leverage* – Defined as net debt divided by adjusted EBITDA.

A description of special items in our non-GAAP financial measures described above are as follows:
- Restructuring expense primarily related to workforce reductions, costs to exit certain course offerings, and prior real estate consolidations at Adtalem's home office. We do not include normal, recurring, cash operating expenses in our restructuring expense.
- Business integration expense includes expenses related to the Walden acquisition and certain costs related to growth transformation initiatives. We do not include normal, recurring, cash operating expenses in our business integration expense.
- Amortization of acquired intangible assets.
- Amortization of cloud computing implementation assets.

- Write-off of debt discount and issuance costs related to prepayments of debt, reserves related to significant litigation, asset impairments related to adjusting certain operating lease assets and property and equipment as a result of adjusting carrying values to fair values, loss on assets held for sale related to adjusting those assets to estimated fair value less costs to sell, and debt modification costs related to refinancing our Term Loan B loan.
- Strategic advisory costs related to expanding capabilities and bringing new capacities to market to further enhance our strategic position. We do not include normal, recurring, cash operating expenses in our strategic advisory costs.
- Tax benefit due to change in unrecognized tax benefits.
- Loss (income) from discontinued operations includes expense from ongoing litigation costs and settlements related to divestitures and the earn-outs we received.

**Adtalem Global Education Inc.**
**Adjusted Operating Income**
**(unaudited)**
**(in thousands)**

| | Three Months Ended June 30, | | | | Year Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Increase/(Decrease) | | | | Increase/(Decrease) | |
| | 2025 | 2024 | $ | % | 2025 | 2024 | $ | % |
| **Chamberlain:** | | | | | | | | |
| Operating income | $ 35,739 | $ 40,487 | $ (4,748) | (11.7)% | $ 151,455 | $ 137,800 | $ 13,655 | 9.9 % |
| Restructuring expense | — | — | — | | 1,912 | — | 1,912 | |
| Adjusted operating income | $ 35,739 | $ 40,487 | $ (4,748) | (11.7)% | $ 153,367 | $ 137,800 | $ 15,567 | 11.3 % |
| Operating margin | 19.4 % | 24.2 % | | | 20.9 % | 21.8 % | | |
| Adjusted operating margin | 19.4 % | 24.2 % | | | 21.1 % | 21.8 % | | |
| **Walden:** | | | | | | | | |
| Operating income | $ 43,982 | $ 30,058 | $ 13,924 | 46.3 % | $ 177,911 | $ 77,179 | $ 100,732 | 130.5 % |
| Restructuring expense | — | — | — | | (776) | — | 776 | |
| Amortization of acquired intangible assets | 2,805 | 7,348 | (4,543) | | 11,220 | 35,644 | (24,424) | |
| Litigation reserve | — | — | — | | (5,550) | 18,500 | (24,050) | |
| Adjusted operating income | $ 46,787 | $ 37,406 | $ 9,381 | 25.1 % | $ 183,581 | $ 130,547 | $ 53,034 | 40.6 % |
| Operating margin | 24.1 % | 19.2 % | | | 25.7 % | 13.0 % | | |
| Adjusted operating margin | 25.7 % | 23.9 % | | | 26.5 % | 21.9 % | | |
| **Medical and Veterinary:** | | | | | | | | |
| Operating income | $ 14,864 | $ 11,923 | $ 2,941 | 24.7 % | $ 68,798 | $ 71,065 | $ (2,267) | (3.2)% |
| Restructuring expense | 218 | 63 | 155 | | 454 | 442 | 12 | |
| Adjusted operating income | $ 15,082 | $ 11,986 | $ 3,096 | 25.8 % | $ 69,252 | $ 71,507 | $ (2,255) | (3.2)% |
| Operating margin | 16.4 % | 13.8 % | | | 18.6 % | 20.0 % | | |
| Adjusted operating margin | 16.6 % | 13.8 % | | | 18.8 % | 20.1 % | | |
| **Home Office:** | | | | | | | | |
| Operating loss | $ (17,660) | $ (13,945) | $ (3,715) | (26.6)% | $ (56,622) | $ (68,990) | $ 12,368 | 17.9 % |
| Restructuring expense | 170 | 590 | (420) | | 948 | 2,204 | (1,256) | |
| Business integration expense | — | 3,594 | (3,594) | | — | 34,215 | (34,215) | |
| Asset impairments | — | — | — | | 6,442 | — | 6,442 | |
| Strategic advisory costs | 6,900 | — | 6,900 | | 12,000 | — | 12,000 | |
| Loss on assets held for sale | 490 | — | 490 | | 490 | 647 | (157) | |
| Debt modification costs | — | — | — | | 712 | 848 | (136) | |
| Adjusted operating loss | $ (10,100) | $ (9,761) | $ (339) | (3.5)% | $ (36,030) | $ (31,076) | $ (4,954) | (15.9)% |
| **Adtalem Global Education:** | | | | | | | | |
| Operating income (GAAP) | $ 76,925 | $ 68,523 | $ 8,402 | 12.3 % | $ 341,542 | $ 217,054 | $ 124,488 | 57.4 % |
| Restructuring expense | 388 | 653 | (265) | | 3,314 | 1,870 | 1,444 | |
| Business integration expense | — | 3,594 | (3,594) | | — | 34,215 | (34,215) | |
| Amortization of acquired intangible assets | 2,805 | 7,348 | (4,543) | | 11,220 | 35,644 | (24,424) | |
| Litigation reserve | — | — | — | | (5,550) | 18,500 | (24,050) | |
| Asset impairments | — | — | — | | 6,442 | — | 6,442 | |
| Strategic advisory costs | 6,900 | — | 6,900 | | 12,000 | — | 12,000 | |
| Loss on assets held for sale | 490 | — | 490 | | 490 | 647 | (157) | |
| Debt modification costs | — | — | — | | 712 | 848 | (136) | |
| Adjusted operating income (non-GAAP) | $ 87,508 | $ 80,118 | $ 7,390 | 9.2 % | $ 370,170 | $ 308,778 | $ 61,392 | 19.9 % |
| Operating margin (GAAP) | 16.8 % | 16.7 % | | | 19.1 % | 13.7 % | | |
| Adjusted operating margin (non-GAAP) | 19.1 % | 19.5 % | | | 20.7 % | 19.5 % | | |

**Adtalem Global Education Inc.**
**Adjusted EBITDA**
**(unaudited)**
**(in thousands)**

| | Three Months Ended June 30, | | | | Year Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Increase/(Decrease) | | | | Increase/(Decrease) | |
| | 2025 | 2024 | $ | % | 2025 | 2024 | $ | % |
| **Chamberlain:** | | | | | | | | |
| Adjusted operating income (GAAP) | $ 35,739 | $ 40,487 | $ (4,748) | (11.7)% | $ 153,367 | $ 137,800 | $ 15,567 | 11.3 % |
| Depreciation | 5,503 | 4,912 | 591 | | 21,687 | 18,752 | 2,935 | |
| Amortization of cloud computing implementation assets | 780 | 382 | 398 | | 3,033 | 1,332 | 1,701 | |
| Stock-based compensation | 3,019 | 1,512 | 1,507 | | 13,309 | 8,303 | 5,006 | |
| Adjusted EBITDA (non-GAAP) | $ 45,041 | $ 47,293 | $ (2,252) | (4.8)% | $ 191,396 | $ 166,187 | $ 25,209 | 15.2 % |
| Adjusted EBITDA margin (non-GAAP) | 24.4 % | 28.3 % | | | 26.4 % | 26.2 % | | |
| **Walden:** | | | | | | | | |
| Adjusted operating income (GAAP) | $ 46,787 | $ 37,406 | $ 9,381 | 25.1 % | $ 183,581 | $ 130,547 | $ 53,034 | 40.6 % |
| Depreciation | 1,993 | 1,654 | 339 | | 7,421 | 7,389 | 32 | |
| Amortization of cloud computing implementation assets | 760 | 385 | 375 | | 3,002 | 1,331 | 1,671 | |
| Stock-based compensation | 3,123 | 1,703 | 1,420 | | 12,477 | 7,525 | 4,952 | |
| Adjusted EBITDA (non-GAAP) | $ 52,663 | $ 41,148 | $ 11,515 | 28.0 % | $ 206,481 | $ 146,792 | $ 59,689 | 40.7 % |
| Adjusted EBITDA margin (non-GAAP) | 28.9 % | 26.3 % | | | 29.8 % | 24.7 % | | |
| **Medical and Veterinary:** | | | | | | | | |
| Adjusted operating income (GAAP) | $ 15,082 | $ 11,986 | $ 3,096 | 25.8 % | $ 69,252 | $ 71,507 | $ (2,255) | (3.2)% |
| Depreciation | 2,755 | 3,086 | (331) | | 10,853 | 11,983 | (1,130) | |
| Amortization of cloud computing implementation assets | 306 | 138 | 168 | | 1,208 | 469 | 739 | |
| Stock-based compensation | 1,873 | 1,243 | 630 | | 7,486 | 4,930 | 2,556 | |
| Adjusted EBITDA (non-GAAP) | $ 20,016 | $ 16,453 | $ 3,563 | 21.7 % | $ 88,799 | $ 88,889 | $ (90) | (0.1)% |
| Adjusted EBITDA margin (non-GAAP) | 22.1 % | 19.0 % | | | 24.1 % | 25.0 % | | |
| **Home Office:** | | | | | | | | |
| Adjusted operating loss | $ (10,100) | $ (9,761) | $ (339) | (3.5)% | $ (36,030) | $ (31,076) | $ (4,954) | (15.9)% |
| Depreciation | 184 | 145 | 39 | | 741 | 1,552 | (811) | |
| Stock-based compensation | 2,394 | 2,084 | 310 | | 8,318 | 3,189 | 5,129 | |
| Adjusted EBITDA | $ (7,522) | $ (7,532) | $ 10 | 0.1 % | $ (26,971) | $ (24,335) | $ (2,636) | (10.8)% |
| **Adtalem Global Education:** | | | | | | | | |
| Net income (GAAP) | $ 54,212 | $ 49,419 | $ 4,793 | 9.7 % | $ 237,065 | $ 136,777 | $ 100,288 | 73.3 % |
| Loss (income) from discontinued operations | 250 | 1,181 | (931) | | (4,388) | 936 | (5,324) | |
| Interest expense | 10,853 | 14,749 | (3,896) | | 52,318 | 63,659 | (11,341) | |
| Other income, net | (2,511) | (1,894) | (617) | | (9,290) | (10,542) | 1,252 | |
| Provision for income taxes | 14,121 | 5,068 | 9,053 | | 65,837 | 26,224 | 39,613 | |
| Depreciation and amortization | 15,086 | 18,050 | (2,964) | | 59,165 | 78,452 | (19,287) | |
| Stock-based compensation | 10,409 | 6,542 | 3,867 | | 41,590 | 25,947 | 15,643 | |
| Restructuring expense | 388 | 653 | (265) | | 3,314 | 1,870 | 1,444 | |
| Business integration expense | — | 3,594 | (3,594) | | — | 34,215 | (34,215) | |
| Litigation reserve | — | — | — | | (5,550) | 18,500 | (24,050) | |
| Asset impairments | — | — | — | | 6,442 | — | 6,442 | |
| Strategic advisory costs | 6,900 | — | 6,900 | | 12,000 | — | 12,000 | |
| Loss on assets held for sale | 490 | — | 490 | | 490 | 647 | (157) | |
| Debt modification costs | — | — | — | | 712 | 848 | (136) | |
| Adjusted EBITDA (non-GAAP) | $ 110,198 | $ 97,362 | $ 12,836 | 13.2 % | $ 459,705 | $ 377,533 | $ 82,172 | 21.8 % |
| Adjusted EBITDA margin (non-GAAP) | 24.1 % | 23.8 % | | | 25.7 % | 23.8 % | | |

**Adtalem Global Education Inc.**
**Adjusted Earnings**
**(unaudited)**
**(in thousands, except per share data)**

| | Three Months Ended June 30, | | Year Ended June 30, | |
|---|---|---|---|---|
| | **2025** | **2024** | **2025** | **2024** |
| Net income (GAAP) | $ 54,212 | $ 49,419 | $ 237,065 | $ 136,777 |
| Restructuring expense | 388 | 653 | 3,314 | 1,870 |
| Business integration expense | — | 3,594 | — | 34,215 |
| Amortization of acquired intangible assets | 2,805 | 7,348 | 11,220 | 35,644 |
| Write-off of debt discount and issuance costs, litigation reserve, asset impairments, loss on assets held for sale, and debt modification costs | 490 | — | 3,832 | 21,108 |
| Strategic advisory costs | 6,900 | — | 12,000 | — |
| Tax benefit due to change in unrecognized tax benefits | — | (5,657) | — | (5,657) |
| Income tax impact on non-GAAP adjustments [1] | (2,602) | (3,749) | (7,423) | (23,104) |
| Loss (income) from discontinued operations | 250 | 1,181 | (4,388) | 936 |
| Adjusted net income (non-GAAP) | $ 62,443 | $ 52,789 | $ 255,620 | $ 201,789 |

[1] Represents the income tax impact of non-GAAP continuing operations adjustments that is recognized in our GAAP financial statements.

| | Three Months Ended June 30, | | Year Ended June 30, | |
|---|---|---|---|---|
| | **2025** | **2024** | **2025** | **2024** |
| Diluted earnings per share (GAAP) | $ 1.44 | $ 1.28 | $ 6.18 | $ 3.39 |
| Effect on diluted earnings per share: | | | | |
| Restructuring expense | 0.01 | 0.02 | 0.09 | 0.05 |
| Business integration expense | — | 0.09 | — | 0.85 |
| Amortization of acquired intangible assets | 0.07 | 0.19 | 0.29 | 0.88 |
| Write-off of debt discount and issuance costs, litigation reserve, asset impairments, loss on assets held for sale, and debt modification costs | 0.01 | — | 0.10 | 0.52 |
| Strategic advisory costs | 0.18 | — | 0.31 | — |
| Tax benefit due to change in unrecognized tax benefits | — | (0.15) | — | (0.14) |
| Income tax impact on non-GAAP adjustments [1] | (0.07) | (0.10) | (0.19) | (0.57) |
| Loss (income) from discontinued operations | 0.01 | 0.03 | (0.11) | 0.02 |
| Adjusted earnings per share (non-GAAP) | $ 1.66 | $ 1.37 | $ 6.67 | $ 5.01 |
| Diluted shares used in non-GAAP EPS calculation | 37,584 | 38,595 | 38,334 | 40,307 |

Note: May not sum due to rounding.

[1] Represents the income tax impact of non-GAAP continuing operations adjustments that is recognized in our GAAP financial statements.

**Adtalem Global Education Inc.**
**Free Cash Flow**
**(unaudited)**
**(in thousands)**

| | Twelve Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **FY24 Q4** | | **FY25 Q1** | | **FY25 Q2** | | **FY25 Q3** | | **FY25 Q4** |
| Net cash provided by operating activities-continuing operations (GAAP) | $ | 288,367 | $ | 291,820 | $ | 281,971 | $ | 335,069 | $ | 333,734 |
| Capital expenditures | | (48,893) | | (48,873) | | (50,375) | | (47,914) | | (50,327) |
| Free cash flow (non-GAAP) | $ | 239,474 | $ | 242,947 | $ | 231,596 | $ | 287,155 | $ | 283,407 |

**Adtalem Global Education Inc.**
**Net Leverage**
**(unaudited)**
**(in thousands)**

|  |  | Year Ended June 30, 2025 |
|---|---|---:|
| **Adtalem Global Education:** |  |  |
| Net income (GAAP) | $ | 237,065 |
| Net income from discontinued operations |  | (4,388) |
| Interest expense |  | 52,318 |
| Other income, net |  | (9,290) |
| Provision for income taxes |  | 65,837 |
| Depreciation and amortization |  | 59,165 |
| Stock-based compensation |  | 41,590 |
| Restructuring expense |  | 3,314 |
| Litigation reserve |  | (5,550) |
| Asset impairments |  | 6,442 |
| Strategic advisory costs |  | 12,000 |
| Loss on assets held for sale |  | 490 |
| Debt modification costs |  | 712 |
| Adjusted EBITDA (non-GAAP) | $ | 459,705 |

|  |  | June 30, 2025 |
|---|---|---:|
| Long-term debt | $ | 558,283 |
| Less: Cash and cash equivalents |  | (199,601) |
| Net debt (non-GAAP) | $ | 358,682 |
|  |  |  |
| Net leverage (non-GAAP) |  | 0.8 x |

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): June 10, 2025**

# ADTALEM GLOBAL EDUCATION INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-13988** | **36-3150143** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **233 South Wacker Drive** | |
|---|---|
| **Chicago, IL** | **60606** |
| (Address of principal executive offices) | (Zip Code) |

**(312) (651-1400)**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock $0.01 Par Value | ATGE | New York Stock Exchange |
| Common Stock $0.01 Par Value | ATGE | NYSE Texas |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 7.01        Regulation FD Disclosure**

On June 10, 2025, Stephen W. Beard, Chairman and Chief Executive Officer of Adtalem Global Education Inc. (the "Company"), entered into a written trading plan (the "10b5-1 Plan"), in accordance with Rule 10b5-1 under the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, and the Company's insider trading policy, to sell up to 108,000 shares of the Company's common stock, par value $0.01 per share (the "Common Stock").  Under the 10b5-1 Plan, the shares will be sold in one or more transactions, if the market price of the Common Stock reaches or exceeds certain minimum price thresholds specified in the 10b5-1 Plan.  The price thresholds are at a premium to the current share trading price as of the date of this filing.  Trades under the 10b5-1 Plan are subject to the required "cooling-off period," with the estimated first sale date under Mr. Beard's 10b5-1 Plan to occur not before September 12, 2025.  Mr. Beard has exceeded the level of Common Stock ownership required under the Company's stock ownership guidelines applicable to executive officers, and the sale by Mr. Beard of the shares of the Company's Common Stock covered by the 10b5-1 Plan would not impact his compliance with such guidelines.  The 10b5-1 Plan is scheduled to terminate on May 29, 2026.  The transactions executed in accordance with the 10b5-1 Plan will be disclosed publicly through one or more Form 144 and Form 4 filings with the Securities and Exchange Commission to the extent required by law.

The information furnished pursuant to this Item 7.01 shall not be deemed "filed" for purposes of Section 18 of the Exchange Act or otherwise subject to the liabilities under that Section and shall not be deemed to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ADTALEM GLOBAL EDUCATION INC.**

By: /s/ Robert J. Phelan
    Robert J. Phelan
    Senior Vice President and Chief Financial Officer
    (Principal Financial Officer)

Date: July 21, 2025